**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| CITY OF CHICAGO, | ) | |
| *ex rel.* AARON ROSENBERG, | ) | |
| | ) | |
| Plaintiff, | ) | 15-cv-08271 |
| | ) | |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| REDFLEX TRAFFIC SYSTEMS, INC., | ) | |
| a Delaware corporation, and REDFLEX | ) | |
| HOLDINGS LIMITED, an Australian company, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

The City of Chicago ("City") files this First Amended Complaint under the False Claims Ordinance, §1-22-010, *et seq.* of the Municipal Code of Chicago ("MCC"), the False Statements Ordinance, §1-21-010, *et seq.* of the MCC, and the Consumer Fraud, Unfair Competition or Deceptive Practices Ordinance, § 2-25-090 of the MCC, as well as claims for breach of contract, civil conspiracy, unjust enrichment, and payment of kickbacks in connection with City contracts in violation of 720 ILCS 5/33E-7, against Redflex Traffic Systems, Inc. ("RTSI") and Redflex Holdings Limited ("RHL") (collectively, "Redflex" or "Defendants"), seeking relief against Redflex on behalf of the City for false claims and false statements submitted to the City, and for deceptive business practices committed while conducting business in the City, and in support states as follows:

**NATURE OF CASE**

1. From 2003 through 2013, RTSI entered into three contracts with the City, Contract P.O. Number 3220 ("P.O. 3220"), Contract P.O. Number 16396 ("P.O. 16396"), and Contract P.O. Number 18031 ("P.O. 18031"), as amended from time to time (collectively, the

"City Contracts"), in connection with the City's Digital Automated Red Light Enforcement Program ("DARLEP").

2.     The City expressly requires, as a condition of entering into public contracts, that those contracting with it affirmatively state, among other things, that they have not bribed or attempted to bribe any employee of the City, and that they will comply with the City's Government Ethics Ordinance, Chapter 2-156 of the MCC ("Ethics Ordinance").

3.     In connection with each of the City Contracts, the Defendants filed numerous statements, under penalty of perjury, certifying, among other things, that they were not engaged in bribery of any City employees, and that they would comply with the Ethics Ordinance.

4.     These statements were false.

5.     The Defendants knew these statements were false.

6.     The Defendants made these false statements to be paid by the City on fraudulent claims.

7.     The Defendants engaged in systematic bribery of John Bills, the former Deputy Commissioner of the City's Department of Transportation ("CDOT"), from 2003 through 2012 in connection with the City's DARLEP.

8.     The City Contracts were the Defendants' most lucrative contracts.

9.     Defendant RTSI committed the bribery and other violations alleged herein through, among others, its successive Chief Executive Officers, Bruce Higgins and Karen Finley.

10.     Defendant RHL committed the bribery and other violations alleged herein through, among others, its Directors Bruce Higgins and Karen Finley.

11.     RHL also committed the bribery and other violations alleged herein as the alter ego of RTSI, given RHL's control over the management and finances of RTSI.

12.     The City's False Claims Ordinance, § 1-22-010, *et seq.* of the MCC ("FCO"), prohibits anyone from presenting or causing to be presented a false or fraudulent claim for payment or approval by the City.

13.     The City's False Statements Ordinance, § 1-21-010, *et seq.* of the MCC ("FSO"), prohibits the making of false statements of material fact in connection with a City contract.

14.     The City's Consumer Fraud, Unfair Competition or Deceptive Practices Ordinance, § 2-25-090 of the MCC ("CFUCDPO"), makes it unlawful for any business to engage in any act of consumer fraud, unfair competition, or deceptive practice while conducting any trade or business in the City.

15.     The Defendants violated the FCO, FSO, and CFUCDPO by engaging in systematic bribery of Bills, and by filing false claims and false statements for the purpose of being paid on fraudulent claims, in relation to RTSI's City Contracts.

16.     The FCO also authorizes a private person to sue on behalf of the City against any person who has violated the FCO.

17.     Relator, Aaron Rosenberg ("Rosenberg"), was intimately involved in and has extensive knowledge of Redflex's systematic bribery of Bills.

18.     Rosenberg, having direct, independent knowledge of the information on which the following allegations are based, brought suit on behalf of the City against Redflex for violations of the FCO.

19.     On August 26, 2015, the City intervened in Rosenberg's *qui tam* suit, and now files this First Amended Complaint ("Complaint").

**JURISDICTION AND VENUE**

20.     Jurisdiction is proper under 28 U.S.C. § 1332(a), because this is a civil action

between citizens of different States and a foreign company, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

21.     Venue is proper pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claim, occurred in this district.

**JURY DEMAND**

22.     The City demands a jury trial pursuant to Federal Rule of Civil Procedure 38.

**PARTIES**

23.     The City is a resident of Illinois because it is a municipal corporation and home rule unit of local government existing under the Constitution of the State of Illinois.

24.     Relator Rosenberg is a resident of California and former employee of RTSI, who represented RTSI in negotiations and other business dealings with the City of Chicago from 2002 through 2012.

25.     RTSI is a citizen of Delaware and Arizona because it is organized under the laws of Delaware and has its primary place of business in Arizona.  During the relevant period, RTSI was doing business in the City of Chicago, County of Cook, State of Illinois.

26.     RHL is a foreign citizen because it is an Australian public company.  During the relevant period, RHL was doing business in the City of Chicago, County of Cook, State of Illinois.

27.     RHL was the "alter ego" or business conduit of RTSI.

28.     For example, RHL and RTSI utilized joint management, including but not limited to, members of RHL's Board of Directors, Bruce Higgins and Karen Finley, serving simultaneously in the position of President and CEO of RTSI.

29.     Senior officials of RTSI would at times participate in RHL's annual shareholder

4

meetings, investor meetings and road shows, and meetings with financial institutions for fund raising, and would at times host and entertain RHL's largest investors.

30.     Senior officials of RHL would at times participate in meetings with RTSI clients. For example, RHL Chairman of the Board, Chris Cooper, met with and entertained government officials in the U.S., including John Bills of the City.

31.     RHL exercised control over RTSI's key business decisions, including but not limited to:

   a.  RHL Board members had meetings with clients on site at U.S. offices and were involved in entertaining U.S. clients (e.g., sporting events, golf and meals); and

   b.  RHL Board members were involved in developing U.S. sales budgets, reviewed each and every market release regarding new U.S. contracts, and developed product and technology road maps and strategic plans for the U.S. business.

32.     RHL exercised control over and comingled RTSI's finances by, among other things:

   a.  causing the majority of profits and funds of RTSI to be sent to RHL; and

   b.  causing RTSI to be undercapitalized such that RTSI would be unable to satisfy liabilities;

   c.  utilizing fully consolidated financial reporting that incorporated RTSI financials into RHL's reporting;

   d.  using RTSI contracts as collateral for obtaining RHL financing

33.     RHL also provided RTSI with research and development, as well as the hardware and software used by RTSI.

## FACTUAL BACKGROUND

34.     Redflex is in the business of producing and implementing traffic safety systems for municipal, county, and state entities in the United States and elsewhere.

35.     Rosenberg was hired by RTSI in March 2002 as Vice President of Sales and Marketing for North America.

36.     Prior to hiring Rosenberg, RTSI hired Bruce Higgins as its Chief Executive Officer ("CEO").

37.     Prior to hiring Rosenberg, RTSI promoted Karen Finley to its Vice President of Operations.

38.     RTSI produces and maintains DARLEP systems that it sells to municipal entities, such as the City.

39.     At the time it hired Rosenberg, RTSI held a Number 4 U.S.-market position with only eleven contracts in the entire United States.

40.     The Chairman of the Board of RHL, Christopher Cooper, as well as Higgins and Finley, instructed Rosenberg to improve RTSI's market position to Number 1 through the execution of new contracts and with a major U.S. city, such as the City, as an anchor client and marquee reference.

41.     Rosenberg had many meetings in the United States with members of RHL's board of directors in which they discussed:

     a.  developing U.S. sales plans;

     b.  developing U.S. sales budgets;

     c.  reviewing each and every market release regarding new US contracts; and

     d.  developing the product and technology road maps and strategic plans for the U.S. business.  Rosenberg also joined RHL's directors in meetings with clients on site at U.S. municipal offices, as well as provided U.S. clients with entertainment (i.e. sporting events, golf and meals.)

**A.  John Bills' Assistance in Negotiation of City Contract**

    **1.  Unlawful Pre-Bid Assistance**

42.     Rosenberg learned that the City was planning on issuing a Request for Proposal ("RFP") for DARLEP systems.

43.     In order to procure a contract with the City to sell Redflex's DARLEP systems, Rosenberg began preliminary discussions with CDOT's Deputy Commissioner John Bills, the chairman of the RFP Evaluation Committee for the City's DARLEP.  Bills managed the City's DARLEP from its inception until he retired in 2011.

44.     An RFP is a solicitation, through a bidding process, by an entity, such as the City, interested in procurement of a commodity, service, or valuable asset, to potential suppliers to submit business proposals to the entity.

45.     Bills asked Rosenberg to provide assistance in developing the scope of services for the City's RFP.

46.     Rosenberg, Higgins, and Finley met face-to-face with Bills to ensure that the scope of the RFP was advantageous to RTSI.

47.     These discussions also concentrated on the types of financial arrangements (*e.g.*, contract terms) that would be most advantageous for RTSI given its limited financial means.

48.     It was improper and a violation of, among other things, his duty to maintain the confidentiality of the RFP and the Ethics Ordinance, for Bills to solicit assistance and input from Redflex in drafting the RFP.

49.     It was improper and a violation of, among other things, the Ethics Ordinance, for Redflex to provide, assistance and input in drafting the RFP.

50.     Bills was not authorized by the City to solicit assistance and input from Redflex in drafting the RFP.

51.     During the winter of 2002/2003, the City held a pre-bid meeting for interested

vendors to discuss the up-coming RFP for DARLEP systems.

52.     Due to a medical condition, attending this meeting was difficult for Rosenberg.

53.     However, Bills told Rosenberg to attend.

54.     Additionally, Bills informed Rosenberg that it was important for Rosenberg to further strengthen his relationship with Bills' boss, Donald Grabowski, before the RFP responses were submitted by vendors.

55.     Bills informed Rosenberg that RTSI's main competitor, Affiliated Computer Systems, Inc. ("ACS"), had deep ties and existing contracts with the City, and that in order for RTSI to be selected, RTSI had to distinguish itself from ACS.

56.     It was improper and a violation of, among other things, the Ethics Ordinance, for Bills to give this information to Rosenberg.

57.     Bills was not authorized by the City to give Rosenberg this information.

58.     Bills gave this information to Rosenberg to gain favor with RTSI and to be in a position to later ask RTSI to compensate him after it had procured a contract with the City.

59.     Rosenberg attended the pre-bid meeting with City officials in Winter 2002/2003.

60.     Rosenberg attended the pre-bid meeting at the direction of Bills and Higgins for the purpose of RTSI gaining an illegal advantage in the RFP process.

61.     After the RFP was issued, RTSI submitted a proposal to the City.

62.     In its submission to the RFP, RTSI included an Economic Disclosure Statement and Affidavit ("EDS") wherein RTSI stated, among other things, that it was in compliance with the Ethics Ordinance.

63.     This statement was false.

64.     RTSI knew that it was false.

65.     RTSI made this false statement for the purpose of procuring the contract for the City's DARLEP.

## 2.     Unlawful Assistance with Field Tests

66.     After the deadline for submissions, the City conducted field tests for various vendors, including RTSI.

67.     The field test consisted of a 30-day live system trial.

68.     Such a field test involved considerable costs for RTSI.

69.     At the direction of Higgins, Rosenberg informed Bills that RTSI was concerned about the considerable costs of the field tests, especially if its bid were to fail.

70.     Bills assured Rosenberg that he wanted to help RTSI.

71.     However, Bills told Rosenberg that RTSI needed to "step-up its game" because ACS was making a strong push to get the City's business.

72.     Bills related that ACS had a good relationship with people at the City and had gone so far as to set up an office in Chicago.

73.     Bills also said that ACS's representative had offered to pay Bills, possibly $100,000, if Bills helped ACS.

74.     Bills gave the information regarding ACS and instructed RTSI to "step-up its game" in order to let RTSI know that his assistance was necessary to get the City contract.

75.     Bills also gave the information regarding ACS and instructed RTSI to "step-up its game" so that he would to be in a position to ask to RTSI to compensate him after it had procured a contract with the City.

76.     Bills was not authorized by the City, and it was improper and in violation of the Ethics Ordinance for Bills, to give the information regarding ACS and to instruct RTSI to "step

up its game" in order for RTSI to procure the City contract because, among other things, he was the chairman of the RFP Evaluation Committee.

### 3. Unlawful Assistance with Evaluation Process

77.     In 2003, upon completion of the field tests, the City initiated an evaluation procedure for the bids and the results of the field tests.

78.     The evaluation process included a formal meeting with the City officials who were members of the Evaluation Committee to discuss the results of the field tests.

79.     On or about May 12th, 2003, Higgins, Finley, and Rosenberg joined Bills at a hotel in Chicago to discuss the evaluation process and to develop evaluation standards that would be advantageous to RTSI.

80.     Higgins and Finley pledged to Bills that Rosenberg would be supporting Bills in his continued efforts to steer this contract award to RTSI.

81.     In the days leading up to the final Evaluation Committee meeting, Rosenberg was in Chicago working with Bills in preparing RTSI's presentation.

82.     On the night before the final Evaluation Committee meeting, Bills met with Rosenberg.

83.     Bills invited Rosenberg to the CDOT offices after hours.

84.     At this meeting, Bills reviewed field test data of RTSI and its competitor, ACS, with Rosenberg.

85.     In particular, Bills and Rosenberg reviewed photos taken by each company during the pilot phase, and each company had instances where the equipment produced good quality photographs and instances where the equipment did not produce good photos.

86.     Bills said he would use good photos for RTSI and poor ones for ACS during the

Evaluation Committee meeting, and would do so in a way that made them seem randomly selected.

87. Bills also informed Rosenberg that he was not sure of all of the votes on the Committee, but that he would make name cards and place the "unknown votes" at the end of the voting order.

88. This effort would make it difficult to vote against RTSI, as the majority of the Committee would have already selected RTSI.

89. Bills insisted he wanted to achieve a unanimous vote from the Evaluation Committee in favor of RTSI.

90. At different points in time, Rosenberg informed Cooper, Finley, and other RHL's directors, including Robert DeVincenzi, of the pre-Evaluation Committee meeting and Bills' assistance.

91. Cooper, Finley and the other RHL's directors praised Rosenberg's acts as exemplary sales acumen.

92. On or about May 27, 2003, Bills delivered the unanimous selection of RTSI by the Evaluation Committee.

93. On May 30th, Bills provided notification to Higgins, Finley, and Rosenberg of the official contract award to RTSI.

94. The after-hours pre-Evaluation Committee meeting and the tender of information by Bills to Rosenberg were improper and in violation of, among other things, the Ethics Ordinance.

95. Bills was not authorized by the City to give this information to Redflex.

96. Bills gave this information to Rosenberg for the purpose of gaining favor with

RTSI and with the intention to be compensated by RTSI after it had procured a contract with the City.

97.    In approximately June 2003, the City accepted RTSI's proposal and initiated negotiations for a formal contract with RTSI.

**B.    Purchase v. Lease of Cameras**

98.    During initial contract negotiations, Bills asked Rosenberg for guidance on whether the City should lease or buy the cameras used for the DARLEP.

99.    Rosenberg consulted with Higgins on whether the City should lease or buy the cameras used for the DARLEP.

100.    Although leasing the cameras was a lower cost option for the City, both in terms of initial expenditure and long term maintenance and repair costs, Higgins directed Rosenberg to convince Bills to have the City purchase the cameras.

101.    The City's purchase of the cameras would help RTSI with cash-capitalization issues.  Each camera system was very expensive and required significant up-front cash outlay for both the hardware (cameras, flashes, housings, wiring, etc.) and the physical construction (boring, conduit, paving, foundations, etc.).

102.    Usually, Redflex would charge a client to lease the turnkey program (Redflex incurred all hard costs) and the client would generally pay either a percentage of the ticket money collected or a fixed monthly fee per month, and it would take years for Redflex to pay for the system and eventually turn a profit.  By convincing the City to purchase the cameras, Redflex shifted the financial burden of paying for, and maintaining, those systems to the City.

103.    Redflex further knew that persuading the City to purchase the cameras was a bad financial decision for the City, because it was more expensive for the City and the City, not

Redflex, would have a depreciating and antiquated asset on its books as the technology continued to advance.

104. Additionally, Redflex knew that only it could reasonably maintain its proprietary systems, so it would be much more difficult for the City to later change vendors from RTSI since the City would already own RTSI cameras.

## C. Entertainment of City Officials

105. During these negotiations and throughout the contractual relationship, Bills entertained Redflex officials including Christopher Cooper, RHL's Chairman of the Board and other Redflex executives, including Finley, and Higgins.

106. Bills' entertainment of these officials included, but was not limited to, escorting them to Chicago White Sox baseball games, where he provided front row seats, personal messages on the Jumbo-Tron, food, beer, and other beverages.

107. During the RFP process, Bills flew to Phoenix, Arizona to meet with various members of the Redflex team, including Finley and Rosenberg.

108. RTSI paid the cost of this trip and also provided Bills with rounds of golf and other entertainment.

109. Bills was not authorized by the City to entertain, or be entertained by, Redflex.

110. It was improper and a violation of the Ethics Ordinance for Bills to entertain the Redflex officials, and for Redflex to entertain Bills.

## D. Payoff to John Bills

### 1. Network Electric, Inc.

111. In most projects, RTSI would seek guidance from the local municipality regarding the hiring of sub-contractors.

13

112. In June 2003, after the initial contract, P.O. 3220, had been executed, Bills traveled to California with Jimmy Johnson, the owner of Network Electric, Inc., to meet with Redflex officials, including Rosenberg and CEO Higgins.

113. One of the purposes of this meeting was to discuss the hiring of sub-contractors.

114. Bills informed RTSI that it must include Network Electric, Inc. as a subcontractor.

115. RTSI later learned that Bills had a relationship with Johnson.

116. Higgins and Finley, who were directly in-charge of Redflex's subcontractors, agreed to hire Network Electric, Inc. in order to accommodate Bills and influence his performance as Deputy Commissioner of CDOT.

117. At a meeting in Los Angeles to celebrate the award of the Chicago contract to RTSI, Bills told Rosenberg words to the effect that "it's time to make good."

118. Bills indicated the amount he wanted, in the range of $100,000 to $200,000, writing notes on a napkin as he spoke.

119. Bills suggested that RTSI could make payments to him either by overpaying Johnson, who would get the money to Bills, or by hiring someone close to Bills in a customer liaison position.

120. Rosenberg told Bills that he would speak with RTSI's CEO Bruce Higgins and that Higgins would determine the appropriate course of action.

**2.    Martin O'Malley**

121. In 2002, John Bills met and became friends with Martin O'Malley.

122. In about March 2003, Bills told O'Malley words to the effect of, "I got something coming up," referring to a possible job opportunity, as Bills was aware that O'Malley was

struggling financially.

123. Bills said the job would be a part-time position with a photo-enforcement company, and it would pay about $30,000 a year.

124. A month or two later, Bills told O'Malley to look in the Chicago Tribune on a specific day for a job posting for RTSI, and apply for the job.

125. Bills said the posting would not specify that RTSI was the company seeking job candidates, but O'Malley could identify the posting because it would contain a telephone or fax number with an Arizona area code.

126. O'Malley found the posting, sent in his resume and told Bills he had sent in his resume.

127. In return for Bills' assistance to RTSI, and in an effort to ensure that Bills would continue to provide such assistance, Finley agreed with Higgins that RTSI would hire O'Malley as an independent contractor.

128. In July 2003, O'Malley received a telephone call from Higgins, who asked O'Malley to come to Arizona for an interview.

129. Later in July 2003, O'Malley traveled to Phoenix and was interviewed in the RTSI offices by Higgins and Finley.

130. Higgins and Finley told O'Malley they were looking to hire a contract employee as the Chicago Customer Service Representative at $30,000 to $35,000 a year.

131. O'Malley requested $60,000 to $65,000 a year, to which Higgins and Finley agreed.

132. Finley understood that RTSI would, in fact, hire O'Malley in exchange for Bills' help in getting RTSI the City Contract and in order to ensure Bills' assistance to RTSI in the

15

future.

133.    After the interview, O'Malley called Bills and told him the interview went well.

134.    After the interview and before an official offer was made, O'Malley asked Bills, rather than anyone from RTSI, about the status of RTSI hiring O'Malley.

135.    Bills told O'Malley that RTSI and the City needed to finalize their Contract, and that Bills would call RTSI to inquire about O'Malley's employment status.

136.    During the period before O'Malley signed a contract with RTSI, Bills told O'Malley words to the effect of, "We are working on the contract."

137.    Bills said he was trying to add a signing bonus and commissions into the contract, which O'Malley had not discussed with Higgins or Finley.

138.    During these conversations with Bills, O'Malley came to understand that parts of O'Malley's compensation from Redflex would not be legitimate.

139.    Specifically, Bills told O'Malley that he and O'Malley would share any commissions O'Malley received, and he said words to the effect of, "this is the way business is done."

140.    O'Malley knew that Bills would be getting money from Redflex commissions in exchange for Bills' helping RTSI get contracts with the City.

141.    Finley understood that O'Malley was a friend of Bills and that it was important to Bills that RTSI hire O'Malley.

142.    Finley and Higgins finalized O'Malley's contract with RTSI, which included provisions for lucrative increases in O'Malley's compensation as new red light cameras were added.

143.    The addition of such provisions were out of the ordinary, as the customer liaison

position for which O'Malley was hired normally did not include such commissions and O'Malley was not going to be selling cameras to the City.

 144. Redflex, under the direction of Higgins and Finley, and Bills agreed that:

  a. Redflex would hire Martin O'Malley, a friend of Bills, to do project management work;

  b. O'Malley would then pay Bills from funds he received from RTSI; and

  c. Bills would use his influence to assist RTSI in procuring additional contracts to sell its systems to the City and contracts to maintain those systems.

 145. In exchange, Bills agreed:

  a. to provide RTSI guidance in expanding its program with the City;

  b. to push through this program expansion; and

  c. to work with RTSI to sell other solutions to the City, such as speed enforcement.

 146. In August 2003, Finley and Higgins negotiated RTSI's consulting contract with O'Malley.

 147. In December 2003, Finley, at Higgins' direction and on behalf of RTSI, signed O'Malley's consulting agreement, effective November 3, 2003 ("O'Malley Consulting Agreement").

 148. O'Malley was to report directly to Karen Finley.

 149. Redflex paid O'Malley a salary and bonus, plus a one-time payment that ranged from $1,500-$2,000 for each new system the City bought from RTSI, plus a commission that ranged from 3%-5% of revenue for scope changes that achieved additional revenue for RTSI.

 150. O'Malley discussed the final contract with Bills before signing it.

 151. By the time O'Malley signed the contract, or sometime shortly thereafter, O'Malley understood, from what Bills said, that O'Malley would keep the $60,000 in annual

fees and that Bills would get the commissions, but that Bills would reward O'Malley somewhere down the line.

152. At some point, Bills and O'Malley agreed that O'Malley would have to pay the taxes on the commissions since O'Malley was on record as earning them.

153. Months after the O'Malley Consulting Agreement was signed, Bills told O'Malley that he would split the commissions half and half; however, in reality Bills received most of the after-tax commissions.

154. From 2003 to 2011, pursuant to the O'Malley Consulting Agreement, O'Malley was paid over $2 million.

155. From late 2003 through 2006, RTSI paid O'Malley approximately $175,000 in salary payments, $35,000 in reimbursed expenses, and $85,000 in bonuses and commissions.

156. Between 2007 and 2011, RTSI paid O'Malley approximately $290,000 in salary payments, $12,000 in reimbursed expenses, and the following in bonuses and commissions: $87,400 (2007), $342,026 (2008), $515,046 (2009), $193,205 (2010), and $289,757 (2011.)

157. O'Malley invoiced RTSI for his commissions.

158. Bills instructed O'Malley as to when O'Malley should send RTSI an invoice, and Bills gave O'Malley paperwork showing how many camera installations had occurred over a certain time period, how to calculate the commission, and what the total commission should be.

159. For each payment, O'Malley prepared an invoice and sent it to RTSI.

160. Bills then followed up with O'Malley to find out when O'Malley received the commission.

161. Redflex mailed the commission checks to a U.S. Post Office box that O'Malley set up.

162.    When O'Malley received a commission check, Bills and O'Malley met so that O'Malley could provide Bills with his share of the commission.

163.    Bills and O'Malley often met for lunch at Chicago restaurants during normal work hours, and Bills arrived at the meetings in his City vehicle.

164.    Before O'Malley met with Bills, O'Malley withdrew cash, and then gave the cash to Bills during the meeting.

165.    Bills sometimes specified to O'Malley how much cash he wanted by speaking in code.

166.    For example, on or about June 6, 2011, Bills sent an e-mail to O'Malley in which he wrote, ". . . how about lunch at Shaller's tomorrow.  8 page speed overview can be discussed at lunch if your schedule permits."

167.    O'Malley understood Bills' reference to "8" to mean that Bills expected O'Malley to provide him $8,000 in cash.

168.    In addition to the cash O'Malley gave Bills, O'Malley also wrote checks to people at Bills' request.

169.    Bills sometimes asked O'Malley to write a check to a particular person for a particular amount.

170.    For example, on or about June 25, 2008, and March 25, 2010, at Bills' direction, O'Malley wrote checks payable to someone to whom Bills owed money.

171.    In addition, Bills asked O'Malley to write checks to a political organization and to write a check and provide cash to pay for a portion of Bills' retirement party.

172.    O'Malley also bought Bills meals, golf, and other personal expenses.

173.    O'Malley then included the costs on his expense reports that RTSI reimbursed.

19

174.    O'Malley did this because O'Malley understood, from Finley, Rosenberg and Higgins, that his job was to keep Bills and the City happy so that RTSI could maintain and expand its business with the City.

175.    In 2008, Bills and O'Malley agreed that O'Malley would use approximately $76,000 from the commissions he had received from RTSI to buy a condo in Arizona in O'Malley's name, but for their joint use.

176.    Bills found the condo, and O'Malley gave Bills a check for the earnest money payment.   O'Malley paid all the expenses associated with the condo, including the down payment, mortgage, interest, assessments, taxes, utilities, insurance, and cable, from RTSI commission payments and without any financial assistance from Bills.

177.    O'Malley visited the condo only three times, while Bills used the condo whenever he wanted to.

178.    In 2007, Finley became the CEO of RTSI.

179.    At that time, O'Malley's commission payments escalated.

180.    Finley avoided discussions regarding revisiting or renegotiating O'Malley's commissions in order to keep Bills happy and to ensure that Bills would assist RTSI in the awarding of new red light camera contracts.

181.    At that time, Bills was assisting RTSI by working to have the new contracts awarded to RTSI pursuant to the non-competitive review ("sole-source") process.

182.    One of the contracts was, in fact, sole-sourced to RTSI.

183.    Although the second contract was not sole-sourced, Bills, through O'Malley, gave Rosenberg and Finley the opportunity to draft documents that Bills could use to give Redflex an advantage in winning that contract.

20

184.     Bills was not authorized by the City to provide this assistance to Redflex.

185.     It was improper and a violation of his duty to maintain the confidentiality of the RFP and the Ethics Ordinance for Bills to give Rosenberg and Finley the opportunity to draft documents.

186.     Despite Finley's knowledge of and participation in the foregoing, Finley falsely certified on EDSs in both August 2007, and September 2008, in connection with the application process for contract P.O. 16396 and as part of the contract process for contract P.O. 18031, respectively, that no agents of RTSI, during the prior five years, had bribed or attempted to bribe an employee of the City of Chicago.

187.     RHL also repeatedly falsely certified on EDSs that no agents of RHL, during the prior five years, had bribed or attempted to bribe an employee of the City.

188.     RTSI agreed to hire O'Malley to influence the performance of Bills' as Deputy Commissioner of the City's DOT.

189.     During the time Bills was receiving funds from O'Malley and in exchange for receiving these funds, Bills protected Redflex from any liability for performance issues under its contract with the City.

190.     Bills was not authorized by the City to provide this protection to Redflex.

191.     Pursuant to the Illinois Criminal Code, a person commits bribery when, "[w]ith intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he or she promises or tenders to that person any property or personal advantage which he or she is not authorized by law to accept."  720 ILCS 33-1(a).

192.     The hiring of Network Electric, Inc., Johnson and O'Malley constituted bribery of

Bills, because RTSI hired them at Bills' request and for Bills' personal advantage, and with the intent to influence Bills' performance as an employee of CDOT.

193.    The hiring of Network Electric, Inc., Johnson and O'Malley violated the Ethics Ordinance.

**E.      Expansion of Original Contract**

194.    The initial contract with RTSI, P.O. 3220, was comprised of 20 systems.

195.    Each system provided cameras for red-light violations in one direction, *i.e.,* a typical Chicago intersection would require two systems to enforce the red-light violations coming from two of four possible directions.

196.    Therefore, P.O. 3220 covered only 10 intersections and 20 systems.

197.    It was contemplated by the City and RTSI that if these 20 systems succeeded, the City would implement 100s of systems throughout the City, which RTSI would continue to sell and maintain.

198.    P.O. 3220 also included provisions for RTSI to maintain the systems for the City.

199.    For the initial 20 systems, the City paid RTSI a one-time fee of $85,000 per each system.

200.    RTSI was also paid by the City $3,250 per each system per each month for program support and maintenance.

201.    In 2006, the scope of the program changed and the RTSI contract was amended so that RTSI would receive a one-time fee of $100,000 per system and $5,000 per month per system for maintenance.

202.    In 2008, RTSI was awarded a sole source agreement, P.O. 18031, with the City to maintain the 136 operational systems for a fee of $1,645 per month per system, and for monthly

support costs of $2,750 per system, for a total cost of $4,395 per month per system.

203.     This contract term was for five years plus, two one-year extensions.

204.     Using O'Malley as a conduit, Bills provided Finley and Rosenberg with a draft specification for the City's upcoming RFP for program expansion.

205.     Bills sought specifications and/or requirements that would be highly advantageous to RTSI.

206.     Finley and Rosenberg reviewed the draft RFP, provided feedback to Bills, and the final RFP specification was designed to be advantageous to RTSI.

207.     Bills also provided RTSI with RFP scoring tables that would demonstrate and justify a high scoring and ranking for RTSI when compared to the competition.

**F.      Payoff for Extension of Contract**

208.     In 2007, O'Malley's annual commissions were less than $100,000.  In 2008, his commissions had increased, and were in excess of $100,000 annually.

209.     In early 2008, RTSI was awarded a contract, P.O. 16396, for program expansion for an additional 248 new systems, which included a one-time fee of $24,500 per system and a monthly fee of $3,900 per system per month.

210.     This contract term was also for five years, plus two one-year extensions.

211.     For this and the other red light enforcement contracts between RTSI and the City , the City paid RTSI in excess of $100,000,000.

212.     As part of each of these contracts, RTSI certified it had not been engaged in bribery or attempted bribery of a public officer or employee of the City of Chicago.

213.     These statements were false as RTSI had been engaged in the bribery of Bills.

214.     As part of each of these contracts, both RTSI and RHL filed EDSs which certified

23

they had not been engaged in bribery or attempted bribery of a public officer or employee of the City.

215.    In the EDSs, RTSI and RHL also certified that they were in compliance with the Ethics Ordinance.

216.    The EDSs submitted by RTSI and RHL were false, as Defendants had been engaged in the bribery of Bills and were not in compliance with the Ethics Ordinance.

217.    Bills ensured that any of RTSI's performance issues were handled solely by him.

218.    Bills ensured that any performance issues did not trigger any liquidated damage provisions called for in RTSI's contract with the City.

219.    This agreement to pay Bills through O'Malley continued until 2011, when Bills retired from the City.

**G.    Bills' Personal Expenses**

220.    Finley knew that RTSI was paying certain personal expenses for Bills in order to influence Bills to assist RTSI in keeping and expanding RTSI's business with the City.

221.    Both Rosenberg and O'Malley paid for such benefits for Bills, including meals, golf outings, hotel stays, rental cars, and other such benefits, expensed the payments to RTSI, and received reimbursement from RTSI.

222.    On some occasions, it was Finley who approved the expense reports and authorized the reimbursements.

223.    For example, in December 2003, Finley approved reimbursement for airline tickets to Phoenix, plus car rental, meals, and golf that O'Malley purchased for himself, Bills, and a friend of Bills over a five-day period in Phoenix.

224.    Also, on various occasions during 2004, Finley approved reimbursement for

meals that O'Malley purchased for himself and Bills.

225.     Further, Finley approved reimbursements for expenses incurred by Rosenberg on behalf of Bills, including stays at the Biltmore Hotel, rental car expenses, and meals and entertainment.

## H.     Bills' Post-Employment Assistance

226.     When he retired from the City, Bills asked RTSI executives, including Finley and Andy Bunske (General Counsel), to secure him employment with Resolute Consulting, a public relations firm with which RTSI worked extensively.

227.     Resolute Consulting either hired Bills directly or through a RTSI-funded public outreach group called the Traffic Safety Coalition at RTSI's request.

228.     By this arrangement, RTSI was able to hire Bills indirectly and circumvent the City's prohibition on vendors hiring its former employees.

229.     The expectation was for RTSI to subsidize Bills' employment and receive continued support with the City.

230.     This support included securing additional contract extensions and new contracts for additional solutions.

231.     Once Resolute Consulting "hired" Bills, Finley and RTSI's Chief Financial Officer, Sean Nolen, informed Rosenberg that RTSI would no longer pay O'Malley his commissions because RTSI was not going to "double pay" Bills.

232.     Bills was prohibited by Section 2-156-100(b) of the Ethics Ordinance from assisting or representing any person, including RTSI, in any business transaction involving the City if he participated "personally and substantially" in the subject matter of that transaction during his City employment.  MCC § 2-156-100(b).  He was also permanently prohibited from

assisting or representing RTSI on RTSI's City Contracts because, during his City employment, he exercised contract management authority over RTSI's City Contracts. *Id.*

I.       **Defendants' Economic Disclosure Statements**

233.    From the initial contract in 2003 through 2013, RTSI entered into three City Contracts and numerous amendments to those contracts.

234.    The City requires disclosure of the information requested in the EDS before any City agency, department, or City Council action regarding the matter that is the subject of the EDS.

235.    Pursuant to Chapter 2-154 of the MCC, or, if applicable, Section 8.5 of the Illinois Municipal Purchasing Act, 65 ILCS 5/8-10-8.5, City contractors and entities holding certain ownership interest in such City contractors are required to submit an EDS before the City enters into and/or amends a contract.

236.    Applicants submitting an EDS are required to disclose, among other things, information about lobbyists, consultants, subcontractors, and any other person whom the applicant has retained or expects to retain in connection with the matter in connection with which the EDS is submitted.

237.    A "lobbyist" means any person (i) who, for compensation or on behalf of any person other than himself, undertakes to influence any legislative or administrative action, or (ii) any part of whose duty as an employee of another includes undertaking to influence any legislative or administrative action.

238.    Applicants submitting an EDS are required to certify, among other things, that neither they, nor any affiliated entity, have, during the five years before the date the EDS is signed, or during the five years before the date of the contract that is the subject of the EDS,

"bribed or attempted to bribe . . . a public office or employee of the City, the State of Illinois, or any agency of the federal government or of any state or local government in the United States of America, in that officer's or employee's official capacity."

239.    Applicants submitting an EDS also are required to certify, among other things, that they will comply with the applicable requirements of the Ethics Ordinance, § 2-156 of the MCC.

240.    Section 2-156-040(c) of the MCC, which was in effect during the relevant time period, provided in pertinent part, that:

> No person who has an economic interest in a specific City business, service or regulatory transaction shall give, directly or indirectly, to any City official or employee whose decision or action may substantially affect such transaction, or to the spouse, domestic partner, or minor child of such official or employee, or any immediate family member residing within the same residence with the official or employee, and none of them shall accept, any gift of (i) cash or its equivalent regardless of value, or (ii) an item or service other than a gift with a value of less than $50.00, as long as the items or services from any one source do not exceed a cumulative value of $100.00 during any calendar year.

241.    In accordance with Section 2-156-110 of the MCC, applicants submitting an EDS also are required to disclose, among other things, whether any official or employee of the City has a financial interest in his or her own name or in the name of any other person in the contract, work, business, or transaction.

242.    Applicants submitting an EDS are further required to certify, among other things, that no official or employee of the City shall have a financial interest in the contract, work, business, or transaction during the duration thereof.

243.    Applicants submitting an EDS are further required to explicitly acknowledge, that the City's Governmental Ethics and Campaign Financing Ordinances, Chapters 2-156 and 2-164 of the MCC, among other things:

  a.  Limit the gifts and favors any person can give, or offer to give, to any City

27

official, employee, contractors or candidate for elected City office; more specifically, persons who are seeking a City contract:

    i.    cannot give them any cash or anonymous gift;

    ii.    cannot give any gift based on a mutual understanding that the City official's or employee's actions or decisions will be affected in any way by the gift;

b.  Prohibit any City elected official or City employee from having a financial interest in any contract, work, transaction or business of the City, if that interest has a cost or present value of $5,000 or more, or if that interest entitles the owner to receive more than $2,500 per year.

c.  Provide that City employees and officials cannot receive compensation or anything of value in return for advice or assistance on matters concerning the operation or business of the City, unless those services are wholly unrelated to their City duties.

d.  Provide that former City employees and officials cannot assist or represent another on any matter involving the City if, while with the City, they were personally and substantially involved in the same matter.

e.  Provide that former City employees and officials cannot assist or represent another on a City contract if, while with the City, they help formulate or supervise that contract.

244.    Applicants submitting an EDS are required to confirm that the certification, disclosure and acknowledgements contained in the EDS become part of any contract awarded by the City, and are material inducements to the City's execution of any contract or taking any other action with respect to the subject of the EDS.

245.    Defendants were required to submit an EDS in connection with each City Contract, and each amendment to a City Contract.

**1.    P.O. 3220**

246.    In connection with the submission of its proposal for P.O. 3220, RTSI submitted an EDS dated January 20, 2003, a true and correct copy of which is attached hereto as **Exhibit 1** and incorporated herein, which was signed by the relator, Aaron Rosenberg, as Vice President of

RTSI.

247.    In connection with the submission of its proposal for P.O. 3220, RTSI also submitted a Disclosure Affidavit for Contracts and Concession Agreements Not Involving Federal Funds (hereafter included in the definition of "EDS") dated January 20, 2003, a true and correct copy of which is attached hereto as **Exhibit 2** and incorporated herein, which was signed by the relator, Aaron Rosenberg, as Vice President of RTSI.

248.    In connection with P.O. 3220, a true and correct copy of which is attached hereto as **Exhibit 3** and incorporated herein, RTSI submitted an EDS dated August 22, 2003, a true and correct copy of which is attached hereto as **Exhibit 4** and incorporated herein, which was signed by Bruce Higgins, as President & CEO of RTSI.

249.    In connection with P.O. 3220, RHL submitted an EDS dated September 4, 2003, a true and correct copy of which is attached hereto as **Exhibit 5** and incorporated herein, which was signed by Graham William Davie, as CEO of RHL.

250.    In connection with Amendment 1 to P.O. 3220, a true and correct copy of which is attached hereto as **Exhibit 6** and incorporated herein, RTSI submitted an EDS dated February 3, 2004, a true and correct copy of which is attached hereto as **Exhibit 7** and incorporated herein, which was signed by Bruce Higgins, as President and CEO of RTSI.

251.    In connection with Amendment 1 to P.O. 3220, RHL submitted an EDS dated February 3, 2004, a true and correct copy of which is attached hereto as **Exhibit 8** and incorporated herein, which was signed by Bruce Higgins, as Director of RHL.

252.    In connection with Amendment 2 to P.O. 3220, a true and correct copy of which is attached hereto as **Exhibit 9** and incorporated herein, RTSI submitted an EDS dated September 14, 2005, a true and correct copy of which is attached hereto as **Exhibit 10** and

incorporated herein, which was signed by Bruce Higgins, as President and CEO of RTSI.

253.     In connection with Amendment 2 to P.O. 3220, RHL submitted an EDS dated September 14, 2005, a true and correct copy of which is attached hereto as **Exhibit 11** and incorporated herein, which was signed by Bruce Higgins, as Director of RHL.

254.     In connection with Amendment 3 to P.O. 3220, a true and correct copy of which is attached hereto as **Exhibit 12** and incorporated herein, RTSI submitted an EDS dated October 23, 2006, a true and correct copy of which is attached hereto as **Exhibit 13** and incorporated herein, which was signed by Richard Eden, as Secretary of RTSI.

255.     In connection with Amendment 3 to P.O. 3220, RHL submitted an EDS dated October 24, 2006, a true and correct copy of which is attached hereto as **Exhibit 14** and incorporated herein, which was signed by Graham Davie, as CEO of RHL.

**2.     P.O. 16393**

256.     In connection with P.O. 16396, a true and correct copy of which is attached hereto as **Exhibit 15** and incorporated herein, RTSI submitted an EDS dated August 17, 2007, a true and correct copy of which is attached hereto as **Exhibit 16** and incorporated herein, which was signed by Karen Finley, as President & CEO of RTSI.

257.     In connection with P.O. 16396, RHL submitted an EDS dated August 14, 2007, a true and correct copy of which is attached hereto as **Exhibit 17** and incorporated herein, which was signed by Christopher Cooper, as Chairman of RHL.

258.     In connection with Amendment 1 to P.O. 16396, a true and correct copy of which is attached hereto as **Exhibit 18** and incorporated herein, RTSI submitted an EDS dated January 29, 2013, a true and correct copy of which is attached hereto as part of **Exhibit 19** and incorporated herein, which was electronically signed by Tamara Dietrich, Director of Legislative

Affairs for RTSI. This was the first time that RTSI disclosed the existence of the O'Malley Consulting Agreement.

259. In connection with Amendment 1 to P.O. 16396, RHL submitted an EDS dated January 30, 2013, a true and correct copy of which is attached hereto as part of **Exhibit 19** and incorporated herein, which was electronically signed by Tamara Dietrich, Director of Legislative Affairs for RHL.

260. In connection with Amendment 2 to P.O. 16396, a true and correct copy of which is attached hereto as **Exhibit 20** and incorporated herein, RTSI submitted an EDS dated July 31, 2013, a true and correct copy of which is attached hereto as **Exhibit 21** and incorporated herein, which was electronically signed by Tamara Dietrich, Director of Legislative Affairs for RTSI. A true and correct copy of Amendment 3 to P.O. 16396 is attached hereto as **Exhibit 22** and incorporated herein.

**3. P.O. 18031**

261. In connection with P.O. 18031, a true and correct copy of which is attached hereto as **Exhibit 23** and incorporated herein, RTSI submitted an EDS dated September 23, 2008, a true and correct copy of which is attached hereto as part of **Exhibit 24** and incorporated herein, which was signed by Karen Finley, as President and Chief Executive Officer of RTSI.

262. In connection with P.O. 18031, RHL submitted an EDS dated September 23, 2008, a true and correct copy of which is attached hereto as part of **Exhibit 24** and incorporated herein, which was signed by Karen Finley, as Director of RHL.

263. In connection with Amendment 1 to P.O. 18031, a true and correct copy of which is attached hereto as **Exhibit 25** and incorporated herein, RTSI submitted an EDS dated January 29, 2013, a true and correct copy of which is attached hereto as part of **Exhibit 26** and

incorporated herein, which was electronically signed by Tamara Dietrich, Director of Legislative Affairs for RTSI. This was the first time that RTSI disclosed the existence of the O'Malley Consulting Agreement.

264. In connection with Amendment 1 to P.O. 18031, RHL submitted an EDS dated January 29, 2013, a true and correct copy of which is attached hereto as part of **Exhibit 26** and incorporated herein, which was electronically signed by Tamara Dietrich, Director of Legislative Affairs for RHL.

265. In connection with Amendment 2 to P.O. 18031, a true and correct copy of which is attached hereto as **Exhibit 27** and incorporated herein, RTSI submitted an EDS dated July 31, 2013, a true and correct copy of which is attached hereto as **Exhibit 28** and incorporated herein, which was electronically signed by Tamara Dietrich, Director of Legislative Affairs for RTSI. A true and correct copy of Amendment 3 to P.O. 18031 is attached hereto as **Exhibit 29** and incorporated herein.

### 4. The False Statements and False Certifications

266. On the EDSs it submitted, RTSI falsely stated and/or certified, among other things, that:

    a. it had not bribed or attempted to bribe any employee of the City in each of the above-referenced EDSs;

    b. it was in compliance with the Ethics Ordinance, including but not limited to, Section 2-156-040 of the MCC, which prohibited offering or giving gifts, directly or indirectly, to any City official, employee or contractor whose decision may affect City business, in each of the above-referenced EDSs;

    c. no official or employee of the City had a financial interest in the City Contracts;

    d. it acknowledged and understood that the City's Governmental Ethics and Campaign Finance Ordinances, which, among other things, prohibits providing gifts, favors, cash, compensation, or anything of value, to City officials or employees unless wholly unrelated to their City duties, applied to

32

the City Contracts.

267.    On the EDSs it submitted, RHL falsely stated and/or certified, among other things, that:

       a.  it had not bribed or attempted to bribe any employee of the City in each of the above-referenced EDSs;

       b.  it was in compliance with the Ethics Ordinance, including but not limited to, Section 2-156-040 of the MCC, which prohibited offering or giving gifts, directly or indirectly, to any City official, employee or contractor whose decision may affect City business, in each of the above-referenced EDSs;

       c.  no official or employee of the City had a financial interest in the City Contracts;

       d.  it acknowledged and understood that the City's Ethics Ordinance and Campaign Finance Ordinances, which, among other things, prohibits providing gifts, favors, cash, compensation, or anything of value, to City officials or employees unless wholly unrelated to their City duties, applied to the City Contracts.

268.    RTSI repeatedly failed to disclose the existence of the O'Malley Consulting Agreement in its EDSs.

269.    RHL repeatedly failed to disclose the existence of the O'Malley Consulting Agreement in its EDSs.

270.    RTSI repeatedly failed to disclose Bills as a lobbyist even though RTSI provided Bills with compensation and benefits, through, among other things,  the O'Malley Consulting Agreement, in order to influence the award of the City Contracts to RTSI.

271.    RHL repeatedly failed to disclose Bills as a lobbyist even though RTSI provided Bills with compensation and benefits, through, among other things, the O'Malley Consulting Agreement, in order to influence the award of the City Contracts to RTSI.

272.    RTSI repeatedly failed to disclose in its EDSs that it had bribed elected public officials in the City of Columbus and Cincinnati in return for the elected public officials agreeing

to take, and actually taking, official acts on behalf of RTSI to obtain and retain municipal contracts.

273.     RHL repeatedly failed to disclose in its EDSs that RTSI had bribed elected public officials in the City of Columbus and Cincinnati in return for the elected public officials agreeing to take, and actually taking, official acts on behalf of RTSI to obtain and retain municipal contracts.

274.     The Defendants filed these false statements with the intent to induce the City to pay RTSI for its products and services.

275.     The City relied upon the Defendants' false statements and paid RTSI pursuant to the fraudulent contracts.

**J.     Federal Guilty Pleas**

276.     On December 10, 2014, Martin O'Malley entered a voluntary guilty plea to conspiracy, in violation of 18 U.S.C § 371, to commit federal program bribery, prohibited by 18 U.S.C § 666(a)(1)(B), in relation to the payment of bribes in exchange for the City Contracts in Case No. 14 CR 135-2, pending in the Northern District of Illinois, Eastern Division.

277.     In his guilty plea, O'Malley admitted, among other things, that between January 2003 and June 30, 2011, he conspired with John Bills, Karen Finley, Aaron Rosenberg, Bruce Higgins, and others, to corruptly solicit and demand, and to accept and agree to accept from another, things of value, namely cash payments of over $2 million and other personal financial benefits, for the benefit of Bills and O'Malley, intending that Bills be influenced and rewarded in connection with the City Contracts.

278.     On June 10, 2015, Karen Finley pled guilty to conspiracy, in violation of 18 U.S.C § 371, in Case No. 2:15 CR 148, pending in the Southern District of Ohio, Eastern

Division.

279.    In her Ohio guilty plea, Finley admitted, among other things, that between 2005 and 2013, she agreed to, and did, provide campaign contributions to elected public officials in the City of Columbus and Cincinnati in return for the elected public officials agreeing to take, and actually taking, official acts on behalf of RTSI to obtain and retain municipal contracts.

280.    On August 20, 2015, Karen Finley entered a voluntary guilty plea to conspiracy, in violation of 18 U.S.C § 371, to commit federal program bribery, prohibited by 18 U.S.C § 666(a)(2), in relation to the payment of bribes in exchange for the City Contracts in Case No. 14 CR 135-3, pending in the Northern District of Illinois, Eastern Division.

281.    In her Illinois guilty plea, Finley admitted, among other things, that between January 2003 and June 30, 2011, she conspired with John Bills, Martin O'Malley, Aaron Rosenberg, Bruce Higgins, and others, to corruptly give, offer, and agree to give things of value, namely cash payments and other personal financial benefits, for the benefit of Bills and O'Malley, with intent to influence and reward Bills in connection with the City Contracts.

282.    Finley further admitted in her Illinois guilty plea, among other things, that she falsely certified on EDSs in both August 2007 and September 2008, in connection with the application process for P.O. 16396 and P.O. 18031, respectively, that no agents of RTSI, during the prior five years, had bribed or attempted to bribe an employee of the City.

## COUNT ONE
## VIOLATIONS OF THE CITY'S FALSE CLAIMS ORDINANCE
### MCC § 1-22-010, *et seq.*
### (Against RTSI and RHL)

283.    The City realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 282 of this Complaint as though fully alleged in this Count.

284.    Section 1-22-020 of the MCC is violated when, among other things, any person:

(1) knowingly presents, or causes to be presented, to an official or employee of the city a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the city; [or] (3) conspires to defraud the city by getting a false or fraudulent claim allowed or paid.

285.    Section 1-22-010 of the MCC defines a "claim" as:

any request or demand, whether under a contract or otherwise, for money or property which is made by a city contractor, grantee, or other recipient if the city is the source of any portion of the money or property which is requested or demanded, or if the city will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

286.    Section 1-22-020(7) of the Municipal Code of Chicago provides, in pertinent part, that any person who:

knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the city, is liable to the city for a civil penalty of not less than $5,000.00 and not more than $10,000.00, plus three times the amount of damages which the city sustains because of the act of that person.  A person violating this section shall also be liable to the city for the attorneys' fees and costs of a civil action brought to recover any such penalty or damages.

287.    RTSI entered into the City Contracts for the purchase and maintenance of its DARLEP systems.

288.    In connection with the City Contracts, RTSI agreed to observe and comply with all applicable federal, state, county and municipal laws, statutes ordinances and executive orders.

289.    As described above, Defendants had systematically bribed Bills through, among other things, the O'Malley Consulting Agreement, the payment of Bills' expenditures, and assisting Bills to obtain employment after his retirement from the City, with the intent to influence and reward Bills for steering the City Contracts to RTSI.

290.    Both RTSI and RHL submitted numerous EDSs to the City as part of RTSI's

contractual obligations to the City.

291.     On each of these EDSs, both RTSI and RHL certified that they had not bribed or attempted to bribe any employee of the City.

292.     Both RTSI and RHL falsely certified in their EDSs that they were in compliance with the applicable requirements of the Ethics Ordinance, including but not limited to, Section 2-156-040 of the MCC, which prohibited offering or giving gifts, directly or indirectly, to any City official, employee or contractor whose decision may affect City business.

293.     Both RTSI and RHL falsely certified in their EDSs that no official or employee of the City had a financial interest in the City Contracts.

294.     Both RTSI and RHL repeatedly failed to disclose the existence of the O'Malley Consulting Agreement on their EDSs.

295.     Both RTSI and RHL certified in their EDSs that they acknowledged and understood that the City's Governmental Ethics and Campaign Finance Ordinances, which, among other things, prohibits providing gifts, favors, cash, compensation, or anything of value, to City officials or employees unless wholly unrelated to their City duties, applied to the City Contracts.

296.     Both RTSI and RHL repeatedly failed to disclose Bills as a lobbyist even though RTSI provided Bills with compensation and benefits, including through the O'Malley Consulting Agreement, in order to influence the award of the City Contracts to RTSI.

297.     Each of these claims made by RTSI and RHL in the EDSs was false.

298.     RTSI also submitted approximately 520 invoices to the City under the City Contracts, including but not limited to invoices for new red-light camera installations, monthly invoices for maintenance and operation fees for each system, as well as invoices for additional

fees for repairs and relocations of red-light camera systems.

299.    Each of these claims made by RTSI in the City Contracts and invoices was false.

300.    Defendants knew that each of these claims in the City Contracts, in the invoices, and in the EDSs was false.

301.    Defendants made these knowingly false claims in the City Contracts, in the invoices, and in the EDSs in order to induce the City to award the City Contracts to RTSI, and to pay RTSI on these fraudulent contracts.

302.    Each of these false claims in the City Contracts, in the invoices, and in the EDSs constitutes a separate violation of the FCO.

303.    The City relied on the false or fraudulent claims when it (a) awarded RTSI the City Contracts to the detriment of the City, and (b) paid RTSI on each City Contract and invoice.

304.    Had the City known that these claims were false, the City would never have entered into the City Contracts with RTSI and/or would have terminated the City Contracts with RTSI.

305.    In addition, Defendants have conspired with each other to defraud the City by getting false or fraudulent claims allowed or paid by the City in violation of Section 1-22-020(3) of the MCC.

306.    The City suffered damages in a substantial amount to be determined at trial in reliance on, among other things, Defendants' false claims that they had not bribed or attempted to bribe any employee of the City, and that they had complied and would comply with all applicable laws.

307.    Since 2003, the City has paid approximately $125,904,645.92 to RTSI under its Contracts with the City.

WHEREFORE, for all of the foregoing reasons, the City prays that this Honorable Court award the following relief:

A.     Find that Defendants violated MCC § 1-22-020, and enter judgment for the City and against Defendants, jointly and severally, on Count One of its Complaint;

B.     Enter a judgment against Defendants, jointly and severally, and in favor of the City, for treble the amount paid to RTSI by the City under the City Contracts relating to the purchase and maintenance of the DARLEP systems;

C.     Enter a judgment against Defendants, jointly and severally, and in favor of the City, for a civil penalty of not less than $5,000.00 and not more than $10,000.00 for each instance that Defendants made or used false records and statements and caused false statements and records to be used to get a false or fraudulent claim paid or approved by the City;

D.     Enter a judgment against Defendants, jointly and severally, and in favor of the City for reasonable expenses which this Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs;

E.     Enter a finding that under the FCO, Relator Aaron Rosenberg, is entitled to a percentage of the total judgment entered in favor of the City on Count One of the Complaint, and reasonable expenses and attorneys' fees; and

F.     Award any and all additional relief to which the City is entitled under the FCO, and any additional relief which this Court deems fair and just.

## COUNT TWO
## VIOLATIONS OF THE CITY'S FALSE STATEMENTS ORDINANCE
### MCC § 1-21-010, *et seq.*
### (Against RTSI and RHL)

308.     The City realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 282 of this Complaint as though fully alleged in this Count.

309.     Section 1-21-010(a) of the MCC provides, in pertinent part:

Any person who knowingly makes a false statement of material fact to the city in violation of any statute, ordinance or regulation, or who knowingly makes a false statement of material fact to the city in connection with any application, report, affidavit, oath, or attestation, including a statement of material fact made in connection with a bid, proposal, contract or economic disclosure statement or affidavit, is liable to the city for a civil penalty of not less than $500.00 and not more than $1,000.00, plus up to three times the amount of damages which the city sustains because of the person's violation of this section. A person who violates

this section shall also be liable for the city's litigation and collection costs and attorney's fees. The penalties imposed by this section shall be in addition to any other penalty provided for in the municipal code.

310. Subsection 1-21-010(d) of the MCC provides, in pertinent part, that:

For the purposes of Chapter 1-21 of this Code, a person knowingly makes a false statement of material fact when that person (i) makes a statement of material fact with actual knowledge that the statement was false, or (ii) makes a statement of material fact with knowledge of facts or information that would cause a reasonable person to be aware that the statement was false when it was made, or (iii) signs, certifies, attests, submits or otherwise provides assurances, or causes any other person to sign, certify, attest, submit or otherwise provide assurances, that a statement of material fact is true or accurate in deliberate ignorance or reckless disregard of the truth or falsity of the statement. For purposes of this section, a person who fails to make a reasonable investigation to determine the accuracy, truthfulness or completeness of any material fact acts in deliberate ignorance or reckless disregard of the truth or falsity of the material fact.

311. Subsection 1-21-020 of the MCC provides, in pertinent part, that:

Any person who aids, abets, incites, compels or coerces the doing of any act prohibited by this chapter shall be liable to the city for the same penalties for the violation.

312. RTSI entered into the City Contracts for the purchase and maintenance of its DARLEP systems.

313. In connection with each of the City Contracts, RTSI agreed to observe and comply with all applicable federal, state, county and municipal laws, statutes, ordinances and executive orders.

314. As described above, Defendants had systematically bribed Bills through, among other things, the O'Malley Consulting Agreement, the payment of Bills' expenditures, and assisting Bills to obtain employment after his retirement from the City, with the intent to influence and reward Bills for steering the City Contracts to RTSI.

315. Both RTSI and RHL also submitted numerous EDSs to the City as part of RTSI's contractual obligations to the City.

316.    On each of these EDSs, both RTSI and RHL certified that they had not bribed or attempted to bribe any employee of the City.

317.    Both RTSI and RHL falsely certified in their EDSs that they were in compliance with the applicable requirements of the Ethics Ordinance, including but not limited to, Section 2-156-040 of the MCC, which prohibited offering or giving gifts, directly or indirectly, to any City official, employee or contractor whose decision may affect City business.

318.    Both RTSI and RHL falsely certified in their EDSs that no official or employee of the City had a financial interest in the City Contracts.

319.    Both RTSI and RHL repeatedly failed to disclose the existence of the O'Malley Consulting Agreement on their EDSs.

320.    Both RTSI and RHL falsely certified in their EDSs that they acknowledged and understood that the City's Governmental Ethics and Campaign Finance Ordinances, which, among other things, prohibits providing gifts, favors, cash, compensation, or anything of value, to City officials or employees unless wholly unrelated to their City duties, applied to the City Contracts.

321.    Both RTSI and RHL repeatedly failed to disclose Bills as a lobbyist even though RTSI provided Bills with compensation and benefits, including through the O'Malley Consulting Agreement, in order to influence the award of the City Contracts to RTSI.

322.    Each of these statements made by RTSI and RHL in the EDSs was false.

323.    RTSI also submitted approximately 520 invoices to the City under each of the City Contracts, including but not limited to invoices for new red-light camera installations, monthly invoices for maintenance and operation fees for each system, as well as invoices for additional fees for repairs and relocations of red-light camera systems.

324.    Each of these statements made by RTSI in the City Contracts and invoices was false.

325.    Defendants knew that each of these statements in the City Contracts, in the invoices, and in the EDSs was false.

326.    Defendants made these knowingly false statements in the City Contracts, in the invoices, and in the EDSs in order to induce the City to award the City Contracts to RTSI and to pay RTSI on these fraudulent contracts.

327.    Each of these false statements in the City Contracts, in the invoices, and in the EDSs constitutes a separate violation of the FSO.

328.    The City relied on the false statements when it (a) awarded RTSI the City Contracts to the detriment of the City, and (b) paid RTSI on each City Contract and invoice.

329.    Had the City known that these statements were false, the City would never have entered into the City Contracts with RTSI and/or would have terminated the City Contracts with RTSI.

330.    The City suffered damages in a substantial amount to be determined at trial in reliance on, among other things, Defendants' false statements that they had not bribed or attempted to bribe any employee of the City, and that it would comply with all applicable laws.

331.    Since 2003, the City has paid for approximately $125,904,645.92 to RTSI under its Contracts with the City.

332.    By virtue of the above-described acts, Defendants also aided, abetted, incited, and caused others to make false statements of material fact to the City in violation of any statute, ordinance or regulation, or make false statements of material fact to the City in connection with a claim for payment, within the meaning of MCC § 1-21-010.

WHEREFORE, for all the foregoing reasons, the City of Chicago prays that this Honorable Court award the following relief:

A.   Find that Defendants violated MCC §§ 1-21-010 and 1-21-020, and enter judgment for the City and against Defendants, jointly and severally, on Count Two of its Complaint;

B.   Enter a judgment against Defendants, jointly and severally, and in favor of the City for treble the amount paid to RTSI by the City under the City Contracts relating to the purchase and maintenance of the DARLEP systems;

C.   Enter a judgment against Defendants, jointly and severally, and in favor of the City for a civil penalty of not less than $500.00 and not more than $1,000.00 for each individual false statement made by Defendants;

D.   Enter a judgment against Defendants, jointly and severally, and in favor of the City for reasonable expenses which this Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs; and

E.   Award any and all additional relief which this Court deems fair and just.

**COUNT THREE**
**CONSUMER FRAUD – DECEPTIVE PRACTICES**
**VIOLATIONS OF MCC § 2-25-090 AND 815 ILCS 505/2**
**(Against RTSI and RHL)**

333.   The City realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 282 of this Complaint as though fully alleged in this Count.

334.   MCC § 2-25-090 makes it unlawful for a business to "engage in any act of consumer fraud, unfair method of competition, or deceptive practice while conducting any trade or business in the city," including "any conduct constituting an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act."

335.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, makes unlawful, among other things, "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or

omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' . . . in the conduct of any trade or commerce."

336.    Section 2-25-090(f) of the Municipal Code of Chicago provides, in pertinent part:

> Except as otherwise provided in this chapter, and in addition to any other penalty provided by law, any person who violates any of the requirements of this section shall be subject to a fine of not less than $2,000.00 nor more than $10,000.00 for each offense. Each day that a violation continues shall constitute a separate and distinct offense to which a separate fine shall apply.

337.    Defendants knowingly engaged in a systematic scheme of bribery of Bills through, among other things, the O'Malley Consulting Agreement, the payment of Bills' expenditures, and the assistance provided to Bills to obtain employment after he retired from the City, while conducting their business in the City, with the intent to influence and reward Bills for steering the City Contracts to RTSI, which conduct constitutes deceptive practices, in violation of MCC § 2-25-090 and 815 ILCS 505/2.

338.    Throughout this same period, Defendants knowingly submitted numerous deceptive and false statements, claims and certifications in the City Contracts, EDSs, and invoices, while conducting their business in the City.

339.    Both RTSI and RHL certified on their EDSs that they had not bribed or attempted to bribe any employee of the City.

340.    Both RTSI and RHL falsely certified in their EDSs that they were in compliance with the applicable requirements of the Ethics Ordinance, including but not limited to, Section 2-156-040 of the MCC, which prohibited offering or giving gifts, directly or indirectly, to any City official, employee or contractor whose decision may affect City business.

341.    Both RTSI and RHL falsely certified in their EDSs that no official or employee of

the City had a financial interest in the City Contracts.

342. Both RTSI and RHL repeatedly failed to disclose the existence of the O'Malley Consulting Agreement on their EDSs.

343. Both RTSI and RHL falsely certified in their EDSs that they acknowledged and understood that the City's Governmental Ethics and Campaign Finance Ordinances, which, among other things, prohibits providing gifts, favors, cash, compensation, or anything of value, to City officials or employees unless wholly unrelated to their City duties, applied to the City Contracts.

344. Both RTSI and RHL repeatedly failed to disclose Bills as a lobbyist even though RTSI provided Bills with compensation and benefits, including through the O'Malley Consulting Agreement, in order to influence the award of the City Contracts to RTSI.

345. Such conduct constitutes deceptive practices, in violation of MCC § 2-25-090 and 815 ILCS 505/2.

346. The City relied on Defendants' false and deceptive statements when it (a) awarded the City Contracts to RTSI to the detriment of the City, and (b) paid RTSI on each Contract and invoice.

347. Had the City known that these statements were false and deceptive, the City would have never entered into the City Contracts with RTSI and/or would have terminated the City Contracts with RTSI.

348. By reason of Defendants' deceptive practices, the City has been damaged in a substantial amount to be determined at trial.

349. Since 2003, the City has paid approximately $125,904,645.92 to RTSI under the City Contracts.

WHEREFORE, for all the foregoing reasons, the City prays that this Honorable Court award the following relief:

A. Find that Defendants violated MCC § 2-25-090 and 815 ILCS 505/2, and enter judgment for the City and against Defendants, jointly and severally, on Count Three of its Complaint;

B. Enter an order compelling Defendants, jointly and severally, to pay restitution of any money acquired as a result of Defendants' deceptive practices;

C. Enter a judgment against Defendants, jointly and severally, and in favor of the City, for a civil penalty of not less than $2,000.00 and not more than $10,000.00 per violation pursuant to § 2-25-0909 for each day the violations occurred; and

D. Enter a judgment against Defendants, jointly and severally, and in favor of the City, compelling Defendants to disgorge their ill-gotten profits; and

E. Enter a judgment against Defendants, jointly and severally, and in favor of the City, for reasonable expenses which this Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs; and

F. Award any and all additional relief which this Court deems fair and just.

## COUNT FOUR
## BREACH OF CONTRACT
### (Against RTSI)

350. The City realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 282 of this Complaint as though fully alleged in this Count.

351. The City and RTSI entered into the City Contracts, pursuant to which RTSI agreed to provide goods and services in exchange for payments from the City.

352. The parties' respective obligations are clearly and definitively set forth in the City Contracts.

353. The City performed all of its obligations to RTSI under the City Contracts.

354. RTSI was contractually required to "observe and comply with all applicable federal, state, county and municipal laws, statutes, regulations, codes, ordinances and executive orders . . . whether or not they appear in the Contract." Contract P.O. 3320 at § 10.1(a);

46

Contract P.O. 16396 at § 10.1(a); Contract P.O. 18031 at § 6.1(a).

355.    RTSI "represent[ed] that [RTSI] and, to the best of its knowledge, its Subcontractors are not in violation of the provisions of Section 2-92-320 of Chapter 2-92 of the Municipal Code of Chicago, and in connection with it, and additionally in connection with the Illinois Criminal Code, 720 ILCS 5/33E as amended, and the Illinois Municipal Code, 65 ILCS 5/11-42.1-1."  Contract P.O. 3320 at § 11.1(h); Contract P.O. 16396 at § 11.1(h); Contract P.O. 18031 at § 7.1(f).

356.    RTSI further "acknowledge[d] that any certification, affidavit or acknowledgment made under oath in connection with this Agreement is made under penalty of perjury and, if false, is also cause for termination."  Contract P.O. 3320 at § 11.1(i); Contract P.O. 16396 at § 11.1(i); Contract P.O. 18031 at § 7.1(6).

357.    In each of its EDSs, RTSI confirmed that the certification, disclosure and acknowledgements contained in the EDS become part of any contract awarded by the City, and were material inducements to the City's execution of any contract or taking any other action with respect to the subject of the EDS.

358.    Since the beginning of the contractual relationship between the City and RTSI, RTSI consistently and materially failed to perform many of its obligations under the City Contracts, including but not limited to submitting false claims to the City for payment, submitting false statements in its EDSs, bribing former City employee Bills, and violating numerous federal, state and municipal laws, including but not limited to 18 U.S.C §§ 371 and 666(a)(2), MCC §§ 1-21-010, 1-21-020, 1-22-020, 2-25-090 and 2-156-040(c), 720 ILCS 33-1(a), 720 ILCS 5/33E and 815 ILCS 505/2.

359.    The City has been damaged as a result of RTSI's breaches of contract in an

amount to be determined at trial.

WHEREFORE, for all the foregoing reasons, the City prays that this Honorable Court award the following relief:

A. Enter a judgment against RTSI and in favor of the City, on Count Four of its Complaint; and

B. Order RTSI to pay all damages, including consequential damages, to the City in an amount to be determined at trial; and

C. Award any and all additional relief which this Court deems fair and just.

## COUNT FIVE
## CIVIL CONSPIRACY
### (Against RTSI and RHL)

360. The City realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 282 of this Complaint as though fully alleged in this Count.

361. Defendants have conspired and agreed with each other and with Bills and O'Malley to commit unlawful acts or lawful acts in an unlawful manner.

362. RTSI, RHL, Bills and O'Malley knowingly and voluntarily engaged in a concerted scheme to submit false statements and false claims for payment to the City, and to systematically bribe Bills with the intent to influence and reward Bills for steering the City Contracts to RTSI.

363. In furtherance of their concerted scheme, RTSI and RHL submitted false statements and false claims for payment to the City, and systematically bribed Bills with the intent to influence and reward Bills for steering the City Contracts to RTSI

364. By reason of Defendants' unlawful acts, the City has been damaged by paying Redflex under the fraudulently obtained City Contracts.

WHEREFORE, for all the foregoing reasons, the City prays that this Honorable Court award the following relief:

A.  Enter a judgment against RTSI and RHL and in favor of the City, on Count Five of its Complaint; and

B.  Compelling Defendants to pay the City damages in an amount to be determined at trial; and

C.  Award any and all additional relief which this Court deems fair and just.

## COUNT SIX
## KICKBACKS
## VIOLATION OF 720 ILCS 5/33E
### (Against RTSI and RHL)

365.  The City realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 282 of this Complaint as though fully alleged in this Count.

366.  A "kickback" means "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract."  720 ILCS 5/33E-2(g).

367.  A person violates 720 ILCS 5/33E-7(a) when he knowingly either:

(1) provides, attempts to provide or offers to provide any kickback; (2) solicits, accepts or attempts to accept any kickback; or (3) includes, directly or indirectly, the amount of any kickback prohibited by paragraphs (1) or (2) of this subsection (a) in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to any unit of State or local government for a public contract.

368.  Section 5/33-E-7(d) provides that the City may "recover a civil penalty from any person who knowingly engages in conduct which violates paragraph (3) of subsection (a) of this Section in twice the amount of each kickback involved in the violation."

369.  RTSI knowingly entered into a subcontract with O'Malley, the O'Malley Consulting Agreement, whereby O'Malley agreed to provide, among other things, customer

management and sales representation services to Redflex in connection with the City Contracts.

370. RTSI knowingly entered into the O'Malley Consulting Agreement for the purpose of improperly obtaining or rewarding favorable treatment in connection with the City Contracts.

371. RTSI and RHL knowingly provided, attempted to provide or offered to provide kickbacks to O'Malley under the O'Malley Consulting Agreement in connection with the City Contracts.

372. Between 2003 and 2011, RTSI paid O'Malley over $2 million under the O'Malley Consulting Agreement, including salary payments (approximately $465,000), reimbursed expenses ($47,000), and bonuses and commissions (approximately $1,512,434).

373. The payments made to O'Malley under the O'Malley Consulting Agreement were directly or indirectly charged by RTSI to the City under the City Contracts.

374. The payments made to O'Malley under the O'Malley Consulting Agreement were kickbacks relating to the City Contracts.

375. The City is entitled to recover from Defendants a civil penalty of twice the amount of each payment made to O'Malley under the O'Malley Consulting Agreement.

WHEREFORE, for all the foregoing reasons, the City of Chicago prays that this Honorable Court award the following relief:

A. Find that Defendants violated 720 ILCS 5/33E-7, and enter judgment for the City and against Defendants, jointly and severally, on Count Six of its Complaint;

B. Enter a judgment against Defendants, jointly and severally, and in favor of the City for twice the amount of each payment made to O'Malley by RTSI under the O'Malley Consulting Agreement in connection with the City Contracts;

C. Award any and all additional relief which this Court deems fair and just.

**COUNT SEVEN**
**UNJUST ENRICHMENT**
**(Pled in the Alternative – Against RTSI and RHL)**

376. The City realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 282 of this Complaint as though fully alleged in this Count.

377. Defendants have unjustly retained a benefit to the City's detriment, and the Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

378. By systematically bribing Bills through, among other things, the O'Malley Consulting Agreement, the payment of Bills' expenditures, and assisting Bills to obtain employment after his retirement from the City, with the intent to influence and reward Bills for steering the City Contracts to RTSI, Defendants have unjustly enriched themselves at the City's expense. The City has made payments to RTSI, and Defendants have benefited from those payments. Because of their false statements, false claims, and deceptive trade practices, Defendants obtained enrichment they would not otherwise have obtained. The enrichment was without justification and the City lacks a remedy provided by law.

379. By reason of Defendants' unlawful acts, the City has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

WHEREFORE, for all the foregoing reasons, the City prays that this Honorable Court award the following relief:

A.   Enter a judgment against RTSI and RHL and in favor of the City, on Count Seven of its Complaint; and

B.   Compelling Defendants to disgorge all unjust enrichment to the City; and

C.   Award any and all additional relief which this Court deems fair and just.

Dated: December 14, 2015               Respectfully submitted,

                                       STEPHEN R. PATTON
                                       Corporation Counsel, City of Chicago

                                       BY:  s/ Fiona A. Burke

Diane M. Pezanoski (ARDC # 6190003)
Fiona A. Burke (ARDC # 6273779)
City of Chicago, Department of Law
30 N. LaSalle Street, Suite 1400
Chicago, IL 60602
Fax: (312) 742-3832
Diane.Pezanoski@cityofchicago.org/(312) 744-6996
Fiona.Burke@cityofchicago.org/(312) 744-6929

*Attorney for City of Chicago*

John J. Muldoon, III (ARDC # 6185878)
Muldoon & Muldoon LLC
30 N. LaSalle St., Suite 2950
Chicago, IL  60602
Phone: (312) 739-3550
jjm@muldoonlaw.com

*Attorney for Relator, Aaron Rosenberg*

## CERTIFICATE OF SERVICE

I, Fiona A. Burke, an attorney, hereby certify that on this, the <u>14th</u> day of <u>December</u>, 2015, I electronically filed the forgoing **First Amended Complaint** with the Clerk of the Court using the CM/ECF system, which thereby electronically served all counsel of record.

<span style="float:right">s/ Fiona A. Burke_____</span>

Fiona A. Burke (ARDC # 6273779)
City of Chicago
Law Department
30 N. LaSalle, Suite 1400
Chicago, IL 60602
Phone: (312) 744-6929
Fiona.Burke@cityofchicago.org