**IN THE UNITED STATES DISTRICT COURT**
**NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CITY OF CHICAGO, | ) | |
|     *ex rel.* AARON ROSENBERG, | ) | |
| | ) | |
|             Plaintiff, | ) | Case No. 15-cv-08271 |
| | ) | |
|             v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| REDFLEX TRAFFIC SYSTEMS, INC., a | ) | |
| Delaware corporation, and REDFLEX | ) | |
| HOLDINGS LIMITED, an Australian | | |
| Company, | ) | |
| | ) | |
|           Defendants. | ) | |

**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES**
**TO FIRST AMENDED COMPLAINT**

       Defendant Redflex Traffic Systems, Inc. ("RTSI") and Defendant Redflex

Holdings, Ltd. ("RHL"), collectively "Defendants," for their answer in response to Plaintiff's

First Amended Complaint, state as follows:

## NATURE OF CASE

     1.     From 2003 through 2013, RTSI entered into three contracts with the City, Contract P.O. Number 3220 ("P.O. 3220"), Contract P.O. Number 16396 ("P.O. 16396"), and Contract P.O. Number 18031 ("P.O. 18031"), as amended from time to time (collectively, the "City Contracts"), in connection with the City's Digital Automated Red Light Enforcement Program ("DARLEP").

   ANSWER:

     Defendants admit the allegations of this paragraph.

     2.     The City expressly requires, as a condition of entering into public contracts, that those contracting with it affirmatively state, among other things, that they have not bribed or attempted to bribe any employee of the City, and that they will comply with the City's Government Ethics Ordinance, Chapter 2-156 of the MCC ("Ethics Ordinance").

ANSWER:

Defendants admit that the City requires, as a condition of entering into public contracts, that those contracting with it affirmatively state, among other things, that they have not bribed or attempted to bribe any employee of the City in the employee's official capacity, and that the undersigned state that he or she understands and will comply with all applicable requirements of the Ethics Ordinance. Defendants deny the remaining the allegations of this paragraph.

3.      In connection with each of the City Contracts, the Defendants filed numerous statements, under penalty of perjury, certifying, among other things, that they were not engaged in bribery of any City employees, and that they would comply with the Ethics Ordinance.

ANSWER:

Defendants admit that they provided to the City executed Economic Disclosure Statements ("EDSs") and that the EDS form contained a preprinted statement that the "Applicable Party" and any "Affiliated Entity" had not bribed or attempted to bribe a public officer or employee of the City and that the EDS's undersigned would comply with the applicable requirements of the Governmental Ethics Ordinance of the City, Title 2, Chapter 2-156 of the Municipal Code. Defendants deny the remaining allegations of this paragraph.

4.      These statements were false.

ANSWER:

Defendants admit that statements in some of the EDSs to the effect that RTSI had not engaged in bribery were false. Defendants deny the remaining allegations of this paragraph.

5.      The Defendants knew these statements were false.

20676090.5

ANSWER:

RTSI admits that its CEO and at least one other of its executives were aware that some statements in the EDSs related to bribery were false.  RHL denies that it knew at the time that the statements were false.  Defendants deny the remaining allegations of this paragraph.

6.     The Defendants made these false statements to be paid by the City on fraudulent claims.

ANSWER:

Defendants admit that they submitted executed EDSs to the City because the City requested them.  Defendants deny the remaining allegations of this paragraph.

7.     The Defendants engaged in systematic bribery of John Bills, the former Deputy Commissioner of the City's Department of Transportation ("CDOT"), from 2003 through 2012 in connection with the City's DARLEP.

ANSWER:

Defendants admit that RTSI provided money for the benefit of John Bills, the former Deputy Commissioner of the City's Department of Transportation ("CDOT"), from 2003 through 2012, in connection with the City's Digital Automated Red Light Enforcement Program ("DARLEP").  Defendants deny that RHL engaged in systematic bribery of John Bills. Defendants deny the remaining allegations of this paragraph.

8.     The City Contracts were the Defendants' most lucrative contracts.

ANSWER:

Defendants admit that the City Contracts were RTSI's most lucrative contracts at some periods of time.  Defendants deny the remaining allegations of this paragraph.

9.     Defendant RTSI committed the bribery and other violations alleged herein through, among others, its successive Chief Executive Officers, Bruce Higgins and Karen Finley.

20676090.5

ANSWER:

Defendants admit that RTSI provided money for the benefit of Bills in connection with the DARLEP. Defendants deny that Bruce Higgins or Karen Finley paid any bribes to Bills. Defendants deny the remaining allegations of this paragraph.

10. Defendant RHL committed the bribery and other violations alleged herein through, among others, its Directors Bruce Higgins and Karen Finley.

ANSWER:

Defendants deny the allegations of this paragraph.

11. RHL also committed the bribery and other violations alleged herein as the alter ego of RTSI, given RHL's control over the management and finances of RTSI.

ANSWER:

Defendants deny the allegations of this paragraph.

12. The City's False Claims Ordinance, § 1-22-010, *et seq.* of the MCC ("FCO"), prohibits anyone from presenting or causing to be presented a false or fraudulent claim for payment or approval by the City.

ANSWER:

Defendants state that the City accurately paraphrases a portion of the City's False Claims Ordinance, §§ 1-22-010, *et seq.* of the MCC.

13. The City's False Statements Ordinance, § 1-21-010, *et seq.* of the MCC ("FSO"), prohibits the making of false statements of material fact in connection with a City contract.

ANSWER:

Defendants state that the City accurately paraphrases a portion of the City's False Statements Ordinance, § 1-21-010, *et seq.*

14. The City's Consumer Fraud, Unfair Competition or Deceptive Practices Ordinance, § 2-25-090 of the MCC ("CFUCDPO"), makes it unlawful for any business to engage in any act of consumer fraud, unfair competition, or deceptive practice while conducting any trade or business in the City.

4

ANSWER:

Defendants state that the City accurately paraphrases a portion of the Consumer

Fraud, Unfair Competition or Deceptive Practices Ordinance, § 2-25-090 of the MCC.

15.     The Defendants violated the FCO, FSO, and CFUCDPO by engaging in systematic bribery of Bills, and by filing false claims and false statements for the purpose of being paid on fraudulent claims, in relation to RTSI's City Contracts.

ANSWER:

Defendants deny the allegations of this paragraph.

16.     The FCO also authorizes a private person to sue on behalf of the City against any person who has violated the FCO.

ANSWER:

Defendants state that the City accurately paraphrases a portion of the City's False

Claims Ordinance.

17.     Relator, Aaron Rosenberg ("Rosenberg"), was intimately involved in and has extensive knowledge of Redflex's systematic bribery of Bills.

ANSWER:

Defendants admit that Relator, Aaron Rosenberg, was directly involved in the

provision of money or other items of value for the benefit of Bills in connection with the

DARLEP.  Defendants deny the remaining allegations of this paragraph.

18.     Rosenberg, having direct, independent knowledge of the information on which the following allegations are based, brought suit on behalf of the City against Redflex for violations of the FCO.

ANSWER:

Defendants admit that Rosenberg purported to bring suit on behalf of the City

against Redflex for violations of the False Claims Ordinance.  Defendants deny the remaining

allegations of this paragraph.

19.    On August 26, 2015, the City intervened in Rosenberg's *qui tam* suit, and now files this First Amended Complaint ("Complaint").

ANSWER:

Defendants admit the allegations of this paragraph.

## JURISDICTION AND VENUE

20.    Jurisdiction is proper under 28 U.S.C. § 1332(a), because this is a civil action between citizens of different States and a foreign company, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

ANSWER:

Defendants admit the allegations of this paragraph.

21.    Venue is proper pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claim, occurred in this district.

ANSWER:

Defendants state that venue is proper pursuant to 28 U.S.C. § 1391 because the events or omissions alleged in the Amended Complaint are alleged to have occurred in this district.

## JURY DEMAND

22.    The City demands a jury trial pursuant to Federal Rule of Civil Procedure 38.

ANSWER:

Defendants admit that the City purports to demand a jury trial pursuant to Federal Rule of Civil Procedure 38.

## PARTIES

23.    The City is a resident of Illinois because it is a municipal corporation and home rule unit of local government existing under the Constitution of the State of Illinois.

20676090.5

ANSWER:

Defendants admit the allegations of this paragraph.

24.     Relator Rosenberg is a resident of California and former employee of
        RTSI, who represented RTSI in negotiations and other business dealings
        with the City of Chicago from 2002 through 2012.

ANSWER:

Defendants admit that Rosenberg, a former employee of RTSI, acted on behalf of

RTSI in some negotiations with the City of Chicago during the period 2002 to 2012. Defendants

lack sufficient knowledge or information to form a belief as to the state of residency of

Rosenberg. Defendants deny the remaining allegations of this paragraph.

25.     RTSI is a citizen of Delaware and Arizona because it is organized under
        the laws of Delaware and has its primary place of business in Arizona.
        During the relevant period, RTSI was doing business in the City of
        Chicago, County of Cook, State of Illinois.

ANSWER:

Defendants admit the allegations of this paragraph.

26.     RHL is a foreign citizen because it is an Australian public company.
        During the relevant period, RHL was doing business in the City of
        Chicago, County of Cook, State of Illinois.

ANSWER:

Defendants admit that RHL is a foreign citizen and that its stock is publicly traded

in Australia. Defendants deny the remaining allegations of this paragraph.

27.     RHL was the "alter ego" or business conduit of RTSI.

ANSWER:

Defendants deny the allegations of this paragraph.

28.     For example, RHL and RTSI utilized joint management, including but not
        limited to, members of RHL's Board of Directors, Bruce Higgins and
        Karen Finley, serving simultaneously in the position of President and CEO
        of RTSI.

ANSWER:

Defendants admit that Bruce Higgins was a member of RHL's Board of Directors at the same time he was CEO of RTSI and that Karen Finley was a member of RHL's Board of Directors at the same time she was CEO of RTSI. Defendants deny the remaining allegations of this paragraph.

> 29. Senior officials of RTSI would at times participate in RHL's annual shareholder meetings, investor meetings and road shows, and meetings with financial institutions for fund raising, and would at times host and entertain RHL's largest investors.

ANSWER:

Defendants admit that some executives of RTSI have attended some of RHL's annual shareholder meetings, which are open to all shareholders. Defendants further admit that some executives of RTSI have attended some investor meetings and some meetings with financial institutions. Defendants lack sufficient knowledge or information to understand what the City means by "road shows" and therefore deny this allegation. Defendants deny the remaining allegations of this paragraph.

> 30. Senior officials of RHL would at times participate in meetings with RTSI clients. For example, RHL Chairman of the Board, Chris Cooper, met with and entertained government officials in the U.S., including John Bills of the City.

ANSWER:

Defendants admit that Chris Cooper, then-Chairman of RHL's Board, met in the United States with Bills on two or three occasions. Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and therefore deny the same.

31.     RHL exercised control over RTSI's key business decisions, including but not limited to:

    a.     RHL Board members had meetings with clients on site at U.S. offices and were involved in entertaining U.S. clients (e.g., sporting events, golf and meals); and

    b.     RHL Board members were involved in developing U.S. sales budgets, reviewed each and every market release regarding new U.S. contracts, and developed product and technology road maps and strategic plans for the U.S. business.

ANSWER:

Defendants deny that RHL exercised control over RTSI's key business decisions and deny the allegations of subparagraph b. Defendants admit that Chris Cooper, then-Chairman of RHL's Board, met in the United States with Bills on two or three occasions. Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and therefore deny the same.

32.     RHL exercised control over and comingled RTSI's finances by, among other things:

    a.     causing the majority of profits and funds of RTSI to be sent to RHL; and

    b.     causing RTSI to be undercapitalized such that RTSI would be unable to satisfy liabilities;

    c.     utilizing fully consolidated financial reporting that incorporated RTSI financials into RHL's reporting;

    d.     using RTSI contracts as collateral for obtaining RHL financing.

ANSWER:

Defendants deny the allegations of this paragraph.

33.     RHL also provided RTSI with research and development, as well as the hardware and software used by RTSI.

ANSWER:

Defendants deny the allegations of this paragraph.

9

## FACTUAL BACKGROUND

34.     Redflex is in the business of producing and implementing traffic safety systems for municipal, county, and state entities in the United States and elsewhere.

ANSWER:

Defendants admit the allegations of this paragraph.

35.     Rosenberg was hired by RTSI in March 2002 as Vice President of Sales and Marketing for North America.

ANSWER:

Defendants admit the allegations of this paragraph.

36.     Prior to hiring Rosenberg, RTSI hired Bruce Higgins as its Chief Executive Officer ("CEO").

ANSWER:

Defendants admit that RTSI hired Higgins as CEO prior to March 2002.

37.     Prior to hiring Rosenberg, RTSI promoted Karen Finley to its Vice President of Operations.

ANSWER:

Defendants admit the allegations of this paragraph.

38.     RTSI produces and maintains DARLEP systems that it sells to municipal entities, such as the City.

ANSWER:

Defendants admit the allegations of this paragraph.

39.     At the time it hired Rosenberg, RTSI held a Number 4 U.S.-market position with only eleven contracts in the entire United States.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the actions alleged in this paragraph and therefore deny the allegations of this paragraph.

20676090.5

40.     The Chairman of the Board of RHL, Christopher Cooper, as well as Higgins and Finley, instructed Rosenberg to improve RTSI's market position to Number 1 through the execution of new contracts and with a major U.S. city, such as the City, as an anchor client and marquee reference.

ANSWER:

Defendants deny the allegations of this paragraph.

41.     Rosenberg had many meetings in the United States with members of RHL's board of directors in which they discussed:

    a.      developing U.S. sales plans;

    b.      developing U.S. sales budgets;

    c.      reviewing each and every market release regarding new US contracts; and

    d.      developing the product and technology road maps and strategic plans for the U.S. business. Rosenberg also joined RHL's directors in meetings with clients on site at U.S. municipal offices, as well as provided U.S. clients with entertainment (i.e. sporting events, golf and meals.)

ANSWER:

Defendants admit that Rosenberg had multiple meetings in the United States with members of RHL's board of directors in which they discussed U.S. sales plans. Defendants deny that he had "many meetings" and any remaining allegations of this paragraph.

**A.      John Bills' Assistance in Negotiation of City Contract**

    **1.      Unlawful Pre-Bid Assistance**

42.     Rosenberg learned that the City was planning on issuing a Request for Proposal ("RFP") for DARLEP systems.

ANSWER:

Defendants admit the allegations of this paragraph.

43.     In order to procure a contract with the City to sell Redflex's DARLEP systems, Rosenberg began preliminary discussions with CDOT's Deputy Commissioner John Bills, the chairman of the RFP Evaluation Committee

11

for the City's DARLEP. Bills managed the City's DARLEP from its inception until he retired in 2011.

ANSWER:

Defendants admit the allegations of this paragraph.

44.     An RFP is a solicitation, through a bidding process, by an entity, such as the City, interested in procurement of a commodity, service, or valuable asset, to potential suppliers to submit business proposals to the entity.

ANSWER:

Defendants state that an RFP is a request for proposals that can be utilized for the purchase of products or services. Defendants deny the remaining allegations of this paragraph.

45.     Bills asked Rosenberg to provide assistance in developing the scope of services for the City's RFP.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and therefore deny the allegations thereof.

46.     Rosenberg, Higgins, and Finley met face-to-face with Bills to ensure that the scope of the RFP was advantageous to RTSI.

ANSWER:

Defendants admit that Rosenberg, Higgins, and Finley met face-to-face with Bills but deny the remaining allegations of this paragraph.

47.     These discussions also concentrated on the types of financial arrangements (*e.g.*, contract terms) that would be most advantageous for RTSI given its limited financial means.

ANSWER:

Defendants deny the allegations of this paragraph.

48.     It was improper and a violation of, among other things, his duty to maintain the confidentiality of the RFP and the Ethics Ordinance, for Bills to solicit assistance and input from Redflex in drafting the RFP.

20676090.5

ANSWER:

        Defendants lack sufficient knowledge or information to form a belief as to the actions alleged in this paragraph and therefore deny the allegations of this paragraph.

49.      It was improper and a violation of, among other things, the Ethics Ordinance, for Redflex to provide, assistance and input in drafting the RFP.

ANSWER:

        Defendants lack sufficient knowledge or information to form a belief as to the actions alleged in this paragraph and therefore deny the allegations of this paragraph.

50.      Bills was not authorized by the City to solicit assistance and input from Redflex in drafting the RFP.

ANSWER:

        Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

51.      During the winter of 2002/2003, the City held a pre-bid meeting for interested vendors to discuss the up-coming RFP for DARLEP systems.

ANSWER:

        Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

52.      Due to a medical condition, attending this meeting was difficult for Rosenberg.

ANSWER:

        Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

53.      However, Bills told Rosenberg to attend.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

54.    Additionally, Bills informed Rosenberg that it was important for Rosenberg to further strengthen his relationship with Bills' boss, Donald Grabowski, before the RFP responses were submitted by vendors.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

55.    Bills informed Rosenberg that RTSI's main competitor, Affiliated Computer Systems, Inc. ("ACS"), had deep ties and existing contracts with the City, and that in order for RTSI to be selected, RTSI had to distinguish itself from ACS.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

56.    It was improper and a violation of, among other things, the Ethics Ordinance, for Bills to give this information to Rosenberg.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the actions alleged in this paragraph and therefore deny the allegations thereof.

57.    Bills was not authorized by the City to give Rosenberg this information.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

58.    Bills gave this information to Rosenberg to gain favor with RTSI and to be in a position to later ask RTSI to compensate him after it had procured a contract with the City.

14

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

59.    Rosenberg attended the pre-bid meeting with City officials in Winter 2002/2003.

ANSWER:

Defendants admit that Rosenberg sought reimbursement from RTSI for a purported trip to Chicago in September 2003. Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations of this paragraph and therefore deny the same.

60.    Rosenberg attended the pre-bid meeting at the direction of Bills and Higgins for the purpose of RTSI gaining an illegal advantage in the RFP process.

ANSWER:

Defendants deny the allegations of this paragraph.

61.    After the RFP was issued, RTSI submitted a proposal to the City.

ANSWER:

Defendants admit the allegations of this paragraph.

62.    In its submission to the RFP, RTSI included an Economic Disclosure Statement and Affidavit ("EDS") wherein RTSI stated, among other things, that it was in compliance with the Ethics Ordinance.

ANSWER:

Defendants admit that, in its submission, RTSI included an Economic Disclosure Statement and Affidavit ("EDS") wherein RTSI's executive vice president stated, among other things, that he understood and would comply with the Ethics Ordinance. Defendants deny the remaining allegations of this paragraph.

20676090.5

63.     This statement was false.

ANSWER:

Defendants deny the allegations of this paragraph in that the statement was true at the time it was made.

64.     RTSI knew that it was false.

ANSWER:

Defendants deny the allegations of this paragraph.

65.     RTSI made this false statement for the purpose of procuring the contract for the City's DARLEP.

ANSWER:

Defendants deny the allegations of this paragraph.

**2.     Unlawful Assistance with Field Tests**

66.     After the deadline for submissions, the City conducted field tests for various vendors, including RTSI.

ANSWER:

Defendants admit the allegations of this paragraph.

67.     The field test consisted of a 30-day live system trial.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

68.     Such a field test involved considerable costs for RTSI.

ANSWER:

Defendants admit the allegations of this paragraph.

69.     At the direction of Higgins, Rosenberg informed Bills that RTSI was concerned about the considerable costs of the field tests, especially if its bid were to fail.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

70.     Bills assured Rosenberg that he wanted to help RTSI.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

71.     However, Bills told Rosenberg that RTSI needed to "step-up its game" because ACS was making a strong push to get the City's business.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

72.     Bills related that ACS had a good relationship with people at the City and had gone so far as to set up an office in Chicago.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

73.     Bills also said that ACS's representative had offered to pay Bills, possibly $100,000, if Bills helped ACS.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

74.     Bills gave the information regarding ACS and instructed RTSI to "step-up its game" in order to let RTSI know that his assistance was necessary to get the City contract.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

75.     Bills also gave the information regarding ACS and instructed RTSI to "step-up its game" so that he would to be in a position to ask to RTSI to compensate him after it had procured a contract with the City.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

76.     Bills was not authorized by the City, and it was improper and in violation of the Ethics Ordinance for Bills, to give the information regarding ACS and to instruct RTSI to "step up its game" in order for RTSI to procure the City contract because, among other things, he was the chairman of the RFP Evaluation Committee.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the actions alleged in this paragraph and therefore deny the allegations of this paragraph.

**3.      Unlawful Assistance with Evaluation Process**

77.     In 2003, upon completion of the field tests, the City initiated an evaluation procedure for the bids and the results of the field tests.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

78.     The evaluation process included a formal meeting with the City officials who were members of the Evaluation Committee to discuss the results of the field tests.

18

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

79.     On or about May 12th, 2003, Higgins, Finley, and Rosenberg joined Bills at a hotel in Chicago to discuss the evaluation process and to develop evaluation standards that would be advantageous to RTSI.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

80.     Higgins and Finley pledged to Bills that Rosenberg would be supporting Bills in his continued efforts to steer this contract award to RTSI.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

81.     In the days leading up to the final Evaluation Committee meeting, Rosenberg was in Chicago working with Bills in preparing RTSI's presentation.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

82.     On the night before the final Evaluation Committee meeting, Bills met with Rosenberg.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

83.     Bills invited Rosenberg to the CDOT offices after hours.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations of this paragraph and therefore deny the allegations thereof.

84.     At this meeting, Bills reviewed field test data of RTSI and its competitor, ACS, with Rosenberg.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations of this paragraph and therefore deny the allegations thereof.

85.     In particular, Bills and Rosenberg reviewed photos taken by each company during the pilot phase, and each company had instances where the equipment produced good quality photographs and instances where the equipment did not produce good photos.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations of this paragraph and therefore deny the allegations thereof.

86.     Bills said he would use good photos for RTSI and poor ones for ACS during the Evaluation Committee meeting, and would do so in a way that made them seem randomly selected.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations of this paragraph and therefore deny the allegations thereof.

87.     Bills also informed Rosenberg that he was not sure of all of the votes on the Committee, but that he would make name cards and place the "unknown votes" at the end of the voting order.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations of this paragraph and therefore deny the allegations thereof.

88.     This effort would make it difficult to vote against RTSI, as the majority of the Committee would have already selected RTSI.

ANSWER:

Defendants deny the allegations of this paragraph.

89.     Bills insisted he wanted to achieve a unanimous vote from the Evaluation Committee in favor of RTSI.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

90.     At different points in time, Rosenberg informed Cooper, Finley, and other RHL's directors, including Robert DeVincenzi, of the pre-Evaluation Committee meeting and Bills' assistance.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations that Rosenberg informed Cooper or Finley and therefore deny the allegations thereof.  Defendants deny the remaining allegations of this paragraph.

91.     Cooper, Finley and the other RHL's directors praised Rosenberg's acts as exemplary sales acumen.

ANSWER:

Defendants do not understand to which of "Rosenberg's acts" the City refers and therefore lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and deny the allegations thereof.  Defendants deny that RHL's directors praised Rosenberg's acts as exemplary sales acumen with regard to the alleged pre-Evaluation Committee meeting or Bills' assistance.

92.     On or about May 27, 2003, Bills delivered the unanimous selection of RTSI by the Evaluation Committee.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

93.     On May 30th, Bills provided notification to Higgins, Finley, and Rosenberg of the official contract award to RTSI.

ANSWER:

Defendant admits the allegations of this paragraph.

94.     The after-hours pre-Evaluation Committee meeting and the tender of information by Bills to Rosenberg were improper and in violation of, among other things, the Ethics Ordinance.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the actions alleged in this paragraph and therefore deny the allegations thereof.

95.     Bills was not authorized by the City to give this information to Redflex.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

96.     Bills gave this information to Rosenberg for the purpose of gaining favor with RTSI and with the intention to be compensated by RTSI after it had procured a contract with the City.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

97.     In approximately June 2003, the City accepted RTSI's proposal and initiated negotiations for a formal contract with RTSI.

ANSWER:

Defendants admit the allegations of this paragraph.

B.     **Purchase v. Lease of Cameras**

98.     During initial contract negotiations, Bills asked Rosenberg for guidance on whether the City should lease or buy the cameras used for the DARLEP.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

99.     Rosenberg consulted with Higgins on whether the City should lease or buy the cameras used for the DARLEP.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

100.     Although leasing the cameras was a lower cost option for the City, both in terms of initial expenditure and long term maintenance and repair costs, Higgins directed Rosenberg to convince Bills to have the City purchase the cameras.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny the allegations thereof.

101.     The City's purchase of the cameras would help RTSI with cash-capitalization issues. Each camera system was very expensive and required significant up-front cash outlay for both the hardware (cameras, flashes, housings, wiring, etc.) and the physical construction (boring, conduit, paving, foundations, etc.).

ANSWER:

Defendants deny the allegations of this paragraph.

102.     Usually, Redflex would charge a client to lease the turnkey program (Redflex incurred all hard costs) and the client would generally pay either a percentage of the ticket money collected or a fixed monthly fee per month, and it would take years for Redflex to pay for the system and eventually turn a profit. By convincing the City to purchase the cameras,

Redflex shifted the financial burden of paying for, and maintaining, those systems to the City.

ANSWER:

Defendants deny the allegations of this paragraph.

103.    Redflex further knew that persuading the City to purchase the cameras was a bad financial decision for the City, because it was more expensive for the City and the City, not Redflex, would have a depreciating and antiquated asset on its books as the technology continued to advance.

ANSWER:

Defendants deny the allegations of this paragraph.

104.    Additionally, Redflex knew that only it could reasonably maintain its proprietary systems, so it would be much more difficult for the City to later change vendors from RTSI since the City would already own RTSI cameras.

ANSWER:

Defendants deny the allegations of this paragraph.

**C.    Entertainment of City Officials**

105.    During these negotiations and throughout the contractual relationship, Bills entertained Redflex officials including Christopher Cooper, RHL's Chairman of the Board and other Redflex executives, including Finley, and Higgins.

ANSWER:

Defendants deny the allegations of this paragraph.

106.    Bills' entertainment of these officials included, but was not limited to, escorting them to Chicago White Sox baseball games, where he provided front row seats, personal messages on the Jumbo-Tron, food, beer, and other beverages.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

107.    During the RFP process, Bills flew to Phoenix, Arizona to meet with various members of the Redflex team, including Finley and Rosenberg.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

108.    RTSI paid the cost of this trip and also provided Bills with rounds of golf and other entertainment.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

109.    Bills was not authorized by the City to entertain, or be entertained by, Redflex.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

110.    It was improper and a violation of the Ethics Ordinance for Bills to entertain the Redflex officials, and for Redflex to entertain Bills.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

**D.      Payoff to John Bills**

**1.      Network Electric, Inc.**

111.    In most projects, RTSI would seek guidance from the local municipality regarding the hiring of sub-contractors.

ANSWER:

Defendants admit that RTSI sometimes discussed appropriate subcontractors with local municipalities.  Defendants deny the remaining allegations of this paragraph.

20676090.5

112. In June 2003, after the initial contract, P.O. 3220, had been executed, Bills traveled to California with Jimmy Johnson, the owner of Network Electric, Inc., to meet with Redflex officials, including Rosenberg and CEO Higgins.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

113. One of the purposes of this meeting was to discuss the hiring of sub-contractors.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

114. Bills informed RTSI that it must include Network Electric, Inc. as a subcontractor.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

115. RTSI later learned that Bills had a relationship with Johnson.

ANSWER:

Defendants do not understand what the City means by "a "relationship" and therefore lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and deny the allegations thereof.

116. Higgins and Finley, who were directly in-charge of Redflex's subcontractors, agreed to hire Network Electric, Inc. in order to accommodate Bills and influence his performance as Deputy Commissioner of CDOT.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

117.   At a meeting in Los Angeles to celebrate the award of the Chicago
       contract to RTSI, Bills told Rosenberg words to the effect that "it's time to
       make good."

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

118.   Bills indicated the amount he wanted, in the range of $100,000 to
       $200,000, writing notes on a napkin as he spoke.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.  Defendants

further deny the allegations of this paragraph because it seems unlikely that Bills would request a

range of compensation rather than a specific amount.

119.   Bills suggested that RTSI could make payments to him either by
       overpaying Johnson, who would get the money to Bills, or by hiring
       someone close to Bills in a customer liaison position.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

120.   Rosenberg told Bills that he would speak with RTSI's CEO Bruce Higgins
       and that Higgins would determine the appropriate course of action.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

20676090.5

## 2.    Martin O'Malley

121.    In 2002, John Bills met and became friends with Martin O'Malley.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

122.    In about March 2003, Bills told O'Malley words to the effect of, "I got something coming up," referring to a possible job opportunity, as Bills was aware that O'Malley was struggling financially.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

123.    Bills said the job would be a part-time position with a photo-enforcement company, and it would pay about $30,000 a year.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

124.    A month or two later, Bills told O'Malley to look in the Chicago Tribune on a specific day for a job posting for RTSI, and apply for the job.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

125.    Bills said the posting would not specify that RTSI was the company seeking job candidates, but O'Malley could identify the posting because it would contain a telephone or fax number with an Arizona area code.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

28

126.    O'Malley found the posting, sent in his resume and told Bills he had sent in his resume.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

127.    In return for Bills' assistance to RTSI, and in an effort to ensure that Bills would continue to provide such assistance, Finley agreed with Higgins that RTSI would hire O'Malley as an independent contractor.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

128.    In July 2003, O'Malley received a telephone call from Higgins, who asked O'Malley to come to Arizona for an interview.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

129.    Later in July 2003, O'Malley traveled to Phoenix and was interviewed in the RTSI offices by Higgins and Finley.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

130.    Higgins and Finley told O'Malley they were looking to hire a contract employee as the Chicago Customer Service Representative at $30,000 to $35,000 a year.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

131.    O'Malley requested $60,000 to $65,000 a year, to which Higgins and Finley agreed.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

132.    Finley understood that RTSI would, in fact, hire O'Malley in exchange for Bills' help in getting RTSI the City Contract and in order to ensure Bills' assistance to RTSI in the future.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

133.    After the interview, O'Malley called Bills and told him the interview went well.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

134.    After the interview and before an official offer was made, O'Malley asked Bills, rather than anyone from RTSI, about the status of RTSI hiring O'Malley.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

135.    Bills told O'Malley that RTSI and the City needed to finalize their Contract, and that Bills would call RTSI to inquire about O'Malley's employment status.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

136.     During the period before O'Malley signed a contract with RTSI, Bills told O'Malley words to the effect of, "We are working on the contract."

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

137.     Bills said he was trying to add a signing bonus and commissions into the contract, which O'Malley had not discussed with Higgins or Finley.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

138.     During these conversations with Bills, O'Malley came to understand that parts of O'Malley's compensation from Redflex would not be legitimate.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

139.     Specifically, Bills told O'Malley that he and O'Malley would share any commissions O'Malley received, and he said words to the effect of, "this is the way business is done."

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

140.     O'Malley knew that Bills would be getting money from Redflex commissions in exchange for Bills' helping RTSI get contracts with the City.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

20676090.5

141.    Finley understood that O'Malley was a friend of Bills and that it was important to Bills that RTSI hire O'Malley.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

142.    Finley and Higgins finalized O'Malley's contract with RTSI, which included provisions for lucrative increases in O'Malley's compensation as new red light cameras were added.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

143.    The addition of such provisions were out of the ordinary, as the customer liaison position for which O'Malley was hired normally did not include such commissions and O'Malley was not going to be selling cameras to the City.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

144.    Redflex, under the direction of Higgins and Finley, and Bills agreed that:

a.      Redflex would hire Martin O'Malley, a friend of Bills, to do project management work;

b.      O'Malley would then pay Bills from funds he received from RTSI; and

c.      Bills would use his influence to assist RTSI in procuring additional contracts to sell its systems to the City and contracts to maintain those systems.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

20676090.5

145.     In exchange, Bills agreed:

      a.     to provide RTSI guidance in expanding its program with the City;

      b.     to push through this program expansion; and

      c.     to work with RTSI to sell other solutions to the City, such as speed enforcement.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

146.     In August 2003, Finley and Higgins negotiated RTSI's consulting contract with O'Malley.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

147.     In December 2003, Finley, at Higgins' direction and on behalf of RTSI, signed O'Malley's consulting agreement, effective November 3, 2003 ("O'Malley Consulting Agreement").

ANSWER:

Defendants admit that in December 2003 Finley signed O'Malley's consulting agreement effective November 3, 2003.  Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore deny the same.

148.     O'Malley was to report directly to Karen Finley.

ANSWER:

Defendants deny the allegations of this paragraph.

149.     Redflex paid O'Malley a salary and bonus, plus a one-time payment that ranged from $1,500-$2,000 for each new system the City bought from RTSI, plus a commission that ranged from 3%-5% of revenue for scope changes that achieved additional revenue for RTSI.

33

20676090.5

ANSWER:

Defendants admit that RTSI paid O'Malley a bi-monthly fee and bonus and that the bonus included payments of $1,500-$2,000 for each new approach the City bought from RTSI and 3%-5% of revenue for additional out-of-scope work. Defendants further state that RTSI's contract with O'Malley required him to act with the highest legal and ethical compliance standards, that RTSI retained the right to void the contract if O'Malley violated the City's Ethics Ordinance and that O'Malley represented that no officer, employee or agent of the City had any interest in the contract. Defendants deny the remaining allegations of this paragraph.

150. O'Malley discussed the final contract with Bills before signing it.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

151. By the time O'Malley signed the contract, or sometime shortly thereafter, O'Malley understood, from what Bills said, that O'Malley would keep the $60,000 in annual fees and that Bills would get the commissions, but that Bills would reward O'Malley somewhere down the line.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

152. At some point, Bills and O'Malley agreed that O'Malley would have to pay the taxes on the commissions since O'Malley was on record as earning them.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

153.    Months after the O'Malley Consulting Agreement was signed, Bills told O'Malley that he would split the commissions half and half; however, in reality Bills received most of the after-tax commissions.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

154.    From 2003 to 2011, pursuant to the O'Malley Consulting Agreement, O'Malley was paid over $2 million.

ANSWER:

Defendants deny the allegations of this paragraph.

155.    From late 2003 through 2006, RTSI paid O'Malley approximately $175,000 in salary payments, $35,000 in reimbursed expenses, and $85,000 in bonuses and commissions.

ANSWER:

Defendants deny the allegations of this paragraph.

156.    Between 2007 and 2011, RTSI paid O'Malley approximately $290,000 in salary payments, $12,000 in reimbursed expenses, and the following in bonuses and commissions: $87,400 (2007), $342,026 (2008), $515,046 (2009), $193,205 (2010), and $289,757 (2011.)

ANSWER:

Defendants admit the allegations of this paragraph.

157.    O'Malley invoiced RTSI for his commissions.

ANSWER:

Defendants admit that O'Malley invoiced RTSI for some of his commissions. Defendants deny the remaining allegations of this paragraph.

158.    Bills instructed O'Malley as to when O'Malley should send RTSI an invoice, and Bills gave O'Malley paperwork showing how many camera installations had occurred over a certain time period, how to calculate the commission, and what the total commission should be.

20676090.5

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

159.    For each payment, O'Malley prepared an invoice and sent it to RTSI.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

160.    Bills then followed up with O'Malley to find out when O'Malley received the commission.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

161.    Redflex mailed the commission checks to a U.S. Post Office box that O'Malley set up.

ANSWER:

Defendants admit that RTSI mailed some commission checks to O'Malley. Defendants deny that RTSI mailed all of the checks to the same location. Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore deny the same.

162.    When O'Malley received a commission check, Bills and O'Malley met so that O'Malley could provide Bills with his share of the commission.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

163.    Bills and O'Malley often met for lunch at Chicago restaurants during normal work hours, and Bills arrived at the meetings in his City vehicle.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

164.    Before O'Malley met with Bills, O'Malley withdrew cash, and then gave the cash to Bills during the meeting.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

165.    Bills sometimes specified to O'Malley how much cash he wanted by speaking in code.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

166.    For example, on or about June 6, 2011, Bills sent an e-mail to O'Malley in which he wrote, ". . . how about lunch at Shaller's tomorrow. 8 page speed overview can be discussed at lunch if your schedule permits."

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

167.    O'Malley understood Bills' reference to "8" to mean that Bills expected O'Malley to provide him $8,000 in cash.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

168.    In addition to the cash O'Malley gave Bills, O'Malley also wrote checks to people at Bills' request.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

169.    Bills sometimes asked O'Malley to write a check to a particular person for a particular amount.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

170.    For example, on or about June 25, 2008, and March 25, 2010, at Bills' direction, O'Malley wrote checks payable to someone to whom Bills owed money.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

171.    In addition, Bills asked O'Malley to write checks to a political organization and to write a check and provide cash to pay for a portion of Bills' retirement party.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

172.    O'Malley also bought Bills meals, golf, and other personal expenses.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

173.    O'Malley then included the costs on his expense reports that RTSI reimbursed.

20676090.5

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

174. O'Malley did this because O'Malley understood, from Finley, Rosenberg and Higgins, that his job was to keep Bills and the City happy so that RTSI could maintain and expand its business with the City.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

175. In 2008, Bills and O'Malley agreed that O'Malley would use approximately $76,000 from the commissions he had received from RTSI to buy a condo in Arizona in O'Malley's name, but for their joint use.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

176. Bills found the condo, and O'Malley gave Bills a check for the earnest money payment. O'Malley paid all the expenses associated with the condo, including the down payment, mortgage, interest, assessments, taxes, utilities, insurance, and cable, from RTSI commission payments and without any financial assistance from Bills.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

177. O'Malley visited the condo only three times, while Bills used the condo whenever he wanted to.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

20676090.5

178.     In 2007, Finley became the CEO of RTSI.

ANSWER:

Defendants admit that Finley became the CEO of RTSI.  Defendants deny the

remaining allegations of this paragraph.

179.     At that time, O'Malley's commission payments escalated.

ANSWER:

Defendants deny the allegations of this paragraph.

180.     Finley avoided discussions regarding revisiting or renegotiating
         O'Malley's commissions in order to keep Bills happy and to ensure that
         Bills would assist RTSI in the awarding of new red light camera contracts.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

181.     At that time, Bills was assisting RTSI by working to have the new
         contracts awarded to RTSI pursuant to the non-competitive review ("sole-
         source") process.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

182.     One of the contracts was, in fact, sole-sourced to RTSI.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

183.     Although the second contract was not sole-sourced, Bills, through
         O'Malley, gave Rosenberg and Finley the opportunity to draft documents
         that Bills could use to give Redflex an advantage in winning that contract.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

184.     Bills was not authorized by the City to provide this assistance to Redflex.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

185.     It was improper and a violation of his duty to maintain the confidentiality of the RFP and the Ethics Ordinance for Bills to give Rosenberg and Finley the opportunity to draft documents.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

186.     Despite Finley's knowledge of and participation in the foregoing, Finley falsely certified on EDSs in both August 2007, and September 2008, in connection with the application process for contract P.O. 16396 and as part of the contract process for contract P.O. 18031, respectively, that no agents of RTSI, during the prior five years, had bribed or attempted to bribe an employee of the City of Chicago.

ANSWER:

Defendants admit that Finley certified in August 2007 and September 2008, in connection with the application process for contract P.O. 16396 and as part of the contract process for contract P.O. 18031, respectively, that no agents of RTSI during the prior five years had bribed or attempted to bribe an employee of the City of Chicago.  Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore deny the same.

187.    RHL also repeatedly falsely certified on EDSs that no agents of RHL, during the prior five years, had bribed or attempted to bribe an employee of the City.

ANSWER:

Defendants admit that on several occasions RHL certified on EDSs that no agents of RHL during the prior five years had bribed or attempted to bribe an employee of the City.

Defendants deny the remaining allegations of this paragraph.

188.    RTSI agreed to hire O'Malley to influence the performance of Bills' as Deputy Commissioner of the City's DOT.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

189.    During the time Bills was receiving funds from O'Malley and in exchange for receiving these funds, Bills protected Redflex from any liability for performance issues under its contract with the City.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

190.    Bills was not authorized by the City to provide this protection to Redflex.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

191.    Pursuant to the Illinois Criminal Code, a person commits bribery when, "[w]ith intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he or she promises or tenders to that person any property or personal advantage which he or she is not authorized by law to accept." 720 ILCS 33-1(a).

42

ANSWER:

Defendants admit the allegations of this paragraph.

192.  The hiring of Network Electric, Inc., Johnson and O'Malley constituted bribery of Bills, because RTSI hired them at Bills' request and for Bills' personal advantage, and with the intent to influence Bills' performance as an employee of CDOT.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the factual allegations in this paragraph, and therefore deny the allegations thereof. Defendants further deny the allegations of this paragraph because the facts alleged do not meet the definition of bribery in the previous paragraph.

193.  The hiring of Network Electric, Inc., Johnson and O'Malley violated the Ethics Ordinance.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

**E.**

**F.      Expansion of Original Contract**

194.  The initial contract with RTSI, P.O. 3220, was comprised of 20 systems.

ANSWER:

Defendants deny the allegations of this paragraph.  Article 3 of Contract 3220 states that the City will buy at least 10 Systems during the first 12 months and that the City would have an option to purchase up to a total of 20 Systems during each of the first two 12-month periods.

195.  Each system provided cameras for red-light violations in one direction, *i.e.,* a typical Chicago intersection would require two systems to enforce the red-light violations coming from two of four possible directions.

43

ANSWER:

Defendants admit the allegations of this paragraph.

196.    Therefore, P.O. 3220 covered only 10 intersections and 20 systems.

ANSWER:

Defendants deny the allegations of this paragraph. Article 3 of Contract 3220 states that the City will buy at least 10 Systems during the first 12 months and that the City would have an option to purchase up to a total of 20 Systems during each of the first two 12-month periods.

197.    It was contemplated by the City and RTSI that if these 20 systems succeeded, the City would implement 100s of systems throughout the City, which RTSI would continue to sell and maintain.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

198.    P.O. 3220 also included provisions for RTSI to maintain the systems for the City.

ANSWER:

Defendants admit the allegations of this paragraph.

199.    For the initial 20 systems, the City paid RTSI a one-time fee of $85,000 per each system.

ANSWER:

Defendants admit that the City was to pay RTSI an amount of $85,000 per system for the initial 20 systems that RTSI installed and the City accepted under contract P.O. 3220 and included site analysis, system installation, storage of digital images and related data for two years, and twelve months of operation, digital image verification services, warranty, training and other services and that the City made this payment on a number of occasions. Defendants lack

sufficient knowledge or information to form a belief as to the truth of whether the City made the payment for all 20 initial systems, and therefore deny this allegation. Defendants deny the remaining allegations of this paragraph.

> 200. RTSI was also paid by the City $3,250 per each system per each month for program support and maintenance.

ANSWER:

Defendants admit that, for systems installed after the first twelve months covered by Contract 3220 (for which program support and maintenance was included in the initial purchase price of the systems), the City agreed to pay RTSI $2,250 per system per month for operation, digital image verification services, warranty, training and other services. Defendants deny the remaining allegations in this paragraph.

> 201. In 2006, the scope of the program changed and the RTSI contract was amended so that RTSI would receive a one-time fee of $100,000 per system and $5,000 per month per system for maintenance.

ANSWER:

Defendants admit that the scope of the program changed from time to time, and that the RTSI contract was amended in 2006. Under the amendment, RTSI agreed to pay $100,000 per system it installed and the City accepted under contract P.O. 3220, and that payment included site analysis, system installation, and twelve months of operation, digital image verification services, warranty, training and other services. Defendants deny the remaining allegations in this paragraph.

> 202. In 2008, RTSI was awarded a sole source agreement, P.O. 18031, with the City to maintain the 136 operational systems for a fee of $1,645 per month per system, and for monthly support costs of $2,750 per system, for a total cost of $4,395 per month per system.

20676090.5

ANSWER:

Defendants admit that RTSI was awarded an agreement, P.O. 18031, with the City for RTSI to maintain the operational systems for a fee of $1,645 per month per system, and for monthly support costs of $2,750 per system, for a total cost of $4,395 per month per system and that the parties contemplated the existence of 136 operational systems. Defendants admit that the contract was awarded without the same RFP process as had been used for contract P.O. 3220. Defendants deny the remaining allegations of this paragraph.

203. This contract term was for five years plus, two one-year extensions.

ANSWER:

Defendants admit that the contract term for contract P.O. 18031 was for an initial five year period. Defendants deny the remaining allegations of this paragraph.

204. Using O'Malley as a conduit, Bills provided Finley and Rosenberg with a draft specification for the City's upcoming RFP for program expansion.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

205. Bills sought specifications and/or requirements that would be highly advantageous to RTSI.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

206. Finley and Rosenberg reviewed the draft RFP, provided feedback to Bills, and the final RFP specification was designed to be advantageous to RTSI.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

207.   Bills also provided RTSI with RFP scoring tables that would demonstrate and justify a high scoring and ranking for RTSI when compared to the competition.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

**G.   Payoff for Extension of Contract**

208.   In 2007, O'Malley's annual commissions were less than $100,000. In 2008, his commissions had increased, and were in excess of $100,000 annually.

ANSWER:

Defendants admit the allegations of this paragraph.

209.   In early 2008, RTSI was awarded a contract, P.O. 16396, for program expansion for an additional 248 new systems, which included a one-time fee of $24,500 per system and a monthly fee of $3,900 per system per month.

ANSWER:

Defendants admit that in early 2008 RTSI entered a contract, P.O. 16396, with the

City for expansion of the red light enforcement program.  Defendants further admit that under

the new contract the City would pay RTSI an amount of $24,500 per system that RTSI installed

and the City accepted and included site analysis, system installation and twelve months of

operation, digital image verification services, warranty, training and other services.  Defendants

deny the remaining allegations of this paragraph.

210.   This contract term was also for five years, plus two one-year extensions.

ANSWER:

Defendants admit that the initial contract term for contract, P.O. 16396 was five years. Defendants deny the remaining allegations of this paragraph.

211. For this and the other red light enforcement contracts between RTSI and the City, the City paid RTSI in excess of $100,000,000.

ANSWER:

Defendants admit that over the life of the relationship between RTSI and the City, the City paid RTSI in excess of $100 million for systems, maintenance and other products and services. Defendants deny the remaining allegations in this paragraph.

212. As part of each of these contracts, RTSI certified it had not been engaged in bribery or attempted bribery of a public officer or employee of the City of Chicago.

ANSWER:

Defendants admit that, from time to time, RTSI signed an EDS that contained the statement that it had not bribed or attempted to bribe a public officer or employee of the City of Chicago in that officer's or employee's official capacity. Defendants deny the remaining allegations of this paragraph.

213. These statements were false as RTSI had been engaged in the bribery of Bills.

ANSWER:

Defendants admit that some of these statements were false. Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore deny the same.

214. As part of each of these contracts, both RTSI and RHL filed EDSs which certified they had not been engaged in bribery or attempted bribery of a public officer or employee of the City.

48

ANSWER:

Defendants admit that RTSI and RHL each signed some EDSs containing the statement that they had not bribed or attempted to bribe a public officer or employee of the City of Chicago in that officer's or employee's official capacity. Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore deny the same.

215. In the EDSs, RTSI and RHL also certified that they were in compliance with the Ethics Ordinance.

ANSWER:

Defendants admit that the EDSs contain the statement that the undersigned (which was sometimes RTSI and sometimes RHL) understood and would comply with all applicable requirements of the Ethics Ordinance. Defendants deny the remaining allegations of this paragraph.

216. The EDSs submitted by RTSI and RHL were false, as Defendants had been engaged in the bribery of Bills and were not in compliance with the Ethics Ordinance.

ANSWER:

Defendants admit that RTSI and RHL each submitted some EDSs that were false because RTSI had bribed or attempted to bribe Bills. Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph, and therefore deny the same. Defendants further deny the remaining allegations in this paragraph because RHL did not bribe or attempt to bribe Bills or fail to comply with the Ethics Ordinance.

217. Bills ensured that any of RTSI's performance issues were handled solely by him.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

218. Bills ensured that any performance issues did not trigger any liquidated damage provisions called for in RTSI's contract with the City.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

219. This agreement to pay Bills through O'Malley continued until 2011, when Bills retired from the City.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

**H.  Bills' Personal Expenses**

220. Finley knew that RTSI was paying certain personal expenses for Bills in order to influence Bills to assist RTSI in keeping and expanding RTSI's business with the City.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

221. Both Rosenberg and O'Malley paid for such benefits for Bills, including meals, golf outings, hotel stays, rental cars, and other such benefits, expensed the payments to RTSI, and received reimbursement from RTSI.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

20676090.5

222.    On some occasions, it was Finley who approved the expense reports and authorized the reimbursements.

ANSWER:

Defendants admit that Finley approved some expense reports for expenses

relating to the red-light traffic systems.

223.    For example, in December 2003, Finley approved reimbursement for airline tickets to Phoenix, plus car rental, meals, and golf that O'Malley purchased for himself, Bills, and a friend of Bills over a five-day period in Phoenix.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

224.    Also, on various occasions during 2004, Finley approved reimbursement for meals that O'Malley purchased for himself and Bills.

ANSWER:

Defendants admit the allegations of this paragraph.

225.    Further, Finley approved reimbursements for expenses incurred by Rosenberg on behalf of Bills, including stays at the Biltmore Hotel, rental car expenses, and meals and entertainment.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

**I.    Bills' Post-Employment Assistance**

226.    When he retired from the City, Bills asked RTSI executives, including Finley and Andy Bunske (General Counsel), to secure him employment with Resolute Consulting, a public relations firm with which RTSI worked extensively.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

227.    Resolute Consulting either hired Bills directly or through a RTSI-funded
        public outreach group called the Traffic Safety Coalition at RTSI's
        request.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

228.    By this arrangement, RTSI was able to hire Bills indirectly and circumvent
        the City's prohibition on vendors hiring its former employees.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

229.    The expectation was for RTSI to subsidize Bills' employment and receive
        continued support with the City.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

230.    This support included securing additional contract extensions and new
        contracts for additional solutions.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

231.    Once Resolute Consulting "hired" Bills, Finley and RTSI's Chief
        Financial Officer, Sean Nolen, informed Rosenberg that RTSI would no
        longer pay O'Malley his commissions because RTSI was not going to
        "double pay" Bills.

52

ANSWER:

   Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

     *232.* Bills was prohibited by Section 2-156-100(b) of the Ethics Ordinance from assisting or representing any person, including RTSI, in any business transaction involving the City if he participated "personally and substantially" in the subject matter of that transaction during his City employment. MCC § 2-156-100(b). He was also permanently prohibited from assisting or representing RTSI on RTSI's City Contracts because, during his City employment, he exercised contract management authority over RTSI's City Contracts. *Id.*

ANSWER:

   Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

**J. Defendants' Economic Disclosure Statements**

    233. From the initial contract in 2003 through 2013, RTSI entered into three City Contracts and numerous amendments to those contracts.

ANSWER:

   Defendants admit that RTSI and the City of Chicago entered into three contracts

and some amendments to those contracts.

    234. The City requires disclosure of the information requested in the EDS before any City agency, department, or City Council action regarding the matter that is the subject of the EDS.

ANSWER:

   Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

    235. Pursuant to Chapter 2-154 of the MCC, or, if applicable, Section 8.5 of the Illinois Municipal Purchasing Act, 65 ILCS 5/8-10-8.5, City contractors and entities holding certain ownership interest in such City contractors are required to submit an EDS before the City enters into and/or amends a contract.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

236. Applicants submitting an EDS are required to disclose, among other things, information about lobbyists, consultants, subcontractors, and any other person whom the applicant has retained or expects to retain in connection with the matter in connection with which the EDS is submitted.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

237. A "lobbyist" means any person (i) who, for compensation or on behalf of any person other than himself, undertakes to influence any legislative or administrative action, or (ii) any part of whose duty as an employee of another includes undertaking to influence any legislative or administrative action.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and therefore deny the allegations thereof.

238. Applicants submitting an EDS are required to certify, among other things, that neither they, nor any affiliated entity, have, during the five years before the date the EDS is signed, or during the five years before the date of the contract that is the subject of the EDS, "bribed or attempted to bribe . . . a public office or employee of the City, the State of Illinois, or any agency of the federal government or of any state or local government in the United States of America, in that officer's or employee's official capacity."

ANSWER:

Defendants admit they signed some EDSs that required the above quoted certifications. Defendants deny the remaining allegations of this paragraph.

239.     Applicants submitting an EDS also are required to certify, among other things, that they will comply with the applicable requirements of the Ethics Ordinance, § 2-156 of the MCC.

ANSWER:

Defendants admit that they signed some EDSs that required these certifications.

Defendants deny the remaining the allegations of this paragraph.

240.     Section 2-156-040(c) of the MCC, which was in effect during the relevant time period, provided in pertinent part, that:

No person who has an economic interest in a specific City business, service or regulatory transaction shall give, directly or indirectly, to any City official or employee whose decision or action may substantially affect such transaction, or to the spouse, domestic partner, or minor child of such official or employee, or any immediate family member residing within the same residence with the official or employee, and none of them shall accept, any gift of (i) cash or its equivalent regardless of value, or (ii) an item or service other than a gift with a value of less than $50.00, as long as the items or services from any one source do not exceed a cumulative value of $100.00 during any calendar year.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the

truth of the allegations in this paragraph, and therefore deny the allegations thereof.

241.     In accordance with Section 2-156-110 of the MCC, applicants submitting an EDS also are required to disclose, among other things, whether any official or employee of the City has a financial interest in his or her own name or in the name of any other person in the contract, work, business, or transaction.

ANSWER:

Defendants admit that in accordance with Section 2-156-110 of the MCC,

applicants submitting an EDS are required to disclose, among other things, whether any official

or employee of the City has a financial interest in his or her own name or in the name of any

other person in the matter to which the EDS pertains. Defendants deny the remaining allegations

of this paragraph.

242.     Applicants submitting an EDS are further required to certify, among other things, that no official or employee of the City shall have a financial interest in the contract, work, business, or transaction during the duration thereof.

ANSWER:

Defendants admit that in the EDSs it received there was a requirement that the applicant certify that no prohibited financial interest in the matter to which the EDS pertains will be acquired by any city official or employee. Defendants deny the remaining allegations of this paragraph.

243.     Applicants submitting an EDS are further required to explicitly acknowledge, that the City's Governmental Ethics and Campaign Financing Ordinances, Chapters 2-156 and 2-164 of the MCC, among other things:

a.     Limit the gifts and favors any person can give, or offer to give, to any City official, employee, contractors or candidate for elected City office; more specifically, persons who are seeking a City contract:

i.     cannot give them any cash or anonymous gift;

ii.     cannot give any gift based on a mutual understanding that the City official's or employee's actions or decisions will be affected in any way by the gift;

b.     Prohibit any City elected official or City employee from having a financial interest in any contract, work, transaction or business of the City, if that interest has a cost or present value of $5,000 or more, or if that interest entitles the owner to receive more than $2,500 per year.

c.     Provide that City employees and officials cannot receive compensation or anything of value in return for advice or assistance on matters concerning the operation or business of the City, unless those services are wholly unrelated to their City duties.

d.     Provide that former City employees and officials cannot assist or represent another on any matter involving the City if, while with the City, they were personally and substantially involved in the same matter.

56

        e.        Provide that former City employees and officials cannot assist or represent another on a City contract if, while with the City, they help formulate or supervise that contract.

ANSWER:

Defendants admit that some versions of the EDS forms contain the express statements, or ones to the same effect, alleged in this paragraph. Defendants deny the remaining allegations of this paragraph.

        244.     Applicants submitting an EDS are required to confirm that the certification, disclosure and acknowledgements contained in the EDS become part of any contract awarded by the City, and are material inducements to the City's execution of any contract or taking any other action with respect to the subject of the EDS.

ANSWER:

Defendants admit that the EDS's they signed included the above language or words to that effect. Defendants deny the remaining allegations of this paragraph.

        245.     Defendants were required to submit an EDS in connection with each City Contract, and each amendment to a City Contract.

ANSWER:

Defendants admit that one or the other of them, or both, signed EDSs for each contract and each amendment thereto that RTSI entered into with the City. Defendants deny the remaining allegations of this paragraph.

**1.     P.O. 3220**

        246.     In connection with the submission of its proposal for P.O. 3220, RTSI submitted an EDS dated January 20, 2003, a true and correct copy of which is attached hereto as **Exhibit 1** and incorporated herein, which was signed by the relator, Aaron Rosenberg, as Vice President of RTSI.

ANSWER:

Defendants admit the allegations of this paragraph.

247.    In connection with the submission of its proposal for P.O. 3220, RTSI also submitted a Disclosure Affidavit for Contracts and Concession Agreements Not Involving Federal Funds (hereafter included in the definition of "EDS") dated January 20, 2003, a true and correct copy of which is attached hereto as **Exhibit 2** and incorporated herein, which was signed by the relator, Aaron Rosenberg, as Vice President of RTSI.

ANSWER:

Defendants admit the allegations of this paragraph.

248.    In connection with P.O. 3220, a true and correct copy of which is attached hereto as **Exhibit 3** and incorporated herein, RTSI submitted an EDS dated August 22, 2003, a true and correct copy of which is attached hereto as **Exhibit 4** and incorporated herein, which was signed by Bruce Higgins, as President & CEO of RTSI.

ANSWER:

Defendants admit the allegations of this paragraph.

249.    In connection with P.O. 3220, RHL submitted an EDS dated September 4, 2003, a true and correct copy of which is attached hereto as **Exhibit 5** and incorporated herein, which was signed by Graham William Davie, as CEO of RHL.

ANSWER:

Defendants admit the allegations of this paragraph, but state that the EDS was

amended on September 16, 2003.

250.    In connection with Amendment 1 to P.O. 3220, a true and correct copy of which is attached hereto as **Exhibit 6** and incorporated herein, RTSI submitted an EDS dated February 3, 2004, a true and correct copy of which is attached hereto as **Exhibit 7** and incorporated herein, which was signed by Bruce Higgins, as President and CEO of RTSI.

ANSWER:

Defendants admit that a true and correct copy of Amendment 1 to P.O. 3220 is

attached to the Amended Complaint as Exhibit 6 and that RTSI submitted an EDS dated

February 3, 2004 to the City signed by Bruce Higgins, as President and CEO of RTSI.

Defendants lack sufficient knowledge or information to form a belief as to whether the EDS was

58

submitted in connection with the amendment, and therefore deny the allegations thereof.

Defendants deny the remaining allegations in this paragraph.

251.    In connection with Amendment 1 to P.O. 3220, RHL submitted an EDS dated February 3, 2004, a true and correct copy of which is attached hereto as **Exhibit 8** and incorporated herein, which was signed by Bruce Higgins, as Director of RHL.

ANSWER:

Defendants admit that RHL submitted an EDS dated February 3, 2004 to the City signed by Bruce Higgins, as Director of RHL and that a true and correct copy of it is attached to the Amended Complaint as Exhibit 8. Defendants lack sufficient knowledge or information to form a belief as to whether the EDS was submitted in connection with the Amendment, and therefore deny the remaining allegations of this paragraph.

252.    In connection with Amendment 2 to P.O. 3220, a true and correct copy of which is attached hereto as **Exhibit 9** and incorporated herein, RTSI submitted an EDS dated September 14, 2005, a true and correct copy of which is attached hereto as **Exhibit 10** and incorporated herein, which was signed by Bruce Higgins, as President and CEO of RTSI.

ANSWER:

Defendants admit the allegations of this paragraph.

253.    In connection with Amendment 2 to P.O. 3220, RHL submitted an EDS dated September 14, 2005, a true and correct copy of which is attached hereto as **Exhibit 11** and incorporated herein, which was signed by Bruce Higgins, as Director of RHL.

ANSWER:

Defendants admit that RHL submitted an EDS dated September 14, 2005 to the City signed by Bruce Higgins, as Director of RHL and that a true and correct copy of it is attached to the Amended Complaint as Exhibit 11. Defendants lack sufficient knowledge or information to form a belief as to whether the EDS was submitted in connection with the amendment, and therefore deny the remaining allegations of this paragraph.

59

254. In connection with Amendment 3 to P.O. 3220, a true and correct copy of which is attached hereto as **Exhibit 12** and incorporated herein, RTSI submitted an EDS dated October 23, 2006, a true and correct copy of which is attached hereto as **Exhibit 13** and incorporated herein, which was signed by Richard Eden, as Secretary of RTSI.

ANSWER:

Defendants admit the allegations of this paragraph.

255. In connection with Amendment 3 to P.O. 3220, RHL submitted an EDS dated October 24, 2006, a true and correct copy of which is attached hereto as **Exhibit 14** and incorporated herein, which was signed by Graham Davie, as CEO of RHL.

ANSWER:

Defendants admit that the allegations of this paragraph.

**2.      P.O. 16393**

256. In connection with P.O. 16396, a true and correct copy of which is attached hereto as **Exhibit 15** and incorporated herein, RTSI submitted an EDS dated August 17, 2007, a true and correct copy of which is attached hereto as **Exhibit 16** and incorporated herein, which was signed by Karen Finley, as President & CEO of RTSI.

ANSWER:

Defendants admit that the allegations of this paragraph.

257. In connection with P.O. 16396, RHL submitted an EDS dated August 14, 2007, a true and correct copy of which is attached hereto as **Exhibit 17** and incorporated herein, which was signed by Christopher Cooper, as Chairman of RHL.

ANSWER:

Defendants admit the allegations of this paragraph.

258. In connection with Amendment 1 to P.O. 16396, a true and correct copy of which is attached hereto as **Exhibit 18** and incorporated herein, RTSI submitted an EDS dated January 29, 2013, a true and correct copy of which is attached hereto as part of **Exhibit 19** and incorporated herein, which was electronically signed by Tamara Dietrich, Director of Legislative Affairs for RTSI. This was the first time that RTSI disclosed the existence of the O'Malley Consulting Agreement.

60

ANSWER:

      Defendants admit the allegations of this paragraph.

259.     In connection with Amendment 1 to P.O. 16396, RHL submitted an EDS dated January 30, 2013, a true and correct copy of which is attached hereto as part of **Exhibit 19** and incorporated herein, which was electronically signed by Tamara Dietrich, Director of Legislative Affairs for RHL.

ANSWER:

      Defendants admit the allegations of this paragraph.

260.     In connection with Amendment 2 to P.O. 16396, a true and correct copy of which is attached hereto as **Exhibit 20** and incorporated herein, RTSI submitted an EDS dated July 31, 2013, a true and correct copy of which is attached hereto as **Exhibit 21** and incorporated herein, which was electronically signed by Tamara Dietrich, Director of Legislative Affairs for RTSI. A true and correct copy of Amendment 3 to P.O. 16396 is attached hereto as **Exhibit 22** and incorporated herein.

ANSWER:

      Defendants admit the allegations of this paragraph.

**3.     P.O. 18031**

261.     In connection with P.O. 18031, a true and correct copy of which is attached hereto as **Exhibit 23** and incorporated herein, RTSI submitted an EDS dated September 23, 2008, a true and correct copy of which is attached hereto as part of **Exhibit 24** and incorporated herein, which was signed by Karen Finley, as President and Chief Executive Officer of RTSI.

ANSWER:

      Defendants admit the allegations of this paragraph.

262.     In connection with P.O. 18031, RHL submitted an EDS dated September 23, 2008, a true and correct copy of which is attached hereto as part of **Exhibit 24** and incorporated herein, which was signed by Karen Finley, as Director of RHL.

ANSWER:

      Defendants admit the allegations of this paragraph.

263. In connection with Amendment 1 to P.O. 18031, a true and correct copy of which is attached hereto as **Exhibit 25** and incorporated herein, RTSI submitted an EDS dated January 29, 2013, a true and correct copy of which is attached hereto as part of **Exhibit 26** and incorporated herein, which was electronically signed by Tamara Dietrich, Director of Legislative Affairs for RTSI. This was the first time that RTSI disclosed the existence of the O'Malley Consulting Agreement.

ANSWER:

Defendants admit the allegations of the first sentence of this paragraph.

Defendants deny the remaining allegations in this paragraph and further state that at the time of

the amendment and EDS, RTSI had already contacted the City to self-report potential

improprieties and retained Sidley Austin to conduct a broad independent internal audit, the

results of which it shared with the City and that the bribery scheme and the involvement of

O'Malley had already been disclosed.

264. In connection with Amendment 1 to P.O. 18031, RHL submitted an EDS dated January 29, 2013, a true and correct copy of which is attached hereto as part of **Exhibit 26** and incorporated herein, which was electronically signed by Tamara Dietrich, Director of Legislative Affairs for RHL.

ANSWER:

Defendants admit that in connection with the amendment RHL submitted to the

City an EDS dated January 29, 2013, which was electronically signed by Tamara Dietrich, as

Director of Legislative Affairs for RHL and that a true and correct copy of the EDS is attached to

the Amended Complaint as Exhibit 26. Defendants deny the remaining allegations in this

paragraph and further state that at the time of the amendment and EDS, RTSI had already

contacted the City to self-report potential improprieties and retained Sidley Austin to conduct a

broad independent internal audit, the results of which it shared with the City and that the bribery

scheme and the involvement of O'Malley had already been disclosed.

265. In connection with Amendment 2 to P.O. 18031, a true and correct copy of which is attached hereto as **Exhibit 27** and incorporated herein, RTSI

62

submitted an EDS dated July 31, 2013, a true and correct copy of which is attached hereto as **Exhibit 28** and incorporated herein, which was electronically signed by Tamara Dietrich, Director of Legislative Affairs for RTSI. A true and correct copy of Amendment 3 to P.O. 18031 is attached hereto as **Exhibit 29** and incorporated herein.

ANSWER:

Defendants admit the allegations of this paragraph.

**4.     The False Statements and False Certifications**

266.     On the EDSs it submitted, RTSI falsely stated and/or certified, among other things, that:

a.  it had not bribed or attempted to bribe any employee of the City in each of the above-referenced EDSs;

b.  it was in compliance with the Ethics Ordinance, including but not limited to, Section 2-156-040 of the MCC, which prohibited offering or giving gifts, directly or indirectly, to any City official, employee or contractor whose decision may affect City business, in each of the above-referenced EDSs;

c.  no official or employee of the City had a financial interest in the City Contracts;

d.  it acknowledged and understood that the City's Governmental Ethics and Campaign Finance Ordinances, which, among other things, prohibits providing gifts, favors, cash, compensation, or anything of value, to City officials or employees unless wholly unrelated to their City duties, applied to the City Contracts.

ANSWER:

Defendants admit that RTSI submitted EDSs on which RTSI made certain certifications and that such submissions contained an RTSI signature and that each one stated that it had not bribed or attempted to bribe any employee of the City and that no official or employee of the City had a financial interest in the matter to which the EDS pertained. Defendants admit that the EDS forms varied and that Defendants each submitted some EDSs to the City, some of which stated that the undersigned understands and shall comply with the applicable requirements of the City's Governmental Ethics Ordinance and others which said that

the disclosing party understood and shall comply with the requirements of Chapters 2-55, 2-56 and 2-156 of the MCC. Defendants deny the remaining allegations of this paragraph.

267. On the EDSs it submitted, RHL falsely stated and/or certified, among other things, that:

    a.     it had not bribed or attempted to bribe any employee of the City in each of the above-referenced EDSs;

    b.     it was in compliance with the Ethics Ordinance, including but not limited to, Section 2-156-040 of the MCC, which prohibited offering or giving gifts, directly or indirectly, to any City official, employee or contractor whose decision may affect City business, in each of the above-referenced EDSs;

    c.     no official or employee of the City had a financial interest in the City Contracts;

    d.     it acknowledged and understood that the City's Ethics Ordinance and Campaign Finance Ordinances, which, among other things, prohibits providing gifts, favors, cash, compensation, or anything of value, to City officials or employees unless wholly unrelated to their City duties, applied to the City Contracts.

ANSWER:

Defendants admit that RHL submitted some EDSs on which RHL made certain certifications and that such submissions contained an RHL signature and that each one stated that it had not bribed or attempted to bribe any employee of the City and that no official or employee of the City had a financial interest in the matter to which the EDS pertained. Defendants admit that the EDS forms varied and that Defendants each submitted EDSs to the City, some of which stated that the undersigned understands and shall comply with the applicable requirements of the City's Governmental Ethics Ordinance and others which said that the disclosing party understood and shall comply with the requirements of Chapters 2-55, 2-56 and 2-156 of the MCC. Defendants deny the remaining allegations of this paragraph.

268. RTSI repeatedly failed to disclose the existence of the O'Malley Consulting Agreement in its EDSs.

ANSWER:

Defendants admit that RTSI did not state in all of the EDSs submitted by RTSI that RTSI and O'Malley had a consulting agreement. O'Malley was disclosed on at least some of the EDSs submitted by Defendants, as evidenced by the January 29, 2013 EDS attached to the Amended Complaint as Exhibit 26, in which O'Malley is identified as a retained party. Defendants deny the remaining allegations of this paragraph.

269.    RHL repeatedly failed to disclose the existence of the O'Malley Consulting Agreement in its EDSs.

ANSWER:

Defendants admit that RHL did not state in all of the EDSs submitted by RHL that RTSI and O'Malley had a consulting agreement. O'Malley was disclosed on at least some of the EDSs submitted by Defendants, as evidenced by the January 29, 2013 EDS attached to the Amended Complaint as Exhibit 26, in which O'Malley is identified as a retained party. Defendants deny the remaining allegations of this paragraph.

270.    RTSI repeatedly failed to disclose Bills as a lobbyist even though RTSI provided Bills with compensation and benefits, through, among other things, the O'Malley Consulting Agreement, in order to influence the award of the City Contracts to RTSI.

ANSWER:

Defendants admit that RTSI did not identify Bills as a lobbyist. Defendants deny the remaining allegations of this paragraph.

271.    RHL repeatedly failed to disclose Bills as a lobbyist even though RTSI provided Bills with compensation and benefits, through, among other things, the O'Malley Consulting Agreement, in order to influence the award of the City Contracts to RTSI.

ANSWER:

Defendants admit that RHL did not identify Bills as a lobbyist (because Bills was not a lobbyist for RHL). Defendants deny the remaining allegations of this paragraph.

272. RTSI repeatedly failed to disclose in its EDSs that it had bribed elected public officials in the City of Columbus and Cincinnati in return for the elected public officials agreeing to take, and actually taking, official acts on behalf of RTSI to obtain and retain municipal contracts.

ANSWER:

Defendants admit that RTSI did not state in its EDSs submitted to the City of Chicago that it had bribed elected officials in Columbus and Cincinnati. Defendants deny the remaining allegations of this paragraph.

273. RHL repeatedly failed to disclose in its EDSs that RTSI had bribed elected public officials in the City of Columbus and Cincinnati in return for the elected public officials agreeing to take, and actually taking, official acts on behalf of RTSI to obtain and retain municipal contracts.

ANSWER:

Defendants admit that RHL did not state in its EDSs submitted to the City of Chicago that RTSI had bribed elected officials in Columbus and Cincinnati. Defendants deny the remaining allegations of this paragraph.

274. The Defendants filed these false statements with the intent to induce the City to pay RTSI for its products and services.

ANSWER:

Defendants deny the allegations of this paragraph.

275. The City relied upon the Defendants' false statements and paid RTSI pursuant to the fraudulent contracts.

ANSWER:

Defendants deny the allegations of this paragraph.

K.     **Federal Guilty Pleas**

276.    On December 10, 2014, Martin O'Malley entered a voluntary guilty plea to conspiracy, in violation of 18 U.S.C § 371, to commit federal program bribery, prohibited by 18 U.S.C § 666(a)(1)(B), in relation to the payment of bribes in exchange for the City Contracts in Case No. 14 CR 135-2, pending in the Northern District of Illinois, Eastern Division.

ANSWER:

Defendants admit the allegations of this paragraph.

277.    In his guilty plea, O'Malley admitted, among other things, that between January 2003 and June 30, 2011, he conspired with John Bills, Karen Finley, Aaron Rosenberg, Bruce Higgins, and others, to corruptly solicit and demand, and to accept and agree to accept from another, things of value, namely cash payments of over $2 million and other personal financial benefits, for the benefit of Bills and O'Malley, intending that Bills be influenced and rewarded in connection with the City Contracts.

ANSWER:

Defendants deny that this paragraph accurately summarizes O'Malley's guilty plea and deny the remaining allegations of this paragraph.

278.    On June 10, 2015, Karen Finley pled guilty to conspiracy, in violation of 18 U.S.C § 371, in Case No. 2:15 CR 148, pending in the Southern District of Ohio, Eastern Division.

ANSWER:

Defendants admit the allegations of this paragraph.

279.    In her Ohio guilty plea, Finley admitted, among other things, that between 2005 and 2013, she agreed to, and did, provide campaign contributions to elected public officials in the City of Columbus and Cincinnati in return for the elected public officials agreeing to take, and actually taking, official acts on behalf of RTSI to obtain and retain municipal contracts.

ANSWER:

Defendants deny that this paragraph accurately summarizes Finley's guilty plea and deny the remaining allegations of this paragraph.

280.     On August 20, 2015, Karen Finley entered a voluntary guilty plea to conspiracy, in violation of 18 U.S.C § 371, to commit federal program bribery, prohibited by 18 U.S.C § 666(a)(2), in relation to the payment of bribes in exchange for the City Contracts in Case No. 14 CR 135-3, pending in the Northern District of Illinois, Eastern Division.

ANSWER:

Defendants admit the allegations of this paragraph.

281.     In her Illinois guilty plea, Finley admitted, among other things, that between January 2003 and June 30, 2011, she conspired with John Bills, Martin O'Malley, Aaron Rosenberg, Bruce Higgins, and others, to corruptly give, offer, and agree to give things of value, namely cash payments and other personal financial benefits, for the benefit of Bills and O'Malley, with intent to influence and reward Bills in connection with the City Contracts.

ANSWER:

Defendants deny that this paragraph accurately summarizes Finley's guilty plea and deny the remaining allegations of this paragraph.

282.     Finley further admitted in her Illinois guilty plea, among other things, that she falsely certified on EDSs in both August 2007 and September 2008, in connection with the application process for P.O. 16396 and P.O. 18031, respectively, that no agents of RTSI, during the prior five years, had bribed or attempted to bribe an employee of the City.

ANSWER:

Defendants deny that this paragraph accurately summarizes Finley's guilty plea and deny the remaining allegations of this paragraph.

## COUNT ONE
## VIOLATIONS OF THE CITY'S FALSE CLAIMS ORDINANCE
### MCC § 1-22-010, *et seq.*
### (Against RTSI and RHL)

283.     The City realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 282 of this Complaint as though fully alleged in this Count.

ANSWER:

Defendants incorporate by reference their answers and responses to paragraphs 1 through 282 of the Amended Complaint as their answers to paragraphs 1 through 282 hereof.

284. Section 1-22-020 of the MCC is violated when, among other things, any person:

(1) knowingly presents, or causes to be presented, to an official or employee of the city a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the city; [or] (3) conspires to defraud the city by getting a false or fraudulent claim allowed or paid.

ANSWER:

Defendants admit that the language of MCC 1-22-020 is accurately summarized herein.

285. Section 1-22-010 of the MCC defines a "claim" as:

any request or demand, whether under a contract or otherwise, for money or property which is made by a city contractor, grantee, or other recipient if the city is the source of any portion of the money or property which is requested or demanded, or if the city will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

ANSWER:

Defendants admit the allegations of this paragraph.

286. Section 1-22-020(7) of the Municipal Code of Chicago provides, in pertinent part, that any person who:

knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the city, is liable to the city for a civil penalty of not less than $5,000.00 and not more than $10,000.00, plus three times the amount of damages which the city sustains because of the act of that person. A person violating this section shall also be liable to the city for the attorneys' fees and costs of a civil action brought to recover any such penalty or damages.

20676090.5

ANSWER:

Defendants admit the allegations of this paragraph.

287.    RTSI entered into the City Contracts for the purchase and maintenance of its DARLEP systems.

ANSWER:

Defendants admit that RTSI entered into several contracts with the City of Chicago for, among other products and services, the purchase and maintenance of DARLEP systems. Defendants deny the remaining allegations of this paragraph.

288.    In connection with the City Contracts, RTSI agreed to observe and comply with all applicable federal, state, county and municipal laws, statutes ordinances and executive orders.

ANSWER:

Defendants admit that RTSI submitted certain EDSs and made certain statements, as admitted above. Defendants deny the remaining allegation of this paragraph.

289.    As described above, Defendants had systematically bribed Bills through, among other things, the O'Malley Consulting Agreement, the payment of Bills' expenditures, and assisting Bills to obtain employment after his retirement from the City, with the intent to influence and reward Bills for steering the City Contracts to RTSI.

ANSWER:

Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore deny said allegations.

290.    Both RTSI and RHL submitted numerous EDSs to the City as part of RTSI's contractual obligations to the City.

ANSWER:

Defendants admit that they each signed certain EDSs that were submitted to the City, as admitted above. Defendants deny the remaining allegations of this paragraph.

70

20676090.5

291.     On each of these EDSs, both RTSI and RHL certified that they had not bribed or attempted to bribe any employee of the City.

ANSWER:

Defendants admit that they each signed certain EDSs that were submitted to the City, as admitted above, but not that they both signed all such EDSs. Defendants deny the remaining allegations of this paragraph.

292.     Both RTSI and RHL falsely certified in their EDSs that they were in compliance with the applicable requirements of the Ethics Ordinance, including but not limited to, Section 2156-040 of the MCC, which prohibited offering or giving gifts, directly or indirectly, to any City official, employee or contractor whose decision may affect City business.

ANSWER:

Defendants state that the EDS forms varied and that Defendants each submitted some EDSs to the City, some of which stated that the undersigned understands and shall comply with the applicable requirements of the City's Governmental Ethics Ordinance and others which said that the disclosing party understood and shall comply with the requirements of Chapters 2-55, 2-56 and 2-156 of the MCC. Defendants state that the EDSs attached to the Amended Complaint contain the specific statements made with regard to each submission. Defendants deny the remaining allegations of this paragraph.

293.     Both RTSI and RHL falsely certified in their EDSs that no official or employee of the City had a financial interest in the City Contracts.

ANSWER:

Defendants deny the allegations of this paragraph.

294.     Both RTSI and RHL repeatedly failed to disclose the existence of the O'Malley Consulting Agreement on their EDSs.

71

ANSWER:

Defendants admit that they did not identify the O'Malley Consulting Agreement to the City of Chicago on all EDSs. O'Malley was disclosed on at least some of the EDSs submitted by Defendants, as evidenced by the January 29, 2013 EDS attached to the Amended Complaint as Exhibit 26, in which O'Malley is identified as a retained party. Defendants deny the remaining allegations of this paragraph.

295. Both RTSI and RHL certified in their EDSs that they acknowledged and understood that the City's Governmental Ethics and Campaign Finance Ordinances, which, among other things, prohibits providing gifts, favors, cash, compensation, or anything of value, to City officials or employees unless wholly unrelated to their City duties, applied to the City Contracts.

ANSWER:

Defendants admit that the EDS forms varied and that Defendants each submitted EDSs to the City, some of which stated that the undersigned understands and shall comply with the applicable requirements of the City's Governmental Ethics Ordinance and others which said that the disclosing party understood and shall comply with the requirements of Chapters 2-55, 2-56 and 2-156 of the MCC. Defendants state that the EDSs attached to the Amended Complaint contain the specific statements made with regard to each submission. Defendants deny the remaining allegations of this paragraph.

296. Both RTSI and RHL repeatedly failed to disclose Bills as a lobbyist even though RTSI provided Bills with compensation and benefits, including through the O'Malley Consulting Agreement, in order to influence the award of the City Contracts to RTSI.

ANSWER:

Defendants deny the allegations of this paragraph.

297. Each of these claims made by RTSI and RHL in the EDSs was false.

ANSWER:

Defendants deny the allegations of this paragraph.

298.    RTSI also submitted approximately 520 invoices to the City under the City Contracts, including but not limited to invoices for new red-light camera installations, monthly invoices for maintenance and operation fees for each system, as well as invoices for additional fees for repairs and relocations of red-light camera systems.

ANSWER:

Defendants admit the allegations of this paragraph.

299.    Each of these claims made by RTSI in the City Contracts and invoices was false.

ANSWER:

Defendants deny the allegations of this paragraph.

300.    Defendants knew that each of these claims in the City Contracts, in the invoices, and in the EDSs was false.

ANSWER:

Defendants deny the allegations of this paragraph.

301.    Defendants made these knowingly false claims in the City Contracts, in the invoices, and in the EDSs in order to induce the City to award the City Contracts to RTSI, and to pay RTSI on these fraudulent contracts.

ANSWER:

Defendants deny the allegations of this paragraph.

302.    Each of these false claims in the City Contracts, in the invoices, and in the EDSs constitutes a separate violation of the FCO.

ANSWER:

Defendants deny the allegations of this paragraph.

303.    The City relied on the false or fraudulent claims when it (a) awarded RTSI the City Contracts to the detriment of the City, and (b) paid RTSI on each City Contract and invoice.

ANSWER:

> Defendants deny the allegations of this paragraph.

304. Had the City known that these claims were false, the City would never have entered into the City Contracts with RTSI and/or would have terminated the City Contracts with RTSI.

ANSWER:

> Defendants deny the allegations of this paragraph.

305. In addition, Defendants have conspired with each other to defraud the City by getting false or fraudulent claims allowed or paid by the City in violation of Section 1-22-020(3) of the MCC.

ANSWER:

> Defendants deny the allegations of this paragraph.

306. The City suffered damages in a substantial amount to be determined at trial in reliance on, among other things, Defendants' false claims that they had not bribed or attempted to bribe any employee of the City, and that they had complied and would comply with all applicable laws.

ANSWER:

> Defendants deny the allegations of this paragraph.

307. Since 2003, the City has paid approximately $125,904,645.92 to RTSI under its Contracts with the City.

ANSWER:

> Defendants deny the allegations of this paragraph.

**COUNT TWO**
**VIOLATIONS OF THE CITY'S FALSE STATEMENTS ORDINANCE**
**MCC § 1-21-010, *et seq.***
**(Against RTSI and RHL)**

308. The City realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 282 of this Complaint as though fully alleged in this Count.

20676090.5

ANSWER:

Defendants incorporate by reference their answers and responses to paragraphs 1

through 282 of the Amended Complaint as their answers to paragraphs 1 through 282 hereof.

309.    Section 1-21-010(a) of the MCC provides, in pertinent part:

Any person who knowingly makes a false statement of material fact to the
city in violation of any statute, ordinance or regulation, or who knowingly
makes a false statement of material fact to the city in connection with any
application, report, affidavit, oath, or attestation, including a statement of
material fact made in connection with a bid, proposal, contract or
economic disclosure statement or affidavit, is liable to the city for a civil
penalty of not less than $500.00 and not more than $1,000.00, plus up to
three times the amount of damages which the city sustains because of the
person's violation of this section. A person who violates this section shall
also be liable for the city's litigation and collection costs and attorney's
fees. The penalties imposed by this section shall be in addition to any
other penalty provided for in the municipal code.

ANSWER:

Defendants admit the allegations of this paragraph.

310.    Subsection 1-21-010(d) of the MCC provides, in pertinent part, that:

For the purposes of Chapter 1-21 of this Code, a person knowingly makes
a false statement of material fact when that person (i) makes a statement of
material fact with actual knowledge that the statement was false, or (ii)
makes a statement of material fact with knowledge of facts or information
that would cause a reasonable person to be aware that the statement was
false when it was made, or (iii) signs, certifies, attests, submits or
otherwise provides assurances, or causes any other person to sign, certify,
attest, submit or otherwise provide assurances, that a statement of material
fact is true or accurate in deliberate ignorance or reckless disregard of the
truth or falsity of the statement. For purposes of this section, a person who
fails to make a reasonable investigation to determine the accuracy,
truthfulness or completeness of any material fact acts in deliberate
ignorance or reckless disregard of the truth or falsity of the material fact.

ANSWER:

Defendants admit the allegations of this paragraph.

311.    Subsection 1-21-020 of the MCC provides, in pertinent part, that:

> Any person who aids, abets, incites, compels or coerces the doing of any act prohibited by this chapter shall be liable to the city for the same penalties for the violation.

ANSWER:

Defendants admit the allegations of this paragraph.

312.    RTSI entered into the City Contracts for the purchase and maintenance of its DARLEP systems.

ANSWER:

Defendants admit that RTSI entered into various contracts with the City of

Chicago, some of which were for the purchase and/or maintenance of DARLEP systems.

Defendants deny the remaining allegations of this paragraph.

313.    In connection with each of the City Contracts, RTSI agreed to observe and comply with all applicable federal, state, county and municipal laws, statutes, ordinances and executive orders.

ANSWER:

Defendants admit that the contracts with the City contained a provision requiring

RTSI to comply with all applicable federal, state, county and municipal laws, statutes,

ordinances and executive orders.  Defendants deny the remaining allegations of this paragraph.

314.    As described above, Defendants had systematically bribed Bills through, among other things, the O'Malley Consulting Agreement, the payment of Bills' expenditures, and assisting Bills to obtain employment after his retirement from the City, with the intent to influence and reward Bills for steering the City Contracts to RTSI.

ANSWER:

Defendants deny the allegations of this paragraph.

315.    Both RTSI and RHL also submitted numerous EDSs to the City as part of RTSI's contractual obligations to the City.

ANSWER:

Defendants admit that RTSI and RHL each submitted some EDSs to the City of

Chicago as part of the process for entering into contracts between RTSI and the City.

Defendants deny the remaining allegations of this paragraph.

316.    On each of these EDSs, both RTSI and RHL certified that they had not
        bribed or attempted to bribe any employee of the City.

ANSWER:

Defendants deny the allegations of this paragraph.

317.    Both RTSI and RHL falsely certified in their EDSs that they were in
        compliance with the applicable requirements of the Ethics Ordinance,
        including but not limited to, Section 2-156-040 of the MCC, which
        prohibited offering or giving gifts, directly or indirectly, to any City
        official, employee or contractor whose decision may affect City business.

ANSWER:

Defendants admit that Defendants each submitted EDSs to the City, some of

which stated that the undersigned understands and shall comply with the applicable requirements

of the City's Governmental Ethics Ordinance and others which said that the disclosing party

understood and shall comply with the requirements of Chapters 2-55, 2-56 and 2-156 of the

MCC.  Defendants state that the EDSs attached to the Amended Complaint contain the specific

statements made with regard to each submission.  Defendants deny the remaining allegations of

this paragraph.

318.    Both RTSI and RHL falsely certified in their EDSs that no official or
        employee of the City had a financial interest in the City Contracts.

ANSWER:

Defendants admit that Defendants each submitted some EDSs to the City, some of

which stated that no official or employee of the City had a financial interest in the contract to

which it pertained.  Defendants state that the EDSs attached to the Amended Complaint contain

the specific statements made with regard to each submission.  Defendants deny the remaining allegations of this paragraph.

319.    Both RTSI and RHL repeatedly failed to disclose the existence of the O'Malley Consulting Agreement on their EDSs.

ANSWER:

Defendants deny the allegations of this paragraph.  O'Malley was disclosed on at least some of the EDSs submitted by Defendants, as evidenced by the January 29, 2013 EDS attached to the Amended Complaint as Exhibit 26, in which O'Malley is identified as a retained party.

320.    Both RTSI and RHL falsely certified in their EDSs that they acknowledged and understood that the City's Governmental Ethics and Campaign Finance Ordinances, which, among other things, prohibits providing gifts, favors, cash, compensation, or anything of value, to City officials or employees unless wholly unrelated to their City duties, applied to the City Contracts.

ANSWER:

Defendants admit that Defendants each submitted some EDSs to the City, some of which stated that the undersigned understands and shall comply with the applicable requirements of the City's Governmental Ethics Ordinance and others which said that the disclosing party understood and shall comply with the requirements of Chapters 2-55, 2-56 and 2-156 of the MCC.  Defendants state that the EDSs attached to the Amended Complaint contain the specific statements made with regard to each submission.  Defendants deny the remaining allegations of this paragraph.

321.    Both RTSI and RHL repeatedly failed to disclose Bills as a lobbyist even though RTSI provided Bills with compensation and benefits, including through the O'Malley Consulting Agreement, in order to influence the award of the City Contracts to RTSI.

ANSWER:

Defendants deny the allegations of this paragraph.

322.    Each of these statements made by RTSI and RHL in the EDSs was false.

ANSWER:

Defendants deny the allegations of this paragraph.

323.    RTSI also submitted approximately 520 invoices to the City under each of the City Contracts, including but not limited to invoices for new red-light camera installations, monthly invoices for maintenance and operation fees for each system, as well as invoices for additional fees for repairs and relocations of red-light camera systems.

ANSWER:

Defendants admit that RTSI submitted invoices to the City for red-light systems, maintenance, operating fees, repairs and relocations.  Defendants deny the remaining allegations of this paragraph.

324.    Each of these statements made by RTSI in the City Contracts and invoices was false.

ANSWER:

Defendants deny the allegations of this paragraph.

325.    Defendants knew that each of these statements in the City Contracts, in the invoices, and in the EDSs was false.

ANSWER:

Defendants deny the allegations of this paragraph.

326.    Defendants made these knowingly false statements in the City Contracts, in the invoices, and in the EDSs in order to induce the City to award the City Contracts to RTSI and to pay RTSI on these fraudulent contracts.

ANSWER:

Defendants deny the allegations of this paragraph.

327.    Each of these false statements in the City Contracts, in the invoices, and in the EDSs constitutes a separate violation of the FSO.

ANSWER:

    Defendants deny the allegations of this paragraph.

328.    The City relied on the false statements when it (a) awarded RTSI the City Contracts to the detriment of the City, and (b) paid RTSI on each City Contract and invoice.

ANSWER:

    Defendants deny the allegations of this paragraph.

329.    Had the City known that these statements were false, the City would never have entered into the City Contracts with RTSI and/or would have terminated the City Contracts with RTSI.

ANSWER:

    Defendants deny the allegations of this paragraph.

330.    The City suffered damages in a substantial amount to be determined at trial in reliance on, among other things, Defendants' false statements that they had not bribed or attempted to bribe any employee of the City, and that it would comply with all applicable laws.

ANSWER:

    Defendants deny the allegations of this paragraph.

331.    Since 2003, the City has paid for approximately $125,904,645.92 to RTSI under its Contracts with the City.

ANSWER:

    Defendants deny the allegations of this paragraph.

332.    By virtue of the above-described acts, Defendants also aided, abetted, incited, and caused others to make false statements of material fact to the City in violation of any statute, ordinance or regulation, or make false statements of material fact to the City in connection with a claim for payment, within the meaning of MCC § 1-21-010.

ANSWER:

    Defendants deny the allegations of this paragraph.

**COUNT THREE**
**CONSUMER FRAUD – DECEPTIVE PRACTICES**
**VIOLATIONS OF MCC § 2-25-090 AND 815 ILCS 505/2**
**(Against RTSI and RHL)**

333.     The City realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 282 of this Complaint as though fully alleged in this Count.

ANSWER:

Defendants incorporate by reference their answers and responses to paragraphs 1

through 282 of the Amended Complaint as their answers to paragraphs 1 through 282 hereof.

334.     MCC § 2-25-090 makes it unlawful for a business to "engage in any act of consumer fraud, unfair method of competition, or deceptive practice while conducting any trade or business in the city," including "any conduct constituting an unlawful practice under the Illinois Consumer Fraud and Deceptive Business Practices Act."

ANSWER:

Defendants admit that this paragraph accurately quotes portions of the Chicago

Municipal Ordinance and the Illinois Consumer Fraud and Deceptive Trade Practices Act.

Defendants deny the remaining allegations of this paragraph.

335.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, makes unlawful, among other things, "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' . . . in the conduct of any trade or commerce."

20676090.5

ANSWER:

Defendants admit that this paragraph accurately quotes portions of the Illinois Consumer Fraud and Deceptive Business Practices Act. Defendants deny the remaining allegations of this paragraph.

336. Section 2-25-090(f) of the Municipal Code of Chicago provides, in pertinent part:

Except as otherwise provided in this chapter, and in addition to any other penalty provided by law, any person who violates any of the requirements of this section shall be subject to a fine of not less than $2,000.00 nor more than $10,000.00 for each offense. Each day that a violation continues shall constitute a separate and distinct offense to which a separate fine shall apply.

ANSWER:

Defendants admit that Section 2-25-090(f) of the Municipal Code of Chicago currently provides as stated by the City in this paragraph, but states that the language quoted above did not become effective until some time in 2012. Defendants deny the remaining allegations of this paragraph.

337. Defendants knowingly engaged in a systematic scheme of bribery of Bills through, among other things, the O'Malley Consulting Agreement, the payment of Bills' expenditures, and the assistance provided to Bills to obtain employment after he retired from the City, while conducting their business in the City, with the intent to influence and reward Bills for steering the City Contracts to RTSI, which conduct constitutes deceptive practices, in violation of MCC § 2-25-090 and 815 ILCS 505/2.

ANSWER:

Defendants deny the allegations of this paragraph.

338. Throughout this same period, Defendants knowingly submitted numerous deceptive and false statements, claims and certifications in the City Contracts, EDSs, and invoices, while conducting their business in the City.

ANSWER:

Defendants deny the allegations of this paragraph.

82

339.    Both RTSI and RHL certified on their EDSs that they had not bribed or attempted to bribe any employee of the City.

ANSWER:

Defendants admit that RTSI and RHL each submitted some EDSs stating that they had not bribed or attempted to bribe any employee of the City.  Defendants deny the remaining allegations of this paragraph.

340.    Both RTSI and RHL falsely certified in their EDSs that they were in compliance with the applicable requirements of the Ethics Ordinance, including but not limited to, Section 2156-040 of the MCC, which prohibited offering or giving gifts, directly or indirectly, to any City official, employee or contractor whose decision may affect City business.

ANSWER:

Defendants deny the allegations of this paragraph.

341.    Both RTSI and RHL falsely certified in their EDSs that no official or employee of the City had a financial interest in the City Contracts.

ANSWER:

Defendants deny the allegations of this paragraph.

342.    Both RTSI and RHL repeatedly failed to disclose the existence of the O'Malley Consulting Agreement on their EDSs.

ANSWER:

Defendants deny the allegations of this paragraph.  O'Malley was disclosed on at least some of the EDSs submitted by Defendants, as evidenced by the January 29, 2013 EDS attached to the Amended Complaint as Exhibit 26, in which O'Malley is identified as a retained party.

343.    Both RTSI and RHL falsely certified in their EDSs that they acknowledged and understood that the City's Governmental Ethics and Campaign Finance Ordinances, which, among other things, prohibits providing gifts, favors, cash, compensation, or anything of value, to City officials or employees unless wholly unrelated to their City duties, applied to the City Contracts.

20676090.5

ANSWER:

      Defendants deny the allegations of this paragraph.

344.    Both RTSI and RHL repeatedly failed to disclose Bills as a lobbyist even though RTSI provided Bills with compensation and benefits, including through the O'Malley Consulting Agreement, in order to influence the award of the City Contracts to RTSI.

ANSWER:

      Defendants deny the allegations of this paragraph.

345.    Such conduct constitutes deceptive practices, in violation of MCC § 2-25-090 and 815 ILCS 505/2.

ANSWER:

      Defendants deny the allegations of this paragraph.

346.    The City relied on Defendants' false and deceptive statements when it (a) awarded the City Contracts to RTSI to the detriment of the City, and (b) paid RTSI on each Contract and invoice.

ANSWER:

      Defendants deny the allegations of this paragraph.

347.    Had the City known that these statements were false and deceptive, the City would have never entered into the City Contracts with RTSI and/or would have terminated the City Contracts with RTSI.

ANSWER:

      Defendants deny the allegations of this paragraph.

348.    By reason of Defendants' deceptive practices, the City has been damaged in a substantial amount to be determined at trial.

ANSWER:

      Defendants deny the allegations of this paragraph.

349.    Since 2003, the City has paid approximately $125,904,645.92 to RTSI under the City Contracts.

ANSWER:

Defendants deny the allegations of this paragraph.

**COUNT FOUR**
**BREACH OF CONTRACT**
**(Against RTSI)**

350.    The City realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 282 of this Complaint as though fully alleged in this Count.

ANSWER:

RTSI incorporates by reference its answers and responses to paragraphs 1 through 282 of the Amended Complaint as its answers to paragraphs 1 through 282 hereof.

351.    The City and RTSI entered into the City Contracts, pursuant to which RTSI agreed to provide goods and services in exchange for payments from the City.

ANSWER:

RTSI admits that it entered into various agreements with the City, and amendments thereto, pursuant to which RTSI agreed to provide various products and services and that the City agreed to pay RTSI for those products and services.  RTSI denies the remaining allegations of this paragraph.

352.    The parties' respective obligations are clearly and definitively set forth in the City Contracts.

ANSWER:

RTSI admits that it entered into various agreements with the City, and amendments thereto, and that those agreements and amendments set forth the parties' respective obligations.  RTSI denies the remaining allegations of this paragraph.

353.    The City performed all of its obligations to RTSI under the City Contracts.

ANSWER:

  RTSI denies the allegations of this paragraph.

  354. RTSI was contractually required to "observe and comply with all applicable federal, state, county and municipal laws, statutes, regulations, codes, ordinances and executive orders . . . whether or not they appear in the Contract." Contract P.O. 3320 at § 10.1(a); Contract P.O. 16396 at § 10.1(a); Contract P.O. 18031 at § 6.1(a).

ANSWER:

  RTSI admits that one or more of the agreements it entered into with the City for products and services contained the language quoted in this paragraph. RTSI denies the remaining allegations of this paragraph.

  355. RTSI "represent[ed] that [RTSI] and, to the best of its knowledge, its Subcontractors are not in violation of the provisions of Section 2-92-320 of Chapter 2-92 of the Municipal Code of Chicago, and in connection with it, and additionally in connection with the Illinois Criminal Code, 720 ILCS 5/33E as amended, and the Illinois Municipal Code, 65 ILCS 5/11-42.1-1." Contract P.O. 3320 at § 11.1(h); Contract P.O. 16396 at § 11.1(h); Contract P.O. 18031 at § 7.1(f).

ANSWER:

  RTSI admits that one or more of the agreements it entered into with the City for products and services contained the language quoted in this paragraph. RTSI denies the remaining allegations of this paragraph.

  356. RTSI further "acknowledge[d] that any certification, affidavit or acknowledgment made under oath in connection with this Agreement is made under penalty of perjury and, if false, is also cause for termination." Contract P.O. 3320 at § 11.1(i); Contract P.O. 16396 at § 11.1(i); Contract P.O. 18031 at § 7.1(6).

ANSWER:

  RTSI admits that one or more of the agreements it entered into with the City for products and services contained the language quoted in this paragraph. RTSI denies the remaining allegations of this paragraph.

357.   In each of its EDSs, RTSI confirmed that the certification, disclosure and acknowledgements contained in the EDS become part of any contract awarded by the City, and were material inducements to the City's execution of any contract or taking any other action with respect to the subject of the EDS.

ANSWER:

RTSI denies the allegations of this paragraph.

358.   Since the beginning of the contractual relationship between the City and RTSI, RTSI consistently and materially failed to perform many of its obligations under the City Contracts, including but not limited to submitting false claims to the City for payment, submitting false statements in its EDSs, bribing former City employee Bills, and violating numerous federal, state and municipal laws, including but not limited to 18 U.S.C §§ 371 and 666(a)(2), MCC §§ 1-21-010, 1-21-020, 1-22-020, 2-25-090 and 2-156-040(c), 720 ILCS 331(a), 720 ILCS 5/33E and 815 ILCS 505/2.

ANSWER:

RTSI denies the allegations of this paragraph.

359.   The City has been damaged as a result of RTSI's breaches of contract in an amount to be determined at trial.

ANSWER:

RTSI denies the allegations of this paragraph.

## COUNT FIVE
## CIVIL CONSPIRACY
### (Against RTSI and RHL)

360.   The City realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 282 of this Complaint as though fully alleged in this Count.

ANSWER:

Defendants incorporate by reference their answers and responses to paragraphs 1 through 282 of the Amended Complaint as their answers to paragraphs 1 through 282 hereof.

361.   Defendants have conspired and agreed with each other and with Bills and O'Malley to commit unlawful acts or lawful acts in an unlawful manner.

ANSWER:

    Defendants deny the remaining allegations of this paragraph.

362.    RTSI, RHL, Bills and O'Malley knowingly and voluntarily engaged in a concerted scheme to submit false statements and false claims for payment to the City, and to systematically bribe Bills with the intent to influence and reward Bills for steering the City Contracts to RTSI.

ANSWER:

    Defendants deny the remaining allegations of this paragraph.

363.    In furtherance of their concerted scheme, RTSI and RHL submitted false statements and false claims for payment to the City, and systematically bribed Bills with the intent to influence and reward Bills for steering the City Contracts to RTSI

ANSWER:

    Defendants deny the remaining allegations of this paragraph.

364.    By reason of Defendants' unlawful acts, the City has been damaged by paying Redflex under the fraudulently obtained City Contracts.

ANSWER:

    Defendants deny the remaining allegations of this paragraph.

## COUNT SIX
## KICKBACKS
## VIOLATION OF 720 ILCS 5/33E
### (Against RTSI and RHL)

365.    The City realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 282 of this Complaint as though fully alleged in this Count.

ANSWER:

    Defendants incorporate by reference their answers and responses to paragraphs 1

through 282 of the Amended Complaint as their answers to paragraphs 1 through 282 hereof.

366.    A "kickback" means "any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee,

subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract." 720 ILCS 5/33E-2(g).

ANSWER:

Defendants admit that this paragraph accurately quotes a portion of 720 ILCS

5/33E-2(g). Defendants deny the remaining allegations of this paragraph.

367.    A person violates 720 ILCS 5/33E-7(a) when he knowingly either:

(1)    provides, attempts to provide or offers to provide any kickback;
(2)    solicits, accepts or attempts to accept any kickback; or
(3)    includes, directly or indirectly, the amount of any kickback prohibited by paragraphs (1) or (2) of this subsection (a) in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to any unit of State or local government for a public contract.

ANSWER:

Defendants admit that this paragraph accurately quotes a portion of 720 ILCS

5/33E-7(a). Defendants deny the remaining allegations of this paragraph.

368.    Section 5/33-E-7(d) provides that the City may "recover a civil penalty from any person who knowingly engages in conduct which violates paragraph (3) of subsection (a) of this Section in twice the amount of each kickback involved in the violation."

ANSWER:

Defendants admit that this paragraph accurately quotes a portion of 720 ILCS

5/33E-7(d). Defendants deny the remaining allegations of this paragraph.

369.    RTSI knowingly entered into a subcontract with O'Malley, the O'Malley Consulting Agreement, whereby O'Malley agreed to provide, among other things, customer management and sales representation services to Redflex in connection with the City Contracts.

89

ANSWER:

Defendants admit that RTSI entered into an agreement with O'Malley to provide

certain services to RTSI. Defendants deny the remaining allegations of this paragraph.

370. RTSI knowingly entered into the O'Malley Consulting Agreement for the purpose of improperly obtaining or rewarding favorable treatment in connection with the City Contracts.

ANSWER:

Defendants deny the allegations of this paragraph.

371. RTSI and RHL knowingly provided, attempted to provide or offered to provide kickbacks to O'Malley under the O'Malley Consulting Agreement in connection with the City Contracts.

ANSWER:

Defendants deny the allegations of this paragraph.

372. Between 2003 and 2011, RTSI paid O'Malley over $2 million under the O'Malley Consulting Agreement, including salary payments (approximately $465,000), reimbursed expenses ($47,000), and bonuses and commissions (approximately $1,512,434).

ANSWER:

Defendants deny the allegations of this paragraph.

373. The payments made to O'Malley under the O'Malley Consulting Agreement were directly or indirectly charged by RTSI to the City under the City Contracts.

ANSWER:

Defendants deny the allegations of this paragraph.

374. The payments made to O'Malley under the O'Malley Consulting Agreement were kickbacks relating to the City Contracts.

ANSWER:

Defendants deny the allegations of this paragraph.

375.     The City is entitled to recover from Defendants a civil penalty of twice the amount of each payment made to O'Malley under the O'Malley Consulting Agreement.

ANSWER:

Defendants deny the allegations of this paragraph.

## COUNT SEVEN
## UNJUST ENRICHMENT
### (Pled in the Alternative – Against RTSI and RHL)

376.     The City realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 282 of this Complaint as though fully alleged in this Count.

ANSWER:

Defendants incorporate by reference their answers and responses to paragraphs 1

through 282 of the Amended Complaint as their answers to paragraphs 1 through 282 hereof.

377.     Defendants have unjustly retained a benefit to the City's detriment, and the Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

ANSWER:

Defendants deny the allegations of this paragraph.

378.     By systematically bribing Bills through, among other things, the O'Malley Consulting Agreement, the payment of Bills' expenditures, and assisting Bills to obtain employment after his retirement from the City, with the intent to influence and reward Bills for steering the City Contracts to RTSI, Defendants have unjustly enriched themselves at the City's expense. The City has made payments to RTSI, and Defendants have benefited from those payments. Because of their false statements, false claims, and deceptive trade practices, Defendants obtained enrichment they would not otherwise have obtained. The enrichment was without justification and the City lacks a remedy provided by law.

ANSWER:

Defendants deny the allegations of this paragraph.

379.     By reason of Defendants' unlawful acts, the City has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

ANSWER:

Defendants deny the allegations of this paragraph.

## AFFIRMATIVE DEFENSES

Defendants Redflex Traffic Systems, Inc. ("RTSI") and RedFlex Holding, Ltd. ("RHL"), collectively "Defendants," submit under Federal Rules of Civil Procedure 8(c) and 12(b) the following affirmative defenses against the Relator Aaron Rosenberg and the City of Chicago, collectively "Plaintiffs."

### I.   UNCLEAN HANDS (Against Aaron Rosenberg)

1.      The alleged bribery scheme was, by the City's own admission, initiated by Deputy Commissioner Bills with the cooperation of Relator, Aaron Rosenberg.  Rosenberg met with Bills and agreed to make payments to Bills without the authority to do so.  Rosenberg initially acted without the knowledge of others at RTSI.  Only later, Rosenberg told others at RTSI what Bills demanded, after the City awarded the contract to RTSI.

2.      It would be inequitable and unfair for Rosenberg to participate as the relator in this action and, therefore his claim as the relator is barred by the doctrine of unclean hands.

### II.   UNCLEAN HANDS (Against the City)

3.      Defendants reallege and incorporate herein by reference each of the allegations contained in paragraphs 1 through 2 of these Affirmative Defenses

4.      The City alleges that RTSI obtained the City's red-light contracts by bribing a high-level City employee, Deputy Commissioner John Bills, and that RTSI continued to bribe Bills for nearly ten years.  However, by the City's own admission, Bills initiated the bribery scheme.

5.      Before Deputy Commissioner Bills even approached Rosenberg for a bribe, he assisted RTSI in preparing to bid for the City contract with no indication that he was doing

anything out of the ordinary or improper, and without even the hint that he was expecting anything in return. It was only after the contract was awarded to RTSI that Bills demanded money and initiated the bribery scheme.

6. The City was in the best position to learn about the alleged bribery scheme and should have identified such bribes years ago. For example, on February 23, 2007, Alderman Edward Burke wrote a seven-page letter to the City's Corporation Counsel and its Chief Procurement Officer, complaining that the "competitive bidding process was compromised" when RTSI secured a 2006 contract and urging that the contract be rescinded.

7. Likewise, the City itself alleges that Bills claims to have been offered a bribe in 2003 by RTSI's main competitor, Affiliated Computer Systems, Inc., well before he asked Rosenberg for a bribe.

8. The City failed to properly supervise Bills or adequately investigate the failure to follow its own procedures. Instead, it gave practically unfettered authority to Bills and placed him in a situation where he could solicit bribes from vendors.

9. It would be unfair and inequitable for the City to receive from the Defendants the damages and penalties it demands in its Amended Complaint and, thus, its claims are barred by unclean hands.

### III. LIMITATION ON CIVIL PENALTIES UNDER THE MUNICIPAL CONSUMER FRAUD ACT

10. Defendants reallege and incorporate herein by reference each of the allegations contained in paragraphs 1 through 9 of these Affirmative Defenses.

11. The City amended the Chicago Consumer Fraud Ordinance, Municipal Code of Chicago ("MCC") § 2-25-090, in mid-2012 to increase civil penalties from $500 to $2,000 for each day for each violation to $2,000 to $10,000 per day per violation. Any penalties based on

alleged activity prior to the effective date of the mid-2012 amendment are limited to the penalty levels of the prior ordinance.

12.     The increased civil penalties were not retroactive.  Even if they were, such application would violate the *ex post facto* provision of the United States Constitution.  *See* U.S. CONST. Art. I, § 9.

## IV.     LIMITATION ON APPLICABLILITY OF MUNICIPAL CONSUMER FRAUD ACT

13.     Defendants reallege and incorporate herein by reference each of the allegations contained in paragraphs 1 through 12 of these Affirmative Defenses.

14.     The Chicago Consumer Fraud Ordinance, MCC § 2-25-090, was enacted as of November 19, 2008.  The ordinance is not retroactive and, thus, there can be no recovery under the Municipal Consumer Fraud Act for events occurring prior to that date.

## V.     PUBIC DISCLOSURE BAR (Against Rosenberg)

15.     Defendants reallege and incorporate herein by reference each of the allegations contained in paragraphs 1 through 14 of these Affirmative Defenses.

16.     Pursuant to Chicago False Claims Ordinance, § 1-22-030(f), the Court lacks jurisdiction over Rosenberg's claim as the relator because the facts underlying his claim were publically disclosed prior to the filing of this lawsuit, and Rosenberg was not the original source of the information upon which the claims are based. Therefore, the Court lacks subject matter jurisdiction to allow Rosenberg to participate as the relator under the false Claims Ordinance.

17.     Only the False Claims Ordinance provides for participation by a *qui tam* relator and he therefore lacks standing to participate in any of the City's other claims.  Defendants have moved to dismiss Rosenberg on these bases.

94

## VI.     PRIOR KNOWLEDGE (Against the City)

18.     Defendants reallege and incorporate herein by reference each of the allegations contained in paragraphs 1 through 17 of these Affirmative Defenses.

19.     No later than October 2012, the City was made aware of potential improprieties by Rosenberg and RTSI.  For example, on or about October 3, 2012, RTSI met with the City to self-report that Rosenberg had submitted a "questionable expense reimbursement request for City of Chicago employee, John Bills."

20.     The *Chicago Tribune* also ran a series of articles, including one on October 14, 2012 that should have alerted the City to inappropriate conduct by Deputy Commissioner Bills.

21.     In October 2012, the City declared RTSI to be a "non-responsible bidder," preventing RTSI from bidding on a speed enforcement camera contract.

22.     RTSI's parent company retained Sidley Austin to conduct a broad independent internal investigation of potential improprieties.  RTSI's parent company shared the results of this investigation, including that an arrangement between Bills, O'Malley and Rosenberg "will likely be considered bribery," with the City.

23.     Yet, the City continued to employ RTSI to operate its red light cameras and the City even extended RTSI's contracts with the City.

24.     On January 30, 2013, the City and RTSI signed an Amendment No. 1 to Contract 16396 extending RTSI's contract to supply and maintain red light camera systems for six months, and an Amendment No. 1 to Contract 18031, extending RTSI's contract to install and maintain red-light camera systems for six months. RTSI disclosed its

25.     On July 30, 2013, the City and RTSI signed an Amendment No. 2 to Contract 16396, extending RTSI's contract to install and maintain red-light camera systems for an

additional six months, and an Amendment No. 2 to Contract 18031 extending RTSI's contract to install and maintain red-light camera systems for an additional six months.

26.     And on January 31, 2014, the City and RTSI signed two more agreements, an Amendment No. 3 to Contract 16396 and an Amendment No. 3 to Contract 18031, each extending their respective contracts by an additional three months, to April 30, 2014, at least 18 months after the City learned of the alleged bribery scheme.

27.     Any payments made to RTSI, any claims made by RTSI, and any statements to the effect that RTSI had not bribed a City employee or would comply with the City's Ethics Ordinance, cannot be the basis of a claim arising after the City was aware of the potential falsity of the statements.  Once the City was aware of the improprieties, it could no longer rely on such statements.

28.     Similarly, the City relies in its Amended Complaint on several EDSs that it claims were signed _after_ the City knew about the bribery scheme alleged in its Amended Complaint. For example, the City relies on EDSs dated January 29, 2013 (Am. Compl., Exs. 18, 19 & 26) and July 31, 2013 (_Id._, Ex. 21 & 28).  The City cannot rely on these EDSs, and these EDSs cannot form the basis of the City's claims because the City was already aware of the bribery scheme it alleges and could not reasonably rely on any contrary statement in the EDSs.

29.     The City paid RTSI more than $28 million for RTSI's work on the red light camera contracts after the City became aware of the alleged bribery scheme.

### VII.     STATUTE OF LIMITATIONS

30.     Defendants reallege and incorporate herein by reference each of the allegations contained in paragraphs 1 through 29 of these Affirmative Defenses.

31.     Each of the claims of the Amended Complaint is barred in whole or part by the applicable statutes of limitations.

32.     The statutes of limitations were running from the time the violations allegedly occurred until September 29, 2015, when the City and Defendants entered a tolling agreement.

33.     Here, claims for many of the violations alleged by the City are time-barred because, even by the City's own admission, they occurred outside of the relevant statutes of limitation.  Some of the statutes of limitation for the City's claims run for a set number of years from the alleged violation.  Others run both for a set number of years or a number of years from when facts concerning the violation were, or should have been, discovered by the City (but never more than ten years).  Many of the alleged claims are outside of the relevant statutes of limitations, regardless of whether such statutes are based upon a set time period from the alleged violation or a time period from when the violation was, or should have been, discovered.

34.     For example, the Chicago False Claims Ordinance, MCC § 1-22-030, has a statute of limitations that bars claims from being brought more than six years after the date of the violation or three years after the date "when facts material to the right of action are known or reasonably should have been known by the official of the city charged with responsibility" and in no event more than ten years after the violation occurred.  The statutes of limitations for the other claims in the Amended Complaint are even shorter.

35.     Many of the violations alleged by the City purportedly occurred prior to September 30, 2009, six years before the tolling agreement.

36.     On information and belief, the City official charged with responsibility to act on the claims alleged in the Amended Complaint knew or should have known facts material to the City's claims prior to September 30, 2012, three years before the tolling agreement.

97

37.    For example, on February 23, 2007, Alderman Edward Burke wrote a seven-page letter to the City's Corporation Counsel and its Chief Procurement Officer, complaining that the "competitive bidding process was compromised" when RTSI secured a 2006 contract and urging that the contract be rescinded.  This put the City official charged with responsibility to act on notice of facts material to the City's claims.

38.    In any event, many of the violations occurred outside of the False Claims Ordinance's ten-year statute of repose.  For example, the City alleges that the EDSs were false claims.  (*See, e.g.,* Am. Compl., ¶ 290.)  It attaches to its Amended Complaint a number of them. The first two purported false claims occurred in association the EDSs signed by Rosenberg.  (*Id.* Exs. 1 & 2.)  The City admits these EDSs were signed on January 20, 2003, more than ten years before the tolling agreement.

39.    The statute of limitations for the City's other claims are shorter than the False Claims Ordinance's ten-year statute of repose.  Thus, large portions of these claims are also barred in whole or in part by their respective statutes of limitation.

## VIII.   EXCESSIVE FINES

40.    Defendants reallege and incorporate herein by reference each of the allegations contained in paragraphs 1 through 39 of these Affirmative Defenses.

41.    The penalties sought in the Amended Complaint would violate the Eighth Amendment of the United States Constitution.  The penalties sought in the Amended Complaint grossly exceed the City's actual damages and are, thus, prohibited under the Eighth Amendment.

42.    Here, the City's actual damages are non-existent or extremely limited because the City received significant value under the digital automated red light enforcement program, which RTSI supplied, operated and maintained.  In fact, the City earned in excess of $500 million in revenue due to the RTSI-supplied system.

43.      The upper limit on any penalties must bear some relationship to the gravity of the offense and cannot reach into a double-digit multiple of the City's actual damages.  Because the City's actual damages are non-existent or extremely limited, penalties sought by the City would violate the Eighth Amendment of the United States Constitution.

WHEREFORE, Defendants, Redflex Traffic Systems, Inc. and Redflex Holdings, Ltd., respectfully request that the Court enter judgment in their favor and against Plaintiffs, the City of Chicago and Relator Aaron Rosenberg, award Defendants their costs of this action and award Defendants any other relief the Court deems equitable and just.

Dated:   February 16, 2016                          Respectfully submitted,


                                                    /s/ Steven A. Weiss
                                                    Attorney for Redflex Traffic Systems, Inc. and
                                                    Redflex Holdings, Ltd.

Steven A. Weiss
Ian H. Fisher
Honigman Miller Schwartz and Cohn LLP
One South Wacker Drive, 28th Floor
Chicago, Illinois 60606
312.701.9300

99

<u>**CERTIFICATE OF SERVICE**</u>

I, Steven A. Weiss, an attorney, hereby certify that on this 16th day of February, 2016, I electronically filed the foregoing **Defendants' Answer and Affirmative Defenses to First Amended Complaint** with the Clerk of the Court using the CM/ECF system, which thereby electronically served all counsel of record.

*/s/* Steven A. Weiss         
Steven A. Weiss

20676090.5