**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CITY of CHICAGO *ex rel*. AARON
ROSENBERG,

       Plaintiff,

    v.

REDFLEX TRAFFIC SYSTEMS, INC. and
REDFLEX HOLDINGS, LTD.

       Defendants.

Case No. 15-cv-8271

Judge John J. Tharp, Jr.

**RELATOR AARON ROSENBERG'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS RELATOR**

## I.     Introduction.

In his *qui tam* relator complaint on behalf of the City of Chicago (the "Complaint"), Aaron Rosenberg ("Rosenberg" or the "Relator") alleged in painstaking detail a decade-long bribery scheme perpetrated by Redflex Traffic Systems, Inc. ("RTSI") and Redflex Holdings, Ltd. ("RHL") (collectively "Redflex") against the City of Chicago.  Indeed, Rosenberg's 162-paragraph Complaint provides song, chapter, and verse about how the bribery scheme began, how it worked, who was involved, and how Redflex profited from it.  Last year, the City of Chicago intervened in the case, seeking to recoup the more than $100 million Redflex wrongfully obtained through its illegal scheme.

Now, Redflex has filed a Motion to Dismiss Relator (the "Motion"), in which it argues that this Court lacks jurisdiction over Rosenberg, because (1) he purportedly based his Complaint on prior public disclosures regarding Redflex's conduct; and (2) he fails to state a claim under Chicago's False Claims Ordinance (the "FCO").  Redflex's arguments are meritless, and the Court should, therefore, deny Redflex's Motion.

Redflex's first argument—that Rosenberg's Complaint was based on prior public disclosures—rests upon four newspaper articles and two RHL securities releases in Australia.  As an initial matter, the RHL securities releases are foreign documents that cannot qualify as prior disclosures under the law.  More importantly, not one of the documents upon which Redflex relies stated facts "substantially similar" to those Rosenberg alleged in his Complaint.  Rather, they at best offered general descriptions of some meals and travel provided to City employee John Bills ("Bills"), and speculated about a "suspicious" relationship between Bills and Redflex customer service representative Martin O'Malley ("O'Malley").  This stands in stark contrast to Rosenberg's exhaustive allegations about virtually every detail of the bribery scheme, all of which came from his personal knowledge as a former Redflex executive.  Indeed, the facts Rosenberg alleged in his Complaint are the same ones to which he testified as a central witness in the federal government's successful criminal prosecution of Bills earlier this year.

With no public disclosure, the Court need not address the "original source" exception. But even if it did, there is no dispute that Rosenberg was the original source of the information when he voluntarily sat down with the Chicago Inspector General's office in February 2013 and revealed the truth about Redflex's conduct. Indeed, while his superiors and others involved in the scheme continued to deny and obfuscate, Rosenberg told the truth about Redflex's illegal conduct. He is thus precisely the type of whistleblower to which the FCO is intended to apply.

Redflex's second argument is equally baseless. Redflex claims that the false statements Rosenberg alleges can only be addressed by Chicago's False Statements Ordinance (the "FSO"), and not by the FCO. But the FCO's plain language makes clear that it applies to Redflex's false Electronic Disclosure Statements, and there is nothing about the FSO that provides it is an exclusive remedy to address such false statements. A reading of the two statutes indicates that the FCO addresses a more significant type of false statement, namely one made to get a claim paid, and has more significant penalties, while the FSO addresses false statements more generally.

## II.    Statement of relevant facts.

From the company's inception in the United States, RTSI CEO Bruce Higgins ("Higgins") and his successor CEO Karen Finley ("Finley"), both of whom served on RHL's Board, directed and encouraged RTSI employees to use gratuities to curry favor with actual and potential customers. *See* Dkt. No. 1, Compl. ¶¶ 19-20, 23, 28, 38. Those customers were typically municipalities, cities, and other government agencies. *See id*; *see also* Dkt. No. 25, First Amended Complaint ("Amd. Compl.") ¶¶ 28-31. Lunches and dinners at high end restaurants, outings to golf and significant events (like Chicago White Sox baseball games), travel expenses, and gifts were all authorized and encouraged. *See* Compl. ¶ 76-80. Redflex employed the systematic use of such gratuities nationwide. *See, e.g.*, Amd. Compl. ¶¶ 278-79.

Higgins and Finley also encouraged and directed out-and-out bribery in certain key locations. Specifically, the two successive CEOs authorized and directed the bribery of Bills in Chicago, (Compl. ¶¶ 2, 28, 57, 87-109) and various city officials in Columbus, Ohio (Amd. Compl.

¶¶ 278-79). Redflex paid bribes in Chicago totaling millions of dollars to Bills through O'Malley, who Redflex hired solely as a conduit to pay Bills (Compl. ¶¶ 91-135), and in Columbus through John Raphael, who RTSI hired as a "consultant."[1]  Redflex also directed employees to provide false information when asked to ensure that its gratuities and bribery schemes continued unabated. *See, e.g.*, Compl. ¶¶ 3-6, 40-43, 142-147.  For example, when questions were raised about a $910 expense for Chicago transportation official John Bills, RTSI directed employees to falsely say the expense was mistakenly paid.  *See* Mot. at Ex. C, Tribune Article (RTSI's general counsel stating that the failure to report the reimbursement was "a regrettable lapse and oversight").  When the Chicago Tribune raised questions about Bills and RTSI's hiring of his longtime friend O'Malley, Redflex directed employees to falsely deny knowing the extent of their relationship, and to deny any improper relationship between Bills and O'Malley.  *Id.* (RTSI's general counsel stating that O'Malley was hired because the company needed someone familiar with Chicago to serve as an operations liaison with city hall, that he was unaware of O'Malley having any connection with Bills, and that O'Malley was a key component of the company's success in Chicago).

Relator Aaron Rosenberg was one of several Redflex executives and employees involved in the company's systemic wrongdoing, and is intimately familiar with the particulars of Redflex's illegal conduct in Chicago.[2]  *See* Compl. ¶ 10.

Redflex's misconduct unraveled in 2013.  On February 4, 2013, Rosenberg met with representatives of the Office of the Inspector General for the City of Chicago and, in the presence of Redflex counsel, disclosed that Redflex's wrongdoing went well beyond gratuities and entertainment.  Declaration of Michael R. Williams ("Williams Decl.") ¶¶ 2-7.  Rosenberg

---

[1] It is unknown if Columbus city officials were actually paid based on bribery payments to Raphael.  During the bribery scheme, Raphael told RTSI that the payments were to go to city officials; but in his guilty plea in Ohio, Raphael maintained that was not the case, but was a lie he told RTSI to get money for himself.  In any event, Redflex and its CEOs authorized the bribe payments both in Chicago and Columbus thinking the money was going to bribe city officials.

[2] Participating in wrongdoing does not preclude a person from being a Relator under the FCO.  It is, however, one of the factors the Court considers when it determines the "relator's share" of that recovery.  MCC § 1-22-030(d)(4).

disclosed that Redflex engaged in out-and-out bribery of city officials and that the bribery was directed from the top of RTSI by its CEOs, who also had reported to RHL in Australia. *See id.*

Redflex's response was to obfuscate and seek to characterize Rosenberg as the wrongdoer. On February 20, 2013, Redflex terminated Rosenberg, sued him in Arizona alleging he violated company policy regarding expense reports, and issued a press release regarding its actions against Rosenberg.[3] He was the only employee Redflex either terminated or sued.

Since Rosenberg's termination and Redflex's lawsuit against him:

- Redflex CEO Karen Finley pleaded guilty to the bribery in Chicago disclosed by Rosenberg (*see U.S. v. Finley*, Case No. 1:14-cr-00135-3);

- Redflex "consultant" Martin O'Malley pleaded guilty to being the conduit between Redflex and Bills of the bribery disclosed by Rosenberg (*see U.S. v. O'Malley*, Case No. 1:14-cr-00135-2);

- Bills was found guilty by a jury of the bribery disclosed by Rosenberg (*see U.S. v. Bills*, Case No. 1:14-cr-00135-1);

- Redflex CEO Karen Finley pleaded guilty to another bribery in Columbus, Ohio, also disclosed by Rosenberg (*see U.S. v. Finley*, Case No 2:15-cr-00148-GCS); and

- Ohio lobbyist John Raphael pleaded guilty to the bribery in Columbus disclosed by Rosenberg (*see U.S. v. Raphael*, Case No. 2:15-cr-00228-GCS-EPD).

Redflex, to this day, continues to ignore it's systemic and "from the top" wrongdoing. It has not pleaded guilty to any criminal wrongdoing, it is denying many of the allegations in this lawsuit, and it continues to falsely claim that its criminality was "initiated" by Rosenberg. *See*, *e.g*., Mot. at 2.

---

[3] The action was filed in the Superior Court of the State of Arizona, County of Maricopa, and was styled *Redflex Traffic Systems, Inc. v. Rosenberg*, Case No. CV2013-001166.

**III.     The Court maintains jurisdiction over Rosenberg because no public disclosure occurred that bars him from being a relator.**

At the recent status conference, the Court questioned whether Redflex's Motion is moot given that the City has intervened in the case. In response to this inquiry, Redflex cites *Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457 (2007). Though it is irrelevant because, as described below, Redflex's substantive arguments are meritless, Redflex's reliance on *Rockwell* is misplaced.

*Rockwell* was an unusual case with a dual prosecution through trial by both the relator (Stone) and the government. *Id.* at 465-466. When the government intervened, it did so as to some of the relator's allegations and not others. *Id.; see also U.S. ex rel Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 795 (10th Cir. 2002) (explaining that "the United States moved to intervene with respect to some, but not all of Stone's FCA allegations"). Stone remained in the case to prosecute his allegations over which the government failed to intervene based upon a set of facts that he was aware of when employed by Rockwell. *Rockwell*, 549 U.S. at 464-65, 474-78; *Rockwell*, 282 F.3d at 806. When the government intervened, it amended the complaint to add a separate set of facts which occurred after the relator left Rockwell and of which the relator had no knowledge. *Rockwell*, 549 U.S. at 464-65, 474-78. At trial, the set of facts brought by the relator was abandoned and the case proceeded to verdict on the additional set of facts of which the relator had no knowledge. *Id.* at 474-78. After the trial, the relator claimed a portion of the jury verdict; however, the court found that as the case was not prosecuted on the set of facts brought by the relator, it had no jurisdiction to award him a portion of the jury award. *Id.* at 476.

The instant case is quite different from *Rockwell*. The City has intervened on *all* of Rosenberg's claims and allegations, not just some of them. Rosenberg, meanwhile, is not separately proceeding on any allegations that the City is not. Accordingly, there are no claims separate from the City's over which this court must determine jurisdiction, and *Rockwell*'s

5

statement that jurisdiction over a relator remains relevant even after government intervention, therefore, does not apply here.

But in any event, Redflex's substantive arguments fail. Redflex contends the Court lacks jurisdiction over Rosenberg because the allegations in his Complaint are based upon publicly disclosed information. Specifically, Redflex argues that "public disclosure" of Rosenberg's allegations occurred in two ways before Rosenberg filed his Complaint: first, Redflex contends the bribery scheme described in detail in Rosenberg's initial Complaint had been "widely reported in the Chicago Tribune"; and second, Redflex asserts that before Rosenberg filed his Complaint, RHL announced in an Australian stock exchange release that Redflex knew or should have known of an arrangement between Chicago's "red light program manager" and a consultant that "authorities may consider . . . to be bribery." Mot. at 7.

The public disclosure bar is intended to encourage suits by whistleblowers with genuinely valuable information, while discouraging litigation by plaintiffs who have no significant information of their own to contribute. *Graham City Soil & Water Conservation Dist. V. United States ex rel. Wilson*, 559 U.S. 280, 294-95 (2010). A comparison of the publicly disclosed information noted by Redflex with the detailed facts and allegations of Rosenberg's Complaint, makes clear that he is a whistle-blower with valuable information, that the public disclosure bar does not apply, and the Court is not stripped of its jurisdiction over him.

As a preliminary matter, only one of Redflex's two purported methods of public disclosure—namely, the Tribune news articles—is of the type that could possibly divest the court of jurisdiction. Section 1-22-030(f) of the Chicago Municipal Code ("MCC") contains the exclusive statutory list for potential sources of public disclosure. *See U.S. ex rel. Yannacopolous v. Gen. Dynamics*, 315 F. Supp. 2d 939, 948 (N.D. Ill. 2004) (stating that the federal False Claims

Act contains the exclusive list of public disclosure sources).  Section 1-22-030(f) identifies three sources of public disclosure:  (1) a "criminal, civil, or administrative hearing"; (2) "a legislative, administrative, or Inspector General's report, hearing, audit, or investigation"; or (3) "the news media."  MCC section 1-22-030(f).  A *qui tam* defendant's own release to a stock exchange is not on this list, and Redflex's "Release to the Australian Securities Exchange" thus fails to meet the plain language of the potential jurisdictional bar.

Moreover, foreign disclosures do not qualify as a source of public disclosure for purposes of the statute in any event, nor can they adversely affect the ability to recover false claims under state law.  *See Yannacopolous*, 315 F. Supp. 2d at 948.  Thus, the Court should only consider whether the information in the Tribune articles constitutes a bar to jurisdiction over Rosenberg.

In assessing the Chicago Tribune articles and jurisdiction over Rosenberg, Relator agrees with Redflex that the Court should follow federal False Claims Act case law and standards.  *See* Mot. at 7 (*citing People ex rel. Schad, Diamond & Shedden, P.C. v. QVC, Inc.*, 2015 IL App (1st) 132999, ¶ 30).  Under that case law, the Court conducts a three-step analysis:

> First, it examines whether the relator's allegations have been "publicly disclosed." If so, it next asks whether the lawsuit is "based upon" those publicly disclosed allegations.  If it is, the court determines whether the relator is an "original source" of the information upon which his lawsuit is based.

*U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 690-91 (7th Cir. 2014) (*quoting Glaser v. Wound Care Consultants Inc.,* 570 F.3d 907, 913 (7th Cir. 2009)).  In performing this jurisdictional analysis, the Court must consider facts in the light most favorable to Rosenberg.  *Heath*, 760 F.3d at 689 (holding that where case is "still in the jurisdictional phase," the court must consider the facts "in the light most favorable to" the relator).

The Court does not reach the second step unless the first is answered in the affirmative, and does not reach the third step (consideration of "original source") unless the first *and* second

steps are answered in the affirmative. *Heath*, 760 F.3d at 691 (holding that it need not consider steps one or three because it determined that step two was not met).

> **1. Rosenberg's allegations had not been publicly disclosed before he filed his Complaint.**

The first step is to compare the substance and allegations of the Complaint to the public disclosure to see the degree to which they are the same. Courts have cautioned against viewing "FCA claims 'at the highest level of generality . . . in order to wipe out *qui tam* suits that rest on genuinely new and material information.'" *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 831 (7th Cir. 2013). Indeed, case law demonstrates that relators with particularized information are not barred simply because there has been public disclosure of more generalized concerns. *See, e.g.*, *U.S. ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 935–36 (7th Cir. 2012) (public disclosure bar did not apply when relator was able to piece together specific information despite the presence of a corresponding government report); *U.S. ex rel. Mateski v. Raytheon Co.*, No. 13-55341, 2016 WL 860337, at * 1-2 (9th Cir. Mar. 7, 2016) (following Seventh Circuit precedent, reversing dismissal of complaint based on public disclosure bar, finding that a federal report and a "slew" of news articles stating generalized concerns regarding Raytheon's radiometer project did not bar *qui tam* complaint with specific allegations of fraud).

Redflex acknowledges that the Tribune articles should be reviewed "to establish that certain facts or allegations were disclosed in the public domain." Mot. at 8 (citing *United States ex rel. John v. Hastert*, 82 F. Supp. 3d 750, 764 (N.D. Ill. 2015)). A comparison of the Tribune articles (Exhibits A-D to the Motion) to the Complaint (*see* Dkt. No. 1) makes readily apparent that the articles do not publically disclose facts that are "substantially similar" to those in the Complaint. Redflex gives those articles the best spin it can in the Motion, characterizing them as:

- indicating that an investigation of Redflex's relationship with Bills and O'Malley was underway, including looking into expenses for trips by Bills;

- questioning whether Redflex executives systematically courted Bills with trips to the Super Bowl and sporting events and hid the extent of the improper relationship;

- informing that the chairman of RHL resigned;

- stating that Redflex paid O'Malley more than $570,000 in commissions (or $2.03 million depending on which article you read) "in a highly suspicious arrangement"; and

- stating that as early as 2007, a city alderman complained about compromises to the competitive bidding process when Redflex secured a contract.

Mot. at 4-5.

Even accepting Redflex's characterization of the Tribune articles, this general questioning of the Redflex/Bills/O'Malley relationship, plus a few purported factual tidbits, falls far short of Rosenberg's extensive, specific, and detailed allegations in his Complaint, which contains over 125 paragraphs of substantive factual allegations. The Complaint provides a meticulous road map of the decade-long bribery scheme, including:

- Bills's "Unlawful Pre-Bid Assistance," including details of his meetings with Rosenberg and Redflex CEOs Higgins and Finley addressing the particulars of what Bills told them he needed and they should do to ensure Redflex positioned itself to get the bid, and information on Redflex's competitor ACS (Compl. ¶¶ 24-40);

- Bills's "Unlawful Assistance with Field Tests," including his information about competitor ACS's tactics to gain the contract, and CEO Higgins's directives to Rosenberg about what to say to Bills (*id.* ¶¶ 44-51);

- Bills's "Unlawful Assistance With Evaluation Process," including his meeting with Rosenberg, Higgins and Finley to strategize about the evaluative process, Higgins and Finley's pledge to Bills that Redflex would have Rosenberg work with him to steer the contracts to Redflex, and Bills's dry-run with Rosenberg after hours at Chicago Department of Transportation to rehearse how Bills would get the Chicago Evaluation Committee to unanimously award Redflex the contract (*id.* ¶¶ 55-71);

- Higgins's steering Bills on the "Purchase vs. Lease of Cameras," including Higgins's strategy for making more money for Redflex by having the City buy the cameras (*id.* ¶¶ 72-75)

- Redflex's "Entertainment of City Officials," including details of Bills's entertaining Redflex CEOs Higgins and Finley, as well as RHL Chairman Chris Cooper, and Redflex's paying for golf outings, entertainment, and trips to Arizona for Bills (*id.* ¶¶ 76-79);

- Redflex's "Payoff to John Bills" including details of Higgins and Finley hiring Network Electric, Inc. as a subcontractor to accommodate Bills's relationship with the owner; Bills indicating the amount he wanted in the range of $100,000 to $200,000 in

writing to Rosenberg at a meeting celebrating Redflex's award of the Chicago contract; Bills suggesting Redflex could make payments to him either by overpaying Mr. Johnson or hiring someone close to Bills in a customer liaison position; Redflex hiring O'Malley, a friend of Bills, to influence Bills's performance as deputy commissioner of the City's DOT and serve as a conduit for the company's bribes to Bills; paying Mr. O'Malley a bonus for each new system the City bought from Redflex plus commission for "out of scope" work changes that achieved additional revenue for Redflex and Bills, who was paid whenever it occurred; paying for Bills's travel expenses, hotel bills, rental cars, golf fees, and personal computers; and Bills protecting Redflex from any liability for performance issues under its contract with the City (*id.* ¶¶ 83-106);

- Redflex's and Bills's "Expansion of Original Contract" including amending the Redflex contract so Redflex would receive a one-time fee of $100,000 per system and $5,000 per month per system; the City awarding a sole source agreement to Redflex; Finley and Rosenberg reviewing the draft RFP for program expansion and providing feedback to Bills, which resulted in the final RFP design specification being advantageous to Redflex; and Bills providing a scoring table that would demonstrate and justify a high scoring and ranking for Redflex (*id.* ¶¶ 110-122);

- Redflex's "Payoff for Extension of Contract" including O'Malley earning commissions in excess of $100,000; Redflex earning over $100 million in revenue for the implementation of additional traffic systems; Redflex falsely certifying as part of each contract that it had not engaged in bribery, while it was in fact bribing Bills; Redflex filing a false EDS certifying it had not engaged in bribery or attempted bribery of a public officer or employee of the City and that it was in compliance with the City's Code of Government Ethics; Bills ensuring that Redflex's performance issues were handed solely by him; Bills ensuring that any performance issue did not trigger any liquidated damage provisions specified in Redflex's contract; and Bills being paid through O'Malley until his retirement in 2011 (*id.* ¶¶ 123-135);

- "Bills Post-Employment Assistance," including Resolute Consulting hiring Bills directly or through a Redflex-funded public reach group called the Traffic Safety Coalition at the request of Redflex CEO Finley and General Counsel Andy Bunkse; Redflex's expectation to subsidize Bills's employment in order to receive the City's support; Redflex circumventing the City's prohibition against vendors hiring its former employees; Redflex securing additional contract extensions and new contracts for additional solutions; Redflex terminating O'Malley's commissions so Bills would not receive "double pay"; Redflex filing false statements certifying that it was not engaged in bribery of a public official in contracts and Redflex falsifying EDS's to the City (*id.* ¶¶ 136-149).

In no way, shape, or form did the Tribune articles disclose the facts and allegations contained in Rosenberg's Complaint. It is simply inaccurate for Redflex to suggest that the incredible detail in Rosenberg's Complaint is "substantially similar" to the articles.

Moreover, as noted above, Redflex's foreign stock market releases cannot be considered under the public disclosure doctrine. But even if that information could be evaluated, the result would be the same. Those documents do not remotely constitute public disclosure of the Complaint's facts and allegations. Redflex claims that the Australian public release indicated that an internal Redflex investigation concluded that "vacation-related expenses and other items of value to the City Program Manager," and the arrangement among that Manager, an "RTSI consultant in Chicago" and Redflex "will likely be considered bribery by authorities." Mot. at 5. As with the Tribune articles, these conclusions are a far cry from the significant detail and facts Rosenberg provided in the Complaint.

### 2. Rosenberg's Complaint was not "based upon" the information in the Tribune articles.

Because the "first step" in determining whether the Complaint's allegations are substantially similar to the public disclosures has not been met, the Court need not and should not proceed to the "second step," *i.e*., whether the Complaint is actually "based upon" the publicly disclosed information. But the second step also is not satisfied here. Redflex's Motion is based on the unsupportable premise that the Complaint's allegations, which span over 125 paragraphs of detailed substantive allegations by Rosenberg, were based upon the publicly disclosed information in the Tribune articles. This contention is nonsense.

"[A] lawsuit is based upon publicly disclosed allegations when the relator's allegations and the publicly disclosed allegations are substantially similar." *Glaser*, 570 F.3d at 915. As detailed above, there is nothing "substantially similar" between the general concerns described in the Tribune articles and Rosenberg's painstakingly detailed allegations.

Moreover, the purpose of this restriction is to "prevent parasitic lawsuits by 'opportunistic plaintiffs who have no significant information to contribute of their own.'" *Heath*, 760 F.3d at 690 (quoting *Graham Cnty.*, 559 U.S. at 294). Rosenberg's Complaint was based on his own knowledge and information about Redflex based on his many years of working there. Rosenberg worked at Redflex from 2003 until February 2013, has first-hand knowledge of many of the

activities at issue because he was involved in them, and heard in real time about many others. In fact, Redflex itself—as part of its relentless and continuing false narrative to shift blame away from itself and its senior officers and board members—specifically accuses Rosenberg of initiating and masterminding the bribery scheme. *See* Mot. at 2. Rosenberg also possesses hundreds of emails and documents from his time at Redflex that demonstrate and support the facts alleged, and which Rosenberg provided to both the Chicago Inspector General's Office and federal law enforcement in connection with their investigations. *See* Williams Decl. ¶¶ 6-7.

The record of when and where Rosenberg provided information to the government is clear. He first provided information about Redflex's bribery of John Bills to the City of Chicago's Inspector General at a meeting in California on or about February 4, 2013. He spent that entire day providing information about Redflex to the City of Chicago. *Id*. at ¶¶ 5-6. Thus, Rosenberg's disclosure to the City of Chicago came before all the instances, save one, of the purported "public disclosures" in Redflex's Motion. *See* Mot. at Exs. B-F. The only one that pre-dates Rosenberg's disclosure is the October 14, 2012 Chicago Tribune article. *Id.* at Ex. A

Moreover, Redflex was well-aware that Rosenberg told the City about the company's bribery because Redflex had one of its lawyers at the meeting. Williams Decl. ¶ 5. After telling the City of Chicago about Redflex's bribery, beginning on or about February 19, 2013, he also told federal authorities about the bribery, and he has continued providing information to both the City and federal authorities through the present.

Indeed, while Redflex does not flag it for the Court, Redflex's own attachment to its Motion proves that it was Rosenberg, not other sources like the press, who disclosed the bribery scheme at issue. Exhibit H to the Motion is the FBI affidavit, filed a month *after* Rosenberg's Complaint, that federal authorities used to support the criminal charges against John Bills. The bulk of the affidavit, about 12 pages worth, consists of recitations of information the government learned from "CS1"—who Redflex acknowledges is Aaron Rosenberg—from February 2013 on. Mot. Ex. H, pp. 6-17. The FBI's affidavit reveals the depth of information Rosenberg provided, and shows unequivocally that he is the source of the detailed information in the Complaint.

For example, the affidavit says that Rosenberg told law enforcement about a "pre-bid meeting" he attended on January 3, 2003, (Mot. Ex. H at p. 7, ¶ 18); this same pre-bid meeting is described in Rosenberg's Complaint. Compl. ¶¶ 37-38. Similar parallels occur throughout both documents:

- Redflex selected for pilot phase/field tests: Mot. at Ex. H ¶ 21; Compl. ¶¶ 44-46;

- Bills told Rosenberg that a competitor offered him $100,000: Mot. at Ex. H ¶ 25; Compl. ¶¶ 51-52;

- Bills took Rosenberg to the transportation department after hours to review what would happen the next day when Chicago's Evaluation Committee voted on the contract: Mot. Ex. H ¶¶ 26-28; Compl. ¶¶ 60-68;

- Bills told Rosenberg that "it's time to make good": Mot. at Ex. H ¶¶ 30-34; Compl. ¶¶ 87-95;

- Redflex made "out of scope" payments to O'Malley: Mot. at Ex. H ¶¶ 36-38; Compl. ¶¶ 97-100;

- Bills requested other financial benefits: Mot. at Ex. H ¶¶ 39-41; Compl. ¶¶ 103-104;

- Redflex's original red light camera contracts with the City were expanded: Mot. at Ex. H ¶¶ 42-46; Compl. ¶¶ 116-122;

- Bills retired from the City and was hired by Company B which was funded by Redflex. Redflex informed him that they would not "double pay" him: Mot. at Ex. H ¶¶ 47-49; Compl. ¶¶ 136-141.

It cannot be disputed that the information in the Complaint came from Rosenberg, not the Tribune articles. The Complaint was not "based upon" the public information in the Tribune articles, and accordingly, the public disclosure bar does not apply.

This conclusion is supported by the case law. For instance, in *Glaser*, the "public disclosure" case upon which Redflex relies, does not involve our situation at all. Glaser alleged fraudulent Medicare billing by the defendants. The court noted, however, that the billing practices at issue were known by the government, which was actively investigating the issue, and had already been publicly disclosed when the federal Centers for Medicare & Medicaid Services (CMS) sent a letter to the provider regarding improper use of billing codes. *Id.* at 913-14. The

court held that the allegations in relator's complaint and the CMS letter were "virtually identical—they pertain to the same entity and describe the same fraudulent conduct—which is enough for us to conclude that [relator's] allegations are substantially similar to the allegations that were at the heart of the CMS investigation," and, therefore, her action was barred. *Id.* at 920.

The Seventh Circuit revisited *Glaser* in *Leveski*, which is analogous to the instant matter. Leveski alleged that ITT submitted false claims in order to receive federal funding. *Leveski*, 719 F.3d at 819. The district court dismissed the relator's case because it found there had been prior public disclosure of ITT's alleged activities in an earlier *qui tam* complaint by a different former employee. *Id.* at 827. The Court of Appeals reversed. *Id.* at 839-40. The court contrasted the *Glaser*-relator with the *Leveski*-relator, stating that the latter "used inside information that she obtained during her decade-long employment [at ITT] to make allegations that are noticeably different from any prior allegations against ITT"; that the *Leveski* relator had "done much more than re-package the [prior *qui tam*] complaint"; and that the relator had "alleged new tactics by ITT to avoid the mandates of the [Higher Education Act]." *Id.* The court likewise noted the *Leveski* relator's "allegations against ITT are only similar to the [prior] allegations when viewed at the highest level of generality." *Id.* at 831.

The Seventh Circuit has consistently stated "that viewing FCA claims 'at the highest level of generality . . . in order to wipe out *qui tam* suits that rest on genuinely new and material information is not sound." *Id.*; *see also United States ex rel. Baltazar v. Warden,* 635 F.3d 866, 886-89 (7th Cir. 2011) (court reversed district court's dismissal based on the public disclosure bar, explaining that the relator's suit "supplied vital facts that were not in the public domain" because it alleged "that [the defendant] not only was submitting false claims but also was submitting them knowing them to be false, and thus was committing fraud," and that "[the relator's] suit is 'based on' those defendant-specific facts, *not* on the public information").

The Seventh Circuit addressed this issue even more recently in *Heath*, where the relator sued Wisconsin Bell, alleging that it was overcharging school districts on matters paid with federal subsidy funds. *Heath*, 760 F.3d at 689-90. Heath based the suit on information he developed and

14

compared to publicly available information and deduced that overcharging occurred. The Seventh Circuit reversed a lower court finding that the suit was "based upon" the publicly disclosed information. It noted the Supreme Court's instruction that the public disclosure bar "seeks to bar parasitic lawsuits by opportunistic plaintiffs who have no significant information to contribute of their own," and observed that Heath was not such a plaintiff:

> Heath's allegations, though they may rely in part on the [publicly disclosed] VNS Agreement, required independent investigation and analysis to reveal any fraudulent behavior. . . . [T]he VNS Agreement, whether publicly disclosed or not . . . is evidence of only one transaction that had to be supplemented with knowledge of other pricing—in this case Heath's insight regarding the pricing received by the school districts—to establish fraud. No one could view the agreement in a vacuum and realize that Wisconsin Bell was overcharging school districts. While the VNS Agreement may provide a measure for the LCP—or in this case damages—it certainly cannot, *per se*, establish fraudulent behavior.

*Heath*, 760 F.3d at 691.

The public information about Redflex "did not establish fraud." It is Rosenberg's detailed facts and information that did so. Rosenberg brought "genuinely new and material information" (*Heath*, 760 F.3d at 692), namely the "inside information that [he] obtained during [his] decade-long employment." *Leveski*, 719 F.3d at 839. The public disclosure bar does not apply here.

### 3. The Court need not reach the "original source" issue, and Rosenberg meets that standard in any event.

A court reaches the third step in the original source analysis only if it answers the first two steps in the affirmative. As discussed above, this Court should answer neither in the affirmative. But even if the Court were to reach the third step, this would not change the fact that the Court should deny Redflex's Motion, because Rosenberg qualifies as an "original source."

An "original source" means "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the city before filing an action under this section which is based on the information." MCC § 1-22-030(f). There is, accordingly, a two part test to determine original source status: (1) the

relator must have "direct and independent knowledge"; and (2) he or she must have "voluntarily provided" information before filing the action.

In determining whether the relator has direct and independent knowledge, "[t]he question is whether the relator is an original source of the allegations in the complaint and not . . . whether the relator is the source of the information in the published reports." *Leveski*, 719 F.3d at 836 (*quoting Baltazar*, 635 F.3d at 869). In other words, "it is appropriate to ask whether [relator] is the original source of the specific allegations in her complaint." *Id.* "[A] relator's knowledge [is] not 'direct' if the relator 'had *no knowledge whatsoever* of the fraudulent conduct before hearing from an attorney.'" *Id.* (*quoting Glaser*, 570 F.3d at 921). "[A] relator's knowledge [is] not 'independent' if the relator would not 'have learned of the allegation or transactions independently of the public disclosure.'" *Id.* As noted above, Rosenberg is the source of the information in the Complaint.

*Glaser* illustrates the situation—unlike ours here—where a relator does *not* have direct and independent knowledge. After analyzing the public disclosure issue, the *Glaser* court turned to the question of whether the relator in that case could avoid the public disclosure bar by showing that she was an "original source" of information upon which the allegations in her complaint were based. The court held that she clearly was not. Indeed, the "only knowledge" relator had of the provider's billing came from her attorney whom relator "had no prior relationship" and "who contacted her out of the blue." *Id.* at 921. In other words, the relator "had *no knowledge whatsoever* of the fraudulent conduct before hearing from an attorney." *Id.* (emphasis in original). This is simply not the situation with Rosenberg. As described above, he had percipient, real-time knowledge of the information in the Complaint.

Section 1-22-030(f) provides in relevant part that relator must "voluntarily provide[] the information *to the city*." MCC § 1-22-030(f) (emphasis added). Redflex's sole argument on this issue is that Rosenberg provided information to federal prosecutors under the terms of a federal immunity agreement in Chicago and a Pretrial Diversion Agreement in an additional Redflex bribe addressed in a federal matter in Ohio. Mot. at p. 11. But these have nothing to do with whether

16

Rosenberg is an original source because both the federal immunity agreement in Chicago and the Pretrial Diversion Agreement in Ohio occurred *after* Rosenberg's February 4, 2013 interview with the Chicago Inspector General's Office.

In that day-long interview, Rosenberg disclosed the details of the bribery scheme to the City. Moreover, Rosenberg voluntarily submitted to that interview. *See* Williams Decl. ¶¶ 3-6. Redflex's omission of the February 4, 2013 Inspector General interview from its Motion is especially puzzling given that a Redflex lawyer sat through the entire interview, and the company is thus presumably well aware that this was the first occasion that Rosenberg—or anyone else for that matter—disclosed the details of Redflex's Chicago bribery scheme to the government. *Id*.

## IV.    The submission of false Economic Disclosure Statements and other false statements and documents violates the City's False Claims Ordinance.

Redflex contends that Rosenberg's allegations state a claim under Chicago's FSO (which does not have a whistleblower provision), but fail to state a claim under Chicago's FCO (which does). Redflex's contention rests on a novel interpretation of statutory language—one that would ignore the plain, unambiguous language of the FCO, gut one of the statute's most important avenues of recovery, and permit companies like Redflex to engage in bribery schemes without having to fear whistleblower lawsuits. Not surprisingly, they fail to cite a single case that adopts their reading of the statute.

As a threshold matter, the FCO explicitly covers false statements. Section 2 provides that anyone who "knowingly *makes*, uses, or causes to be made or used, *a false record or statement to get* a false or fraudulent claim paid . . ." is liable to the City for such conduct. *Id.* at § 1-22-020(2) (emphasis added). Section 1, covering false "claims," prohibits the presentation of "a false or fraudulent claim for payment . . . ." MCC § 1-22-020(1). The City's FSO, on the other hand, covers any false statement made to the City "in connection with *any* application, report, affidavit, oath, or attestation." MCC § 1-21-010(a) (emphasis added). When read together, the clear and logical meaning of the ordinances is that there is a greater penalty for making a false statement "to get a . . . claim paid" than for simply making a false statement. One ordinance does not, as Redflex

17

contends, render the other superfluous given that the scope of the conduct they cover is not identical.  Courts are, in any event, required to give laws effect regardless of whether they cover the same or similar subjects.  *See United States v. Palumbo Bros.*, 145 F.3d 850, 862 (7th Cir. 1998) ("[i]t is a cardinal principle of construction that . . . [w]hen there are two acts upon the same subject, the rule is to give effect to both.") (quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939)); *see also Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective").

Defendant also contends that the term "claim," as it appears in the FCO, should not be interpreted to include documents such as Economic Disclosure Statements ("EDS").  This argument again ignores the fact that the FCO does not limit its proscription solely to false "claims."  Only Section 1 of the seven sections in the FCO actually proscribes presenting a false "claim."  While the mere creation of the false EDS may have violated the FSO, by falsifying the EDS to get paid, defendants violated Section 2 of the FCO.  And Rosenberg has alleged as much.

Specifically, the Amended Complaint alleges that "[d]efendants made these knowingly false claims in the City Contracts, in the invoices, and in ***the EDSs in order*** to induce the City to award the City Contracts to RTSI, and ***to pay RTSI*** on these fraudulent contracts." Amd. Compl. ¶ 301 (emphasis added).  Accordingly, the Amended Complaint properly alleges a violation of Section 2 of the FCO.

As Redflex points out, "[s]tatutes should be read as a whole with all relevant parts considered, and they should be construed, if possible, so that no term is rendered superfluous or meaningless."  *Midwest Gaming & Entm't, LLC v. Cnty. of Cook*, 2015 IL App (1st) 142786, ¶ 81. The phrase "to get a false or fraudulent claim paid" has real meaning and is not rendered superfluous by virtue of the FSO.  Indeed, it is Redflex's reading of the FCO that would violate a fundamental canon of statutory interpretation, namely, ignoring the plain text of a statute.

Dated:  April 4, 2016                          Respectfully submitted,


                                               /s/John J. Muldoon_____
                                               Attorney for Relator Aaron Rosenberg

John J. Muldoon, III (ARDC # 6185878)
Muldoon & Muldoon LLC
30 N. LaSalle St., Suite 2950
Chicago, IL 60602
Phone: (312) 739-3550
jjm@muldoonlaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

CITY of CHICAGO *ex rel*. AARON
ROSENBERG,

                  Plaintiff,

                  Case No. 15-cv-8271

     v.

                  Judge John J. Tharp, Jr.

REDFLEX TRAFFIC SYSTEMS, INC. and
REDFLEX HOLDINGS, LTD.

                  Defendants.

---

**DECLARATION OF MICHAEL R. WILLIAMS IN SUPPORT OF
AARON ROSENBERG'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS RELATOR**

I, Michael R. Williams, declare as follows:

1.     I am an attorney at the law firm of Bienert, Miller & Katzman PLC, counsel of record for Relator Aaron Rosenberg in the above-captioned action.  I am a member in good standing of the State Bar of California.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.     Beginning in late 2012, I represented Aaron Rosenberg in connection with civil matters relating to his employment with Redflex.

3.     On or about January 17, 2013, I spoke with Christopher McClellan and Mark Grba of the City of Chicago's Office of the Inspector General (the "Chicago IG").  At the outset of the

1

call, I informed Messrs. McClellan and Grba that Mr. Rosenberg intended to fully cooperate in providing them with information regarding Redflex's relationship with the City of Chicago, and would be happy to voluntarily submit to an interview with them. I offered some available dates for the interview, and we subsequently confirmed that the interview would take place on February 4, 2013 at my offices in California.

4. During our January 17 phone call, subsequent to my confirmation that Mr. Rosenberg would voluntarily submit to an interview, Mr. McClellan informed me that because Mr. Rosenberg worked for a city contractor, it was the Chicago IG's policy to offer to read an "Advisement" at the outset of the meeting. On February 1, 2013, Mr. McClellan sent me an email containing the text of that advisement. A true and correct copy of Mr. McClellan's email is attached to this Declaration as Exhibit 1. The advisement offered by Mr. McClellan indicated, among other things, that statements made by Mr. Rosenberg to the Chicago IG "may be used as evidence of misconduct or as the basis for adverse action up to and including debarment," and that his statements "and the fruits thereof cannot be used against [him] in a criminal proceeding." At no time, however, did Mr. Rosenberg in any way condition his willingness to take part in the interview or provide full and complete information to the Chicago IG on being given the advisement, or anything else.

5. On February 4, 2013, Mr. Rosenberg and I met with Messrs. McClellan and Grba at my California offices as agreed. An attorney from Sidley Austin, representing Redflex, was also present. The interview lasted nearly a full day. Mr. McClellan or Mr. Grba read the advisement at the interview's outset.

6. In the course of the interview, Mr. Rosenberg provided extensive information regarding Redflex's relationship with the City of Chicago, including extensive and detailed

2

information regarding travel and other benefits Redflex provided to John Bills, as well as detailed information about the actual bribes Redflex paid to John Bills. The information Mr. Rosenberg provided included, among other things, the origin of the bribery scheme, the mechanisms through which the bribes were paid (including the use of Martin O'Malley as an intermediary for payments), the communications within Redflex regarding the scheme, and how Redflex's management, including its CEOs, directed and approved of the scheme.

7.     As a result of his employment with Redflex, from approximately 2003 through 2013, Mr. Rosenberg had in his possession at least hundreds of documents relating to Redflex's activities in the City of Chicago, including the bribery scheme he detailed in his February 4, 2013 Chicago IG interview. We provided some or all of these documents to both the Chicago IG and federal law enforcement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 4, 2016 at San Clemente, California.

MICHAEL R. WILLIAMS

307855-308194-1

3

| | |
|---|---|
| **From:** | Michael Williams |
| **To:** | Ali Matin; Tom Bienert |
| **Subject:** | Advisement |
| **Date:** | Wednesday, March 30, 2016 11:19:48 AM |

From: Christopher McClellan

     <CMcClellan@chicagoinspectorgeneral.org<mailto:CMcClellan@chicagoinspectorgeneral.org>>

     Date: February 1, 2013, 8:50:48 AM PST

     To: "mwilliams@businesslit.com<mailto:mwilliams@businesslit.com>"

     <mwilliams@businesslit.com<mailto:mwilliams@businesslit.com>>

     Subject: Advisement

     Mike, here's the language of the advisement.

     I understand that this interview is part of an official investigation
and that I have a duty to
cooperate with the Inspector General's Office, which includes
answering all questions completely
and truthfully.

     I understand that any statement made by me in the course of this
interview may be used as
evidence of misconduct or as the basis for adverse action up to and
including debarment.

     I understand that any statement made by me during this interview and
the fruits thereof cannot be
used against me in a criminal proceeding.

     I understand that a refusal to answer any question or any false,
inaccurate or deliberately
incomplete statement by me would constitute a violation of Chicago
Municipal Ordinance 2-56.

     I acknowledge that this advisement has been read aloud to me, and I
have been allowed to review
this document.

     _____

EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CITY of CHICAGO *ex rel.* AARON ROSENBERG, | |
| Plaintiff, | |
| v. | Case No. 15-cv-8271 |
| REDFLEX TRAFFIC SYSTEMS, INC. and REDFLEX HOLDINGS, LTD. | Judge John J. Tharp, Jr. |
| Defendants. | |

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2016, I caused to be electronically filed Relator Aaron Rosenberg's Opposition to Defendants' Motion to Dismiss Relator using the CM/ECF system, which will then send a notification of such filing to all registered users:

To:    **Cornel Hershel Kauffman**
City of Chicago Department of Law
AERC
30 North LaSalle Street
Suite 1400
Chicago, IL 60602
(312) 744-0306
cornel.kauffman@cityofchicago.org

**Ian Howard Fisher**
**Steven A. Weiss**
Honigman Miller Schwartz & Cohn LLP
One South Wacker Drive
28th Floor
Chicago, IL 60606
(312) 701-9300
sweiss@honigman.com
ifisher@honigman.com

/s/ John J. Muldoon, III
Muldoon & Muldoon, LLC
Attorneys for Relator

Muldoon & Muldoon LLC
30 N. LaSalle St., Suite 2950
Chicago, IL  60602
(312) 739-3550
Illinois Atty. No. 6185878
jjm@muldoonlaw.com