**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CITY OF CHICAGO *ex rel.* AARON ROSENBERG, | ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | No. 15 C 08271 |
| v. | ) ) | |
| | ) | Judge John J. Tharp, Jr. |
| REDFLEX TRAFFIC SYSTEMS, INC. AND REDFLEX HOLDINGS, LTD., | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Aaron Rosenberg was a senior executive with Redflex Traffic Systems, Inc. ("RTSI") from 2002 to February 2013. Rosenberg initiated this law suit on behalf of the City of Chicago in April 2014 by filing a *qui tam* complaint alleging that RTSI violated the City's False Claims Ordinance ("FCO"), Chicago Mun. Code ch. 1-22, by orchestrating a bribery scheme to secure contracts with the City to provide and maintain its digital automated red-light camera enforcement program ("DARLEP"). The City intervened and filed an amended complaint against RTSI and its parent company, Redflex Holdings, Inc. ("RHI") (collectively, "Redflex"). Redflex has now moved pursuant to Rule 12(b)(1) to dismiss Rosenberg from the suit on the ground that he cannot serve as a *qui tam* relator, asserting that his allegations had been publicly disclosed, he does not qualify as an original source of those allegations, and his claim is really a claim under Chicago's False Statements Ordinance, which does not permit *qui tam* suits. Given the City's intervention, the last argument is moot, but the Court agrees that Rosenberg was not authorized under the FCO to bring this suit on behalf of the City. Because Rosenberg is subject to the FCO's public disclosure bar, the Court cannot exercise jurisdiction over any claim he has

advanced and therefore grants the City's motion under Fed. R. Civ. P. 12(b)(1) to dismiss him from the case.

## BACKGROUND

The facts relevant to this motion are largely undisputed. That is because, for the most part, what is relevant to this motion, which is based primarily upon the public disclosure bar, are not the actual facts relating to the alleged bribery scheme, but what Rosenberg and others have said about the scheme and the import of those statements.

### 1.      *The Allegations of the Rosenberg Complaint*

In the original complaint, which will be referred to as the Rosenberg complaint, the relator alleged that the DARLEP bribery scheme began in 2002 when RTSI, at the direction of RHI's Chairman Christopher Cooper, and RTSI's CEO, Bruce Higgins, launched an effort to improve RTSI's market position in the United States. At the time, Rosenberg was RTSI's Vice President for Sales and Marketing in North America. Responding to the initiative, Rosenberg began discussions with John Bills of the City's Department of Transportation. From Bills, Rosenberg learned that the City was planning to issue an RFP for digital automated red light enforcement systems. Though the complaint is vague on details about the developing relationship between Rosenberg and Bills, it alleges that Bills sought RTSI's assistance with developing the scope of services for the City's RFP (¶ 27-28), discussed ways to structure financial terms that would be advantageous to RTSI (¶ 29), and that Bills provided inside information about Affiliated Computer Systems, Inc. ("ACS"), the company that he anticipated would be RTSI's principal competitor for the contract. According to Rosenberg, Bills gave this information to him to curry favor with RTSI so Bills could later ask RTSI to compensate him for his assistance in securing the contract with the City. This information included communications about ACS's existing ties to the City and its efforts to secure the contract both by opening an

office in Chicago and offering a $100,000 bribe to Bills for his assistance. Bills exhorted RTSI needed to "step up its game" if it wanted to win the contract.

After the City conducted field tests of competing systems, the Rosenberg complaint alleges, Rosenberg worked with Bills to develop the evaluation protocol for the field tests and on the night before the Evaluation Committee met, Bills reviewed the field test data with Rosenberg and strategized about how to maximize the prospects that RTSI would be selected as the vendor by selecting favorable photographs taken by RTSI's cameras and manipulating the voting order of the committee members.

In June 2003, the City accepted RTSI's proposal and began contract negotiations with RTSI. During the negotiations (and thereafter), the Rosenberg complaint alleges (under a heading "ENTERTAINMENT OF CITY OFFICIALS") that Bills provided extensive entertainment to RHI/RTSI executives, including Cooper, Higgins, and Finley.[1] This set of allegations also includes a claim that on one occasion (date unspecified), Bills flew to Phoenix to meet with RTSI executives and that RTSI reimbursed him for the cost of the trip and also provided rounds of golf and other entertainment. (¶ 78-79).

After the City's initial contract with RTSI was finalized, Rosenberg alleges that Bills told him that "it's time to make good," and indicated that he wanted RTSI to pay him between $100,000 and $200,000. Bills suggested that he could be paid by overpaying Network Electric, a subcontractor with ties to Bills and which Bills had required RTSI to use, or by hiring someone close to Bills in a customer liaison position. Ultimately, in August 2003, RTSI hired a friend of

---

[1] Neither Rosenberg's complaint nor his briefs in response to Redflex's motion to dismiss explain the allegations that Bills provided extensive entertainment to Redflex executives; as the heading of this section of the complaint and the bulk of the allegations in the complaint suggest, the bribery scheme included payments by RTSI for lavish entertainment provided to Bills, not the other way around.

Bills, Martin O'Malley, ostensibly as a consultant but really to serve as a conduit for payments from RTSI to Bills. Between 2003 and 2011 (when Bills retired from the City), RTSI paid O'Malley over $2,000,000; O'Malley's invoices were approved by Higgins and Finley. The Rosenberg complaint alleges that some portion (no specific amount is alleged) of these funds was paid to Bills and that RTSI routinely paid travel and other expenses for Bills. For his part of the ongoing scheme, the complaint alleges that Bills protected RTSI from any liability for performance issues under its contract with the City.

Between 2003 and 2008, the scope of the City's red-light camera program expanded significantly, increasing the number of systems from 20 to several hundred. The complaint alleges that Bills assisted RTSI in obtaining new contracts with the City by providing specifications that would be favorable to RTSI and allowing RTSI to review and comment on the draft specifications before they were published.

Finally, the Rosenberg complaint alleges that when Bills retired from the City in 2011, RTSI arranged (at Bills' request) for Bills to be hired by Resolute Consulting, a public relations firm with which Redflex worked extensively. It was anticipated that this arrangement would circumvent the City's prohibition on vendors hiring former City employees, and that Bills would continue to support RTSI's efforts to expand the scope of its red-light contracts with Chicago. At that point, Rosenberg alleges, RTSI stopped making payments to O'Malley because it was not going to "double pay" Bills by making payments to Bills through both O'Malley and Resolute Consulting.

The long-running bribery scheme gave rise to false claims by RTSI under its contracts with the City, Rosenberg's complaint claims, because in connection with those contracts, RTSI was required to sign Economic Disclosure Statements ("EDS") certifying, among other things,

that it had not engaged in bribery or attempted to bribe any employee of the City. Because these false certifications caused the City to pay RTSI under the DARLEP contracts, the Rosenberg complaint claims that RTSI's claims for payment under those contracts are actionable under the City's FCO.

2.    *The Chicago Tribune Articles*

Beginning in October 2012, the Chicago Tribune began publishing a series of articles relating to the City's DARLEP contracts with RTSI. Between October 2012 and February 2014, the Tribune published dozens of articles concerning the contracts and the relationships between Bills, RTSI, and O'Malley. Perhaps most significant for purposes of this motion are five of the earliest articles, published on October 14, October 17, and November 13 of 2012, and on February 8 and March 3, 2013. In the October 14 article, the Tribune reported that two years earlier, in August 2010, an RTSI executive (not Rosenberg) had alleged that there was "an improper relationship between Bills and O'Malley" and that O'Malley's role as liaison between RTSI and the City for the red-light program was unnecessary. The executive reported that, after retiring from the City, Bills then went to work for the Redflex-funded Traffic Safety Coalition (run by Resolute Consulting). The executive also alleged that RTSI had paid for Bills' tab at a luxury hotel in Phoenix. These allegations, the story reported, prompted an internal investigation by RTSI that concluded that there was no improper relationship but confirmed that Bills' hotel tab had been mistakenly paid by the company. RTSI did not, however, report the mistake to the City.

Three days later, on October 17, 2016, the Tribune followed up with a report that the City had made RTSI ineligible to bid on a new speed light camera program because of RTSI's failure to report the 2010 payment for Bills' hotel. The Tribune also reported that the City had

confirmed that its Inspector General was investigating "much broader allegations of wrongdoing involving the company's relationship" with Bills. The next month, the Tribune reported that RHI had hired Chicago-based law firm Sidley Austin to assist it in responding to the Chicago IG's investigation and to conduct its own internal investigation regarding the relationship between Bills and O'Malley. Several months later, on February 8, 2013, the City announced that RTSI would be ineligible to bid on a new red-light camera contract when its contract expired, based on findings by Sidley Austin that RTSI had "systematically courted" Bills "with thousands of dollars in free trips to the Super Bowl and other sporting events," "hid the extent of the improper relationship from City Hall," and that a number of company executives were implicated in the wrongdoing. On March 3, the Tribune reported that RHI had issued information releases to the Australian Stock Exchange reporting the findings of the company's internal probe and concluding that the conduct would likely be considered by law enforcement authorities as bribery. The Tribune articles relating to RHI's securities releases reported the substance of the releases (which is detailed further below).

More articles followed over the course of the next year, including articles reporting on Redflex's termination of Rosenberg, Findley, and other executives as the result of its internal probe, a lawsuit that RTSI filed against Rosenberg in Maricopa County, Arizona (RTSI is based in Phoenix) and Rosenberg's counterclaims in that suit against RTSI. Those pleadings included allegations by RTSI that Rosenberg made "inappropriate payments and gifts on behalf of Redflex to employees or agents of Redflex customers; [and] attempt[ed] to conceal his misconduct by, for example, submitting expense reports without supporting documentation, altering the dates chares were incurred and altering the description of the charges on the expense reports so as to disguise their true nature," as well as Rosenberg's contention that he was a

6

scapegoat for the company's long-standing practice of plying government officials with lavish gifts and bribes to win business. The Tribune reported Rosenberg's cooperation with the U.S. Attorney's Office in Chicago in January 2014 and its coverage preceding the filing of the Rosenberg complaint culminated in an article on February 21, 2014, that reported an account of an initial meeting between Bills and RTSI officials, including Rosenberg and Finley, at which Bills reportedly coached the RTSI team on what to do and say during the next day's proposal presentation at City Hall.

     *3.*     *The Inspector General's Investigation*

As reported in the October 17, 2012 Tribune article, the City's Office of Inspector General ("OIG") began an investigation relating to the allegations of financial improprieties in the relationships between Bills, O'Malley and RTSI. The OIG served a request for documents on RTSI on October 18, 2012. That request, which began by reciting the provision of the Chicago Municipal Code that requires vendors to cooperate with the OIG in any investigation pertaining to city contracts, sought documents and information relating to (among other things):

- all communications between RTSI and Bills;

- Rosenberg's expense account and reimbursement requests;

- the relationship between Bills, O'Malley, and Rosenberg;

- O'Malley's job duties;

- the process by which O'Malley was hired by RTSI;

- any gifts or payments made to Bills; and

- RTSI's involvement with the Traffic Safety Coalition and Resolute Consulting.

By December 2012, the IG was interviewing witnesses and on February 8, 2013, the City announced that RTSI would be ineligible to bid on future DARLEP contracts.

4.     *Sidley Austin Meeting with the Inspector General*

The City's action in declaring RTSI ineligible for further red-light camera contracts came after Sidley Austin attorney Scott Lassar met with a representative of the OIG on January 31, 2013. According to an affidavit by Lassar that Redflex submitted in support of its motion, RTSI retained Sidley Austin in connection with the IG's investigation. During his meeting with the OIG representative, Lassar attests that he provided "extensive information" about the relationship between RTSI and Bills, including findings that:

- RTSI paid for 17 trips for Bills and O'Malley, including expenses for air fare, luxury hotels, and golf fees;

- Bills had initiated a bribery scheme by offering to help RTSI secure the red-light camera contract in exchange for payments from RTSI;

- Bills told RTSI that it needed his assistance because ATS, a competitor of RTSI, had clout with the City;

- O'Malley was hired by RTSI at Bills' suggestion and served as a conduit for payments from RTSI to Bills;

- Between 2003 and 2012, RTSI had paid O'Malley over $2 million; and

- Network Electric may also have served as a conduit for payments to Bills.

5.     *Rosenberg's Meeting with the Inspector General*

A few days later, on February 4, 2013, Rosenberg met with OIG representatives (including Christopher McClellan, who had also been present for Lassar's report a few days earlier) at the office of Michael Williams, one of Rosenberg's attorneys, at Williams' office in California. An attorney from Sidley Austin (the record does not reflect whether this was Lassar or someone else) was also present. Rosenberg's submission does not provide the genesis of this meeting, but in a supporting affidavit, Williams represents that in a January 17, 2013 phone call with the OIG, he advised the City officials that Rosenberg "would be happy to voluntarily submit

8

to an interview with" the OIG. Williams also attests that after he confirmed that Rosenberg was willing to meet voluntarily, McClellan informed him that because Rosenberg worked for a city contractor, the OIG would provide an "Advisement" to him at the outset of the interview that warned that the information provided in the interview could be the basis of adverse action by the City. The Advisement also warned Rosenberg that the interview was "part of an official investigation" and that he had "a duty to cooperate with the Inspector General's Office," and that "any statement made . . . during this interview and the fruits thereof cannot be used against me in a criminal proceeding."

According to Williams' affidavit, Rosenberg's interview by the OIG lasted "nearly a full day." During the interview, "Rosenberg provided extensive information regarding Redflex's relationship with the City of Chicago, including":

- information regarding travel and other benefits RTSI provided to Bills;

- the bribery scheme between RTSI and Bills;

- the origin of the scheme;

- the use of O'Malley as a conduit for the payments from RTSI to Bills;

- the communications within RTSI about the scheme; and

- the knowledge of the scheme by RTSI's upper management.

Williams' affidavit also represents that Rosenberg also provided "at least hundreds of documents" to the City IG, though his submission does not state clearly when those documents were provided.

RTSI fired Rosenberg two weeks later, on February 20, 2013. Finley and several other RTSI executives were fired on March 2, 2013, in conjunction with Redflex's public

announcements concerning the results of its internal investigation concerning the Chicago DARLEP.

6.    *The RHI ASX Release*

On March 4, 2013, RHI issued a public release to the Australian Securities Exchange (ASX) divulging results from its internal investigation of RTSI's contracts with the City. Among other things, the release noted that the internal investigation had focused on whether payments to O'Malley were funneled to Bills and whether RTSI had paid for vacations for Bills. Payments of more than $2 million to O'Malley were documented, along with the payment by RTSI of expenses for at least 17 different trips by Bills. The release reported that, based on the investigation, RTSI had concluded that the financial arrangements between Bills, O'Malley, and RTSI "will likely be considered bribery by the authorities," that some portion of the payments to O'Malley were funneled to Bills, and that both Finley and Rosenberg were in positions to know that the payments were improper. The release also reported that prior information provided by RTSI to both the Chicago Board of Ethics and to the Tribune was "inaccurate and misleading" and that the company officials responsible for those disclosures "knew or should have known this." The Chicago Tribune reported the substance of the information developed during the internal investigation on March 3, 2016, and reported the fact of the ASX release and its substance in another article in its March 4, 2013 edition.

7.    *The Federal Criminal Investigation*

At some point in late 2012 or early 2013, the RTSI DARLEP bribery scheme came under federal criminal investigation. (This fact, too, was reported by the Chicago Tribune as early as March 16, 2013.) Rosenberg was interviewed by federal law enforcement agents after receiving an immunity agreement. Information that Rosenberg provided to the City in his meeting with the

OIG representatives,[2] and additional information provided in the subsequent immunized interviews with federal agents, was used to support the issuance of a criminal complaint against Bills in May 2014. Bills was later indicted and was convicted of bribery after a jury trial in January 2016. Former RTSI CEO Karen Finley and Martin O'Malley pleaded guilty to charges arising from the scheme.

8.    *The Procedural History of this Case*

Rosenberg filed his original complaint under seal in state court on April 15, 2014 against RTSI only. The substantive content of the complaint has already been described above. The complaint set forth a single claim for violation of the Chicago False Claims Ordinance. The City intervened in the suit on August 26, 2015, the seal was lifted, and RTSI was served. RTSI then removed the case to federal court. Following removal, the City filed an Amended Complaint, which added RHI as a defendant, and supplemented the FCO claim with an additional claim under the Chicago municipal code as well as various Illinois statutory and common law claims. Of particular note, Count Two of the City's Amended Complaint asserts a claim under the City's False Statements Ordinance based on the submission of false EDSs and invoices in connection with the City Contracts. Rosenberg is not a party to any of these additional claims.

## DISCUSSION

At the threshold, it bears noting that the City's intervention does not render the relator's participation in this suit superfluous as a legal matter. The City is an intervenor, not a substituted party, and as the Supreme Court explained in *Rockwell Int'l Corp. v. United States*, 549 U.S.

---

[2] The affidavit in support of the criminal complaint states that the OIG "compelled CS1 [Rosenberg] to sit for an interview" in December 2012. (Dkt. 30-8, Ex. H at 6 n.1). Rosenberg, who relies on this affidavit to support his arguments, does not contest its characterization of his meeting with the OIG. With respect to the date of that meeting, no other exhibit or submission refers to any interview of Rosenberg by the OIG in December 2012; the parties appear to agree that Rosenberg's first meeting with the OIG was on February 4, 2013.

457, 476-78 (2007), the federal False Claims Act expressly provides that the relator may continue as a party after intervention by the government:[3]

> An action brought by a private person does not become one brought by the Government just because the Government intervenes and elects to "proceed with the action." Section 3730 [of the federal False Claims Act] elsewhere refers to the Government's "proceed[ing] with an action brought by a person under subsection (b)"—which makes crystal clear the distinction between actions brought by the Government and actions brought by a relator where the Government intervenes but does not oust the relator.

Thus, the Government's intervention in this case does not itself "oust" Rosenberg from this case; he may remain a party to the case unless it is determined that he is jurisdictionally barred from asserting a claim by the public disclosure bar. But, "[w]here a relator fails to qualify as an 'original source,' government intervention does not cure the jurisdictional defect." *U.S. ex. rel. Lisitza v. Johnson & Johnson*, 765 F. Supp. 2d 112, 120 (D. Mass. 2011). In that instance, government's intervention does not permit the would-be relator to continue in the case; if the would-be relator is jurisdictionally barred from asserting a claim, the government's intervention does convert the case to one brought by the government. *Rockwell,* 549 U.S. at 478 ("an action originally brought by a private person, which the Attorney General has joined, becomes an action

---

[3] The parties agree that the City's FCO is substantially similar to the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, and that cases construing the FCA are also relevant to the construction and interpretation of the FCO. Mem. at 7, ECF No. 30; Resp. at 7, ECF No. 47 ("Relator agrees with Redflex that the Court should follow federal False Claims Act case law and standards."). *Cf. Scachitti v. UBS Fin'l Servs.,* 215 Ill. 2d 484, 831 N.E.2d 544, 557-58 (2005) (noting that Illinois' Whistleblower Reward and Protection Act—now known as the Illinois False Claims Act—"closely mirrors the Federal False Claims Act" and following Supreme Court's interpretation of the federal FCA to resolve question of proper interpretation of the state act); *People ex rel. Schad, Diamond & Shedden, P.C. v. QVC, Inc.*, 2015 IL App (1st) 132999, ¶ 30, 31 N.E.3d 363, 371 (Ill. App. 2015) ("Illinois courts have relied on federal courts' interpretation of the federal False Claims Act (31 U.S.C. § 3730 (2012)) for guidance in construing the Illinois False Claims Act."). That said, in the wake of amendments to the FCA in 2010, the text of the FCA is no longer identical to that of the FCO, raising questions about the relevance of some post-2010 cases construing the FCA in interpreting the FCO. Several such issues are discussed *infra* at notes 6 and 7.

brought by the Attorney General once the private person has been determined to lack the jurisdictional prerequisites for suit"). Thus, notwithstanding the jurisdictional nature of this motion, and regardless of its outcome, the case will go forward.[4]

That said, one might wonder about the point of Redflex's motion. If the case goes forward no matter, what is the point? Whether the FCO claim goes forward with, or without, Rosenberg will make little, if any, difference in the prosecution of this case. The City has taken the lead and will control the presentation of the case at trial and the conduct of discovery before trial. *See* Chicago Mun. Ord. 1-22-030(c)(1) (the City "shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action"). Rosenberg's attorneys may provide some useful assistance, but they can do so whether Rosenberg is a party or not. And Rosenberg's status as a party, of course, has no bearing on his role as a witness in the case.

Redflex's motion appears to be animated, at least in part, by its view—evident in its briefs—that Rosenberg is now seeking to profit from the actions he took that caused the company to lose hundreds of millions of dollars in business and exposed it to substantial potential liability in this lawsuit. Reading Redflex's briefs, it is difficult to avoid the conclusion that its primary purpose is to deny Rosenberg any portion of a future damage award. *See, e.g.*, Reply at 1, ECF No. 52 ("after directly participating in the alleged fraud for years and lying repeatedly to RTSI's attorneys about his and others' misconduct for years, Rosenberg finally divulged limited information about his actions"). While Rosenberg's presence or absence as a party will not affect the amount of any damage award Redflex may ultimately be required to pay,

---

[4] Redflex, moreover, has answered, rather than challenged, the City's amended complaint, so all of the claims the City has asserted, including the FCO claim, are going forward. For this reason, and as discussed in more detail below at 34-35, Redflex's alternative motion to dismiss Rosenberg's complaint for failure to state a claim is moot.

Rosenberg will not be entitled to **any** share of that damage award if he is dismissed from the case based on the public disclosure bar.[5] The ruling Redflex seeks would render Rosenberg's participation in the case void *ab initio*.

That does not mean, however, that Redflex has no reason to contest Rosenberg's participation in this case. While his share of a damage award would not increase Redflex's exposure, his entitlement to recover reasonable attorney's fees would. Under § 1-22-030(d)(3) of the FCO, the relator is entitled to recover, *inter alia*, reasonable attorneys' fees and costs even if the City has intervened. Thus, the defendants have a legitimate basis to seek to dismiss Rosenberg from the case; while Rosenberg's fees post-intervention should presumably be modest in view of the limited role his counsel will play, the fees incurred pre-intervention are likely to be much more significant. Whatever its motives, then, Redflex has a reasonable basis to challenge Rosenberg's status as "a person bringing the action." Onward, then, to the substance of the motion.

### A. Public Disclosure Bar

The principal issue presented by the defendants' motion is whether the "public disclosure bar" applies to Rosenberg. The City's FCO expressly denies jurisdiction[6] to any court over an action

---

[5] Under the FCO, like the FCA, the share of an award that would otherwise go to a relator may be reduced "if the court finds that the action was brought by a person who planned, initiated or participated in the violation . . . upon which the action was brought . . . ." Ch. Mun. Ord. 1-22-030(d)(4).

[6] Until 2010, the FCA also stated expressly that the public disclosure bar is jurisdictional and the Supreme Court confirmed as much in *Rockwell*. *See* 549 U.S. at 468 ("a clear and explicit *withdrawal* of jurisdiction [undoubtedly] withdraws jurisdiction") (emphasis in original). In 2010, however, Congress amended § 3730(e)(4) and replaced the statement "no court shall have jurisdiction" with "the court shall dismiss an action or claim under this section." In *Cause of Action,* the Seventh Circuit left open the question whether the 2010 amendment to the FCA changed the analysis of whether the public disclosure bar is "jurisdictional," but noted that other

based upon the public disclosure of allegations or transactions . . . in a legislative, administrative, or Inspector General's report, hearing, audit, or investigation, or from the news media, unless the action is brought by the corporation counsel or the person bringing the action is an original source of the information. . . . "[O]riginal source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the city before filing an action under this section which is based on the information.

Chi. Mun. Code § 1-22-030(f).[7] Whether allegations have been publicly disclosed within the meaning of the public disclosure bar, or whether a relator qualifies as an original source, are questions of law. *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009).

Redflex maintains that Rosenberg cannot act as Relator in this case because the bribery scheme alleged in his complaint had already been "publicly disclosed" within the meaning of the

---

circuits that have addressed the issue have concluded that the post-2010 version of the bar is not jurisdictional. 815 F.3d at 271 n.5. The Seventh Circuit has since described the rule as jurisdictional, however, citing *Rockwell* but failing to address the 2010 amendment to the statutory language. *See United States ex rel. Sheet Metal Workers Int'l Assoc., Local Union 20 v. Horning Investments, LLC*, — F.3d —, 2016 WL 3632616, *3 (7th Cir. July 7, 2016). Further complicating the matter, the Seventh Circuit has held that the 2010 amendments to the public disclosure bar are not retroactive. *Id*. at 272 n.6. Thus, in a case where the conduct at issue spans the 2010 amendment, some portion of the claim could be subject to a jurisdictional bar while another would not be. *See Bogina,* 809 F.3d at 368-69 (noting cases that hold that "the pre-2010 version of the statute governs conduct that occurred in that era while the new version governs only more recent conduct"). It is not necessary in this case, however, to work through the puzzles presented by the 2010 amendment to the FCA's "jurisdictional" language, because no similar amendment has been made by the City to its ordinance. The FCO retains its language making the public disclosure bar jurisdictional and, accordingly, the Court will treat it as such.

[7] The definition of "original source" under the FCA was the same until amended in 2010; the FCA now defines an "original source" as someone who "has knowledge that is independent of and materially adds to the publicly disclosed allegations." 31 U.S.C. § 3730(e)(4). The Seventh Circuit has held that the 2010 amendment to the FCA's original source definition clarified rather than changed the meaning of that term. *See United States ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 368 (7th Cir. 2016) (explaining that a source has "direct and independent knowledge" when the source "has knowledge that is independent of and materially adds to the publicly disclosed allegations"). Accordingly, post-amendment case law construing the term, like *Bogina,* remains relevant notwithstanding the lack of a similar amendment to the City's definition. Further, because the Court's ruling is predicated on the absence of voluntary disclosure, a requirement that survived the 2010 amendment to the FCA, the import of the change to the other components of the "original source" definition does not matter.

  
FCO and Rosenberg does not qualify as an original source of the information on which his complaint is based because he did not voluntarily provide information to the City. Rosenberg contends that the details of the red-light bribery scheme disclosed in his complaint had never been publicly disclosed and that in any event he qualifies as an original source of the disclosed allegations because he has personal knowledge of the scheme and voluntarily supplied the information to the City when he met with representatives of the City's OIG on February 4, 2013—well before he filed his complaint and before most of the allegations concerning the DARLEP bribery scheme entered the public domain.

The Seventh Circuit has described the inquiry to determine whether the public disclosure bar applies as "a three-step analysis." *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 274 (7th Cir. 2016). First must be determined whether the allegations in the complaint have been "publicly disclosed" through one of the channels enumerated in the statute. *Id*. If so, it must then be determined whether the relator's lawsuit is "based upon," *i.e.,* whether it is "substantially similar to," those publicly disclosed allegations. *Id*. If it is, the public-disclosure bar precludes the suit unless the relator is an "original source" of the information. *Id*. The first and third steps, however, each require subsidiary inquiries. The public disclosure determination "presents two distinct issues: whether the relevant information was 'placed in the public domain,' and, if so, whether it contained the 'critical elements exposing the transaction as fraudulent.'" *Id.* (quoting *United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003)). As for the original source inquiry, it requires that the source have voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, § 3730(e)(4)(B)(i), or have "direct and independent knowledge of the information on which the

relator's allegations are based[8] (which is to say that the relator's knowledge is both "independent of" and "materially adds to" the publicly disclosed allegations, *Bogina*, 809 F.3d at 368) and that the source have voluntarily provided that information to the City before filing the action, § 3730(e)(4)(B)(ii). *See Cause of Action*, 815 F.3d at 282-83. The would-be relator bears the burden of proof as to all of these inquires. *Id.* at 274; *Glaser*, 570 F.3d at 913. Thus, it is Rosenberg's task to show that he is not subject to the public disclosure bar.

### 1. Public Disclosure

"[A] public disclosure occurs when the critical elements exposing the transaction as fraudulent are placed in the public domain." *Glaser*, 570 F.3d at 913 (internal quotation marks omitted). This is true even if those elements stop short of stating an allegation of fraud expressly or even compelling an inference of fraud; it is enough that the public disclosures raise a possibility of the submission of false claims that would be sufficient to prompt the government to investigate. *Cause of Action*, 815 F.3d at 276 (holding disclosure of "possible improprieties" sufficed for public disclosure bar where information was sufficient to prompt responsible authority to undertake an investigation); *Bogina*, 809 F.3d at 370 (liability where government was previously on notice of "possibility" of alleged kick-back scheme and could have pursued it based on the information it possessed); *Glaser*, 570 F.3d at 909 (government's awareness of "possible improprieties" in defendants billing practices, which had given rise to an investigation, sufficient to invoke public disclosure bar).

Our marker in this analysis is April 15, 2014, the date that Rosenberg filed his complaint. The FCO's public disclosure bar withholds jurisdiction over any suit based upon information that

---

[8] *Rockwell*, 549 U.S. at 470-72 (holding that the phrase "information on which the allegations are based" refers to the information on which the relator's allegations, rather than the publicly disclosed allegations, are based).

was publicly disclosed (as that term is defined) before that date unless the putative relator qualifies as an original source of the information.

There can be no serious dispute that by April 15, 2014, extensive allegations about the DARLEP bribery scheme had been publicly disclosed and that those allegations included information "exposing the transaction as fraudulent." As Redflex's motion details, by that time there had been dozens of articles relating to the scheme and RHI had itself issued press releases and disclosures to the Australian National Stock Exchange detailing the results of its internal investigation.[9] In addition, the City had been conducting an investigation of the scheme since at least mid-October 2012 and the federal government's investigation had been ongoing since sometime in February 2013, at the latest. Given this wealth of information, the central, critical allegations exposing the DARLEP bribery scheme clearly had already entered the public domain by the time Rosenberg filed his complaint.

Rosenberg argues that disclosures by Redflex through the Australian stock exchange releases it issued do not constitute "public disclosures" that implicate the disclosure bar because they are not amount the specifically enumerated types of disclosures identified in the FCO and

---

[9] Redflex's motion presents a factual challenge to jurisdiction, *i.e.,* it contends that "there is in fact no subject matter jurisdiction notwithstanding the adequacy of the pleadings. "In reviewing a factual challenge, the court may look beyond the pleadings and view any evidence submitted to determine if subject matter jurisdiction exists." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). Rosenberg does not dispute the fact of the publication of these articles and releases, and in any event the Court may take judicial notice of the fact of publication and the content of the articles (as distinguished from the truth or accuracy of their content). *See, e.g., Ennenga v. Starns*, 677 F.3d 766, 773–74 (7th Cir. 2012) ("A court may take judicial notice of facts that are (1) not subject to reasonable dispute and (2) either generally known within the territorial jurisdiction or capable of accurate and ready determination through sources whose accuracy cannot be questioned."); *Bardney v. United States*, 151 F.3d 1032 (7th Cir. 1998) ("As it is indisputable that the articles were in fact published, the existence of the articles was a proper subject for judicial notice.").

because foreign disclosures cannot trigger the bar. Section 1-22-030(f) identifies only three types of disclosures that trigger the disclosure bar: (1) a "criminal, civil, or administrative hearing"; (2) "a legislative, administrative, or Inspector General's report, hearing, audit, or investigation"; or (3) "the news media." As for the argument that "foreign" disclosures do not satisfy the enumerated criteria, Rosenberg cites only *United States ex rel. Yannacopolous v. General Dynamics*, 315 F. Supp. 2d 939, 948 (N.D. Ill. 2004) for that proposition, but that case addressed a foreign proceeding under seal—*i.e.,* proceedings that were *not* publicly disclosed.[10] As for the question of whether Redflex's public securities filing satisfies the disclosure criteria, Redflex cites a number of district court decisions holding that securities filings, company press releases, and information available on company web sites are included within the ambit of public disclosures. There is, however, no need to resolve definitively either of these questions in this case. Whether or not the Redflex ASX release was itself a "public disclosure" within the meaning of the FCO, the fact and content of that release were promptly reported by the Chicago Tribune in its March 4, 2013 edition. *That* report unquestionably qualifies as a domestic report by the news media, and so constitutes a public disclosure of the information set forth in the release.

In addition, it also bears noting that Redflex's disclosure of the results of its internal investigation to the City's OIG also constitutes a "public disclosure" of that information under Circuit precedent. The Seventh Circuit has held that because "the purpose of a public disclosure is to alert the responsible authority that fraud may be afoot, the Government's possession of the

---

[10] In *Yannacopolous,* the court's holding was also premised on the notion that, if public disclosure was interpreted to extend to foreign proceedings, a corporation "could avoid FCA prosecution . . . by arguing that a foreign government investigated the matter." 315 F. Supp. 2d at 948. That rationale is not persuasive; the public disclosure bar operates only against would-be relators, not against the government. Disqualification of the relator has no adverse effect on the government's ability to pursue a claim.

information exposing a fraud is alone sufficient to trigger the public-disclosure bar." *Cause of Action*, 815 F.3d at 275 (internal quotation marks omitted). Although "mere governmental awareness of wrongdoing does not mean a public disclosure occurred," *Glaser*, 570 F.3d at 913, disclosure is deemed to have occurred where the government's knowledge is accompanied by efforts to investigate or remedy the fraud. *Cause of Action*, 815 F.3d at 276 (agency's investigation prior to communication from whistleblower constituted public disclosure).[11] Here, there is no dispute that the City was actively investigating the DARLEP contracts based on the Tribune's initial reports in October 2012; Rosenberg acknowledges that he met with the City's investigators and based on the OIG's investigation, the City ultimately terminated its relationship with Redflex. Nor is there a dispute that Redflex shared with the OIG the results of its own investigation by permitting its outside counsel to brief City IG officials on the results of the company's internal investigation. The Lassar affidavit confirms that Sidley Austin disclosed to the City the arrangements by which it was "likely" that Bills had been taking bribes to deliver the red light camera program to RTSI. Thus, that disclosure also constitutes a public disclosure within the meaning of the FCO.

Putting aside the pointless argument concerning the ASX release, Rosenberg does not really contest that there were public disclosures about the bribery scheme before he filed his complaint. Instead, Rosenberg's brief erroneously conflates the questions of whether there was public disclosure and whether the complaint was "based upon" publicly disclosed information, construing both as turning on the question of whether the information alleged in the complaint

---

[11] In *Cause of Action*, the Seventh Circuit considered but did not adopt the view of some other circuits requiring that a "public disclosure" requires, in addition to government knowledge and investigation, "there be some act of disclosure to the public outside of the government." *See* 815 F.3d at 276-277. Even were that rule to apply, in this case there has clearly been, by virtue of the Tribune's extensive press coverage, disclosure outside the government.

was "substantially similar" to information in the public domain. *See, e.g.*, Resp. at 11, ECF 47 ("Because the 'first step' in determining whether the complaint's allegations are substantially similar to the public disclosures has not been met, the Court need not and should not proceed to the 'second step,' *i.e.*, whether the Complaint is actually 'based upon' the publicly disclosed information."). As discussed below, however, the "based upon" inquiry is where the question of substantial similarity fits into the public disclosure bar analysis; "substantial similarity" is not a consideration in identifying the information that was in the public domain before the relator's complaint was filed.

### 2. Suit "based upon" publicly disclosed information

Rosenberg's principal argument is not that there was not information about the bribery scheme in the public domain, but that the information in the public domain was not substantially similar to the information he supplied in his complaint. The public disclosure bar is implicated only where suit is "based upon" allegations that have been publicly disclosed. "[A] lawsuit is based upon publicly disclosed allegations when the relator's allegations and the publicly disclosed allegations are substantially similar." *Glaser*, 570 F.3d at 915.

In arguing that the allegations of his complaint are not substantially similar to the allegations that were in the public domain before he filed his complaint, Rosenberg invokes the Seventh Circuit's warning that care must be taken not to compare FCA claims and publicly disclosed allegations at a level of generality so high that meaningful distinctions between them are obscured. *See, e.g., Leveski v. ITT Educational Servs., Inc.*, 719 F.3d 818, 831 (7th Cir. 2013); *U.S. ex rel Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 936 (7th Cir. 2012). The caution is well-taken but does not help Rosenberg, because his FCO claim and the allegations about the City's DARLEP program that describe the same scheme. Before the filing of the

Rosenberg complaint, the City, its OIG, and the public knew that there was a substantial basis to believe that RTSI had won and expanded its red-light camera contract with the City through the systematic bribery of John Bills, who managed the program for the City. They knew the duration of the scheme, the principal individuals involved, the value of the bribes, and the mechanisms by which the bribes had been paid. They knew that Redflex had acknowledged the bribery scheme and that it implicated a number of the company's senior executives, that the City had barred Redflex from bidding on other projects and from renewing its DARLEP contracts based on the bribery scheme, and that a federal criminal investigation was proceeding. They knew, in short, that the entire history of the City's red-light camera program had been besotted by the corrupt relationship between Bills and RTSI.

Nevertheless, Rosenberg maintains that the information reported by the Tribune, and provided to the OIG by RTSI, lacked the specificity of the information supplied in his complaint. That contention is neither relevant nor accurate. It is not relevant because "substantially similar" does not mean "identical"; nor does "based upon" mean "solely based upon," for a "*qui tam* action even partly based upon publicly disclosed allegations or transactions is nonetheless 'based upon' such allegations or transactions. *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 691 (7th Cir. 2014), citing *Glaser*, 570 F.3d at 920. To clear the substantially similar threshold, a putative relator must present "genuinely new and material information" beyond that which has been publicly disclosed. That means information that expands what is publicly known about the scheme's fraudulent nature, or its scope, objectives, duration, and the like. Anything else, as the

saying goes, "is just details,"[12] and a putative relator "is not allowed to proceed independently if he merely 'adds details' to what is already known in outline." *Bogina*, 806 F.3d at 370.

The Seventh Circuit's cases applying the substantially similar requirement bear this out. *Compare, e.g., Wisconsin Bell, Inc.*, 760 F.3d at 691 (allegations not substantially similar where they provided missing information that allowed inference of fraud to be made); *Leveski*, 719 F.3d at 829-33 (allegations not substantially similar because they spanned an entirely different time period, involved another department, and were based on different violations of applicable regulations); *Goldberg*, 680 F.3d at 935 (allegations not substantially similar because they alleged a different form of deceit), *with Cause of Action*, 815 F.3d at 282 (allegations substantially similar where they pertained to same entity and describe same fraudulent scheme of underreporting deadhead mileage by city buses); *Bogina*, 809 F.3d at 370 (allegations substantially similar where they added only details to a previously alleged kickback scheme such as an additional class of customers who received kickbacks and identified a different Medicare program targeted by the scheme); *U.S. ex rel. Ziebell v. Fox Valley Workforce Development Bd., Inc.*, 806 F.3d 946, 952 (7th Cir. 2015) (allegations substantially similar where relator described same improper practice that state agency had criticized in an audit report); *Glaser*, 570 F.3d at 920 (allegations substantially similar where they pertained to the same entity and described the same fraudulent conduct).[13]

---

[12] *Cf.* Albert Einstein (popularly attributed, but unsourced): "I want to know how God created this world. I'm not interested in this or that phenomenon, in the spectrum of this or that element. I want to know His thoughts, the rest are details."

[13] Rosenberg cites *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565 (9th Cir. 2016) as an example that supports his interpretation of Seventh Circuit precedent, but in that case, the Ninth Circuit reversed the district court's ruling that the public disclosure bar applied to block the relator's suit because it concluded that the complaint alleged fraud "that is different in kind and degree" from previously disclosed information in the public domain. *Id.* at 567. That is simply not the case here. The fraud alleged in the Rosenberg complaint is different in neither

Nor is Rosenberg's contention that the publicly disclosed information concerning the DARLEP bribery scheme lacked the specificity of the information supplied in his complaint accurate. The information within the public domain concerning the bribery scheme was not limited to the broad contours of the scheme. These reports were not, as Rosenberg dismisses them, merely "general questioning of the Redflex/Bills/O'Malley relationship, plus a few purported factual tidbits." They were detailed reports of allegations and information suggesting that millions of dollars were being paid by the City's red-light camera contractor to the City official responsible for overseeing that program.

Indeed, the initial allegations reported by the Tribune in October 2012 were sufficiently detailed and specific that they prompted the City to begin the OIG investigation and Redflex to conduct its own internal investigation. Based on the information that had already been publicly reported in October 2012, the City OIG issued the equivalent of a subpoena to RTSI in October 2012 clearly premised on concern that O'Malley was a conduit for bribe payments to Bills; among other information, the OIG request sought detailed information on O'Malley's work for RTSI, how he came to be hired, who else had been considered for the position, and other information that would be relevant to determine whether his employment by RTSI was bona fide.

The Tribune's reporting, and the OIG's probing, in turn led to RTSI's own internal investigation, conducted by Sidley Austin, the results of which greatly expanded the publicly available information about the bribery scheme. Rosenberg does not dispute that Scott Lassar met with, and provided information to, the OIG but argues that ambiguities in Lassar's affidavit

---

kind nor degree from the information available in the public domain; it relates to precisely the same fraudulent scheme, carried out over the same period, for the same purpose, and involving the same actors. *Mateski* provides no support whatsoever for Rosenberg's argument.

raise questions about the level of detail actually provided to the OIG. The outline of the bribery scheme provided by Sidley Austin, however, was anything but vague and ambiguous, particularly in light of the subsequent statements by Redflex and reports by the Tribune.

If specificity is the measure Rosenberg demands, consider the detail developed through RTSI's internal investigation and subsequently reported by the Tribune. Lassar reported to the OIG that RTSI's internal investigation had confirmed that Bills had initiated a bribery scheme by offering to help RTSI secure the red-light camera contract in exchange for payments from RTSI and that some portion of those payments (which totaled in excess of $2 million) had likely been funneled to Bills through O'Malley, who had been hired by RTSI specifically for that purpose. In addition, Lassar reported that there may have been another conduit for payments to Bills (specifically, Network Electric) and that RTSI had also treated Bills and O'Malley to 17 expensive trips where they stayed in luxury hotels and golfed at the company's expense. Subsequent published reports identified many of the specific individuals responsible for the company's corrupt practices; not only the value, but the timing, of the payments to O'Malley as a conduit for Bills; and the supplementation of those payments with specific lavish travel junkets. The Tribune's reports before the filing of the Rosenberg complaint even culminated in a detailed description of a secret meeting between Bills and RTSI officials, including future RTSI CEO Karen Finley, at which Bills coached RTSI before its bid submission. The article went on to describe Bills' roll in reviewing the DARLEP bids and even the fact that Bills' engineered an unprecedented result: Redflex's bid "received flawless, perfect scores from every committee member in every category." (March 25, 2013).

Rosenberg invites a comparison of the publicly disclosed information about the bribery scheme and the allegations of his complaint, but that analysis demonstrates that the principal

topics discussed in the complaint had been publicly disclosed before the complaint was filed, and that the new information that Rosenberg supplied in his complaint was simply additional detail about the very same bribery scheme with which any regular reader of the Chicago Tribune was already quite familiar:

| *Rosenberg's Complaint "Road Map"* | *"Publicly Disclosed" Information*[14] |
|---|---|
| Bills' "Unlawful Pre-Bid Assistance," including details of meetings addressing particulars of what Redflex needed to do to win the bid (Compl. ¶¶ 24-40) | Tribune, Feb. 21, 2014: "Red light deal tied to secret meeting" in February 2003; Bills "spent two hours coaching us on how to win the contract, telling us how to behave, what things were going to work and what wouldn't," according to another RTSI former employee. Lassar report to OIG: Bills offered assistance to Redflex in return for payments, advising that competitor had clout and Redflex would need his assistance to win the contract. |
| Bills' "Unlawful Assistance with Field Tests" | [no public disclosures of this information identified] |
| Bills' "Unlawful Assistance With Evaluation Process"; "how Bills would get the Chicago Evaluation Committee to unanimously award Redflex the contract" | Tribune, March 25, 2013: Daley administration was warned six years ago about preferential treatment in contract awards relating to red-light camera program; Alderman alleges that the selection of RTSI and subsequent expansions of its contract "contravene open and competitive procurement required by law"; Redflex received perfect scores from every member of selection committee; Bills' listed as a government reference for Redflex while evaluating competing proposals. |
| Redflex's "Entertainment of City Officials" | Tribune articles, including …, March 3, 2013, March 4, 2013, February 21, 2014 reporting information about 17 company-paid trips for Bills including air fare, hotels, rental cars, golf outings, and meals, [super bowl] |
| Redflex's "Payoff to John Bills" including information about payment conduits through a consultant or contractor recommended by Bills (*i.e.*, O'Malley and Network Electric) | Tribune, March 3, 2013: reporting allegations by Redflex exec in 2010 that O'Malley "serves no useful function" and that payments to O'Malley were intended for Bills. Lassar report to OIG: O'Malley and possibly Network Electric were conduits for payments to Bills; Bills suggested using O'Malley. |

---

[14] The sources of information identified here are only illustrative, not exhaustive.

| Rosenberg's Complaint "Road Map" | "Publicly Disclosed" Information[14] |
|---|---|
| Redflex's "Expansion of Original Contract" | Tribune, March 25, 2013: Bills advises ASC that City's contract with Redflex had been made exclusive without notice; bulk of funds paid to O'Malley paid beginning in 2007 when red-light program blossomed. Tribune, February 21, 2014: Bills steered red light contract to RTSI and oversaw its decade long expansion; Bills' corrupt relationship with RTSI "grew a trial project at two Chicago intersections into the largest traffic camera enforcement program in the country." |
| Redflex's "Payoff for Extension of Contract," including payments to Bills through O'Malley through retirement in 2011 | [no public disclosures of this information identified] |
| "Bills' Post-Employment Assistance," including hiring by Resolute Consulting/Traffic Safety Coalition at the request of Redflex | Tribune, March 3, 2013: Bills resigned from the City and took a consulting job with Resolute Consulting, a company funded by Redflex. Tribune, February 8, 2013: same. |
| Involvement and knowledge of senior Redflex executives | Tribune, February 21, 2014: team of five Redflex officials, including future CEO Karen Findley, attended a secret meeting with Bills; "six top Redflex officials were jettisoned" in the wake of the bribery investigation. Tribune, January 23, 2014: Rosenberg files counterclaims asserting that he was "carrying out orders" and that RTSI made him a scapegoat for company's longstanding practice of providing government officials with lavish gifts and bribes." Tribune, March 4, 2013: Redflex internal investigation concludes that executives provided clearly inadequate oversight and "inaccurate and misleading" information to the City in response to initial report of inappropriate relationship between Rosenberg and Bills. Tribune, March 3, 2013: reporting allegations by Redflex executive in 2010 that the "level of insider fraud" at Redflex would "take down the contract" with Chicago. Lassar report to OIG: CEO approved some of the payments to Bills. |

As this comparison reflects, the nature, scope, duration, value and operation of the bribery scheme were included in the public domain before Rosenberg filed his complaint. The

only aspects of the scheme that Rosenberg identified that did not appear in public reports prior to the filing of the complaint are some of the details about how Bills actually ensured RTSI would win and expand its contracts with the City (though a great deal of detail about the operation of the scheme was also in the public domain before Rosenberg filed his complaint). None of the press reports, for example, include specific information about how Bills rigged field evaluations to favor RTSI. But that sort of information is mere detail; it adds nothing to the basic story that Redflex was bribing Bills, through payments funneled through O'Malley and the provision of lavish junkets, to secure and grow its red-light camera business in the City. The Rosenberg complaint simply did not reveal any information that added any new allegations or transactions that were involved in the DARLEP bribery scheme; the fraudulent nature of the relationship between RTSI and Bills had been known for a year and a half when Rosenberg filed his complaint, and his pleading did not expand the scope, objectives, or other fundamental aspects of the scheme.

Perhaps for that reason, Rosenberg also insists that "he is the source of the detailed information in the Complaint." Resp. at 12, ECF 47. Even assuming that claim to be true (and there seems little reason to doubt it, given Rosenberg's undisputed participation in the bribery scheme), it is misplaced in the context of considering whether the complaint is "based upon"— that is, "substantially similar"—to information in the public domain. In asserting this point, Rosenberg again confuses and conflates the distinct steps of the public disclosure bar analysis. What Rosenberg seeks to do is establish that his own knowledge was not based upon publicly disclosed information, but that fact is relevant only to the question of whether Rosenberg qualifies as an "original source" of the information in the complaint; the Seventh Circuit has ruled that it has no bearing on the question of whether the complaint is "based upon" publicly

disclosed information. *Glaser*, 570 F.3d at 916-17 (rejecting dictionary definition of "based upon").

### 3. Original Source

Because the allegations and transactions in the Rosenberg complaint are based upon—that is, substantially similar to—information that was within the public domain, Rosenberg may act as relator only if he qualifies as an "original source" of the information. "[O]riginal source means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the city before filing an action under this section which is based on the information." Chic. Mun. Ord. 1-22-030(f). Redflex does not meaningfully argue that Rosenberg does not have "direct and independent knowledge" of the bribery scheme (how could it when it contends that Rosenberg orchestrated the scheme?). Instead, Redflex contends that Rosenberg does not qualify as an original source because he did not disclose information about the DARLEP bribery scheme voluntarily, but only after investigations by the City and by federal law enforcement authorities were under way. Whether Rosenberg qualifies as an original source, then, turns on two related questions, one factual and one legal: whether Rosenberg provided information to the City only in the course of its investigation and whether that fact counts for anything in assessing whether his disclosures to the City were "voluntary" for purposes of the original source rule.

To begin, it is only Rosenberg's disclosures to the City that are relevant to the original source inquiry. That is because this case involves the City's False Claim ordinance, not the federal False Claims Act. Per the definition of "original source," the voluntary disclosure must have been made "to the city"; there is no basis to conclude that a voluntary disclosure to the federal government would qualify one as an original source of information on which a claim

under the municipal ordinance was based. Moreover, although Redflex emphasizes that Rosenberg obtained immunity from criminal prosecution from the U.S. Attorney in exchange for his disclosure of information in the federal criminal investigation, it is undisputed that the U.S. Attorney had not granted Rosenberg immunity before Rosenberg met with City OIG on Feb. 4, 2013. Because that meeting predated the federal grant of immunity, Rosenberg's subsequent disclosures to the federal government are irrelevant to the question of whether he is an original source.

Rosenberg's submissions omit any discussion of how or when the initial contact between the OIG and Rosenberg's counsel was made. Rosenberg's narrative begins with his counsel's averment that in a call with representatives of the City's OIG on January 17, 2013, he reported that Rosenberg "intended to fully cooperate in providing them with information regarding Redflex's relationship with the City," and would "voluntarily submit to an interview with them." Williams Aff. ¶ 3. The date for an interview was subsequently arranged, and Rosenberg met with the City's OIG representatives on February 4, 2013, in Williams' office in California. In the days leading up to the interview, OIG sent Rosenberg and Williams a copy of an "Advisement" which informed Rosenberg, among other things, that "this interview is part of an official investigation"; that he had "a duty to cooperate with the [OIG]"; and that his statements, and any evidence identified based on his statements, could not be used against him in a criminal proceeding. Williams' affidavit attests that Rosenberg did not seek such an "Advisement" or condition his participation in the interview on any protection or condition expressed in the Advisement.

Redflex maintains that the disclosures Rosenberg made during the meeting with the OIG were not voluntary because the information was provided in the context of the City's investigation: "Rosenberg waited for almost a decade to reveal information about the alleged

31

bribery scheme to the government. When he finally disclosed certain information about what he knew, he did so in an interview in connection with an already pending investigation." And at the time, the City maintains, Rosenberg—still at that time an employee of a City contractor—was under a legal duty—*see* Chicago Mun. Ord. § 2-56-090—to cooperate with the City's investigation relating to malfeasance in connection with that contract, a fact that further undermines Rosenberg's contention that he provided information to the City voluntarily.

Although the Seventh Circuit has not addressed the question (at least so far as the parties or the Court have been able to determine), other courts have affirmed the position that providing information to government investigators in response to their investigative efforts does not qualify as "voluntarily" providing information within the context of a *qui tam* suit, for the simple reason that the purpose of a *qui tam* statute is "to encourage private individuals who are aware of fraud against the government to bring such information forward at the earliest possible time and to discourage persons with relevant information from remaining silent." *United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 704 (8th Cir. 1995). In light of that objective, in *Barth*, the Eighth Circuit held that the relator had not voluntarily disclosed information to the government when he provided information requested by a government investigator who had contacted him. Rewarding individuals for sitting on information for years before finally offering it up at the instance of a government investigator, the circuit court concluded, "is outside the intent of the Act." *Id.* Consistent with this view, the Third Circuit held in *United States ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 340-41 (3d Cir. 2005) that a putative relator does not, consistent with the policy underlying *qui tam* actions, "voluntarily" provide information to the government where the government has identified the putative relator as being involved in the fraudulent activity and has initiated contact with a subpoena demanding information fundamental to the

putative relator's action, even where the relator ultimately provided more information than the subpoena sought. *See also, e.g., Prather v. AT&T,* 996 F. Supp. 2d 861, 870 (N.D. Cal. 2013) (relator who provided information only in response to request from representative of the Attorney General did not voluntarily disclose the information).

The logic of these cases is compelling and Rosenberg offers no contrary argument or authority; indeed, his briefs (which include a surreply) barely address the issue of the voluntariness of his disclosures to the City. Rosenberg devotes what little attention he pays to this issue to arguing that he didn't condition his participation in the interview on receipt of any legal protections, but he does not claim that he initiated the contact with the OIG or dispute that the format under which he disclosed information to the OIG was an interview (to which he "submitted") conducted by government officials as part of an investigation by the City. Nor, of course, can Rosenberg dispute that although he had knowledge of the bribery scheme for many years (by virtue of his direct participation in that scheme), he did not disclose information about that scheme until the City had launched its investigation. In light of these undisputed facts, it can only be concluded that Rosenberg disclosed information to the City only after he had been exposed and even then only in response to the City's initiative. As the *Barth* and *Paranich* courts concluded, one who sits on information about fraudulent conduct for years and coughs it up only when the government comes knocking does not qualify as an "original source" of information about that fraud because such a disclosure cannot be considered voluntary. To hold otherwise would substantially undermine the efficacy of the incentives *qui tam* statutes offer.

Because the Rosenberg complaint was based on publicly disclosed information and Rosenberg is not an original source of the information in the complaint, the motion pursuant to Rule 12(b)(1) to dismiss Rosenberg from this case for lack of jurisdiction is granted.

### B. False Statements vs. False Claims

Rosenberg styled his original claim as a *qui tam* action on behalf of the City under the FCO. Redflex asserts, however, that Rosenberg's claim is actually a claim under the City's False ***Statements*** Act, not the False ***Claims*** Act, and moves pursuant to Rule 12(b)(6) to dismiss Rosenberg's claim on that basis because the City's False Statements Act does not authorize *qui tam* suits while the FCO does. RTSI argues that Rosenberg's theory of liability is premised not on the submission of ***claims*** for payment that are themselves false, but rather on ***statements*** that were false in the EDS's that RTSI was required to sign as a condition of contracting with the City.

The City's False Statements ordinance finds no parallel in the FCA. It prohibits a "false statement of material fact to the city" and includes statements of material fact "made in connection with a bid, proposal, contract or economic disclosure statement of affidavit." By negative implication, RTSI argues, that sort of false statement lies outside the ambit of the falsehoods prohibited by the City's False Claims ordinance, which prohibits only false statements "to get a false or fraudulent claim paid or approved by the city." RTSI acknowledges that under the federal FCA, "statement" is construed broadly to reach statements that foreseeably cause or facilitate later false claims, but according to RTSI, the City's False Statements Act would be superfluous if the FCO were interpreted as broadly as the FCA. Although the City did not take a position on Redflex's argument with respect to the application of the public disclosure bar, it filed a "position paper" disputing Rosenberg's take on the interplay between the City's

two statutes, arguing that Redflex's interpretation is overly narrow and conflicts with federal false claim law.[15]

There is, however, no need to resolve this dispute—at least at present. Whether Rosenberg remains the relator or not, his complaint was superseded by the First Amended Complaint filed by the City when it intervened in this suit. Rosenberg's FCO claim is therefore a nullity. And although the City's amended complaint also asserts a claim based on the FCO, there is, as the City points out, no challenge pending to that claim. Redflex answered that claim (and all the others asserted in the FAC) rather than asserting that there is no valid FCO claim, so there is no present challenge to Count 1 of the FAC. Consistently, Redflex's brief expressly states that Redflex's motion does not seek dismissal of any of the causes of action set forth in the City's FAC. Accordingly, to the extent that Redflex's motion targets the FCO claim set forth in the Rosenberg complaint, it is denied as moot. And there being no challenge to the FCO claim set forth in the FAC, the Court leaves to another day the question of whether the existence of the FSA has any implications for the scope of the FCO.

\*     \*     \*

Dated: August 8, 2016

_____
John J. Tharp, Jr.
United States District Judge

---

[15] The parties briefed this issue before the Supreme Court issued its opinion in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S.—, 136 S. Ct. 1989 (2016), holding that the "implied certification" theory presents a valid basis for liability under the FCA where a request for payment includes specific representations about the goods or services provided and the failure to disclose noncompliance with material statutory, regulatory, or contractual requirements renders the representations misleading, *id*. at 2001, and that such resulting misrepresentation be material to the government's payment decision, *id*. at 2003-2004.